# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE RELAFEN ANTITRUST LITIGATION | ) ) ) ) | Master File No. 01-CV-12239-WGY |
| THIS DOCUMENT RELATES TO END-PAYOR ACTIONS: | ) ) ) ) | |
| *Lynch v. SmithKline Beecham Corp.* | ) ) | No. 02-CV-10163-WGY |
| *A.F. of L. - AGC Building Trades Welfare Plan v. SmithKline Beecham Corp.* | ) ) ) | No. 02-CV-10205-WGY |
| *Twin Cities Bakery Workers Health & Welfare Fund v. SmithKline Beecham Corp.* | ) ) ) ) | No. 02-CV-985 (E.D. Pa.) |
| *Houchins v. SmithKline Beecham Corp.* | ) ) | No. 02-CV-10424-WGY |
| *Teamsters Local No. 35 Health Plans v. SmithKline Beecham Corp.* | ) ) ) | No. 02-CV-10487-WGY |
| *Smithfield Foods, Inc. v. SmithKline Beecham Corp.* | ) ) ) | No. 02-CV-10589-WGY |
| *Franklin v. SmithKline Beecham Corp.* | ) ) | No. 02-CV-10671-WGY |
| *Fox v. SmithKline Beecham Corp.* | ) ) | No. 02-CV-11543-WGY |
| *Kravitz v. SmithKline Beecham Corp.* | ) ) | No. 02-CV-11806-WGY |

## FOURTH AMENDED STIPULATION AND AGREEMENT OF SETTLEMENT

This Fourth Amended Stipulation and Agreement of Settlement (the "Stipulation") is

submitted pursuant to Rule 23 of the Federal Rules of Civil Procedure. Subject to the approval

of the Court, this Stipulation is entered into between and among (i) Plaintiffs on behalf of

themselves and the Class (as hereinafter defined) (the "End-Payor Plaintiffs") and (ii)

Defendants GlaxoSmithKline PLC, SmithKline Beecham Corporation, d/b/a GlaxoSmithKline,

48993

Beecham Group PLC, and SmithKline Beecham, PLC. (collectively "GSK" or "Defendants"), by and through their respective counsel.

WHEREAS, there is pending in the United States District Court for the District of Massachusetts a consolidated and coordinated proceeding comprised of actions, including the above-captioned End-Payor Class Actions, in which the End-Payor Plaintiffs have alleged, *inter alia*, that GSK unlawfully obtained its patent on Relafen through fraud on the United States Patent and Trademark Office and excluded generic competition through sham patent litigation against generic manufacturers, all in violation of Section 2 of the Sherman Act and numerous state laws;

WHEREAS, Defendants have asserted a number of defenses to the claims by the End-Payor Plaintiffs;

WHEREAS, the End-Payor Plaintiffs and Defendants agree that this Stipulation shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Defendants or of the truth of any of the claims or allegations alleged in the End-Payor Class Actions or actions consolidated therewith;

WHEREAS, End-Payor Lead Counsel have concluded, after extensive discovery and investigation of the facts and after carefully considering the circumstances of the End-Payor Class Actions, including the claims asserted in the complaints filed in the End-Payor Class Actions and the possible legal and factual defenses thereto, that it would be in the best interests of the End-Payor Class to enter into this Stipulation in order to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the End-Payor Class; and, further, that End-Payor Lead Counsel consider the settlement set forth herein to be fair, reasonable and adequate and in the best interests of the End-Payor Plaintiffs and all putative members of the End-Payor Class;

WHEREAS, the End-Payor Class is comprised of (i) third-party payor purchasers ("TPPs") as defined below, and (ii) individual consumers ("Consumers"), who purchased Relafen or its generic equivalent from September 1, 1998 through June 30, 2003 (the "Class Period");

WHEREAS, a group of End-Payor health plans ("Settling Health Plans," "SHPs"or "SHP Group"), who have represented that the SHP Group made at least 25% of the total TPP purchases of Relafen and its generic equivalent during the Class Period, elected to opt-out of the End-Payor Class and have executed a separate settlement agreement with Defendants;

WHEREAS, the settlement between the SHP Group and Defendants requires a coordination of the claims administration process for the End-Payor Class and the SHP Group;

WHEREAS, the SHP Group asserted that as an opt-out from the End-Payor Class it has no obligation to pay for costs and expenses of litigation and class notice and claims administration, including attorney fees to Class Counsel, and Class Counsel contended that even though the SHP Group is entitled to opt-out from the End-Payor Class, under the circumstances of this case the SHP Group is obligated to pay for a portion of the costs and expenses;

WHEREAS, the SHP Group and End-Payor Lead Counsel have reached an agreement regarding the SHP's payment of costs and expenses of litigation and class notice and claims administration, including attorney fees;

WHEREAS, Defendants, through their counsel, and the End-Payor Plaintiffs, through the End-Payor Lead Counsel, after months of vigorous, arms'-length negotiations, have conditionally agreed to payment by Defendants of Seventy-Five Million Dollars ($75,000,000) minus the SHP Group Initial Payment (as defined herein) to settle the End-Payor Class Actions;

WHEREAS, Consumer Counsel and Third-Party Payor Counsel appointed by End-Payor Lead Counsel engaged in vigorous arms'-length negotiations to apportion the Settlement Fund

between Consumer and TPP members of the End-Payor Class, and reached agreement to apportion Twenty-Five Million Dollars ($25,000,000) of the principal amount of the Settlement Fund to Consumers (the "Consumer Settlement Pool"), and Fifty Million Dollars ($50,000,000) of the principal amount of the Settlement Fund minus the SHP Group Initial Payment (as defined herein) to TPPs (the "TPP Settlement Pool");

WHEREAS, separate and independent counsel, appointed by lead counsel, representing Group I States and Group II States (as defined herein) and the other states, have engaged in vigorous and arms-length negotiation in order to determine the relative weight to be given to claims by Consumers and TPPs in their respective Groups or states and to establish minimum payment amounts to Consumers in their respective Groups or state: and

WHEREAS, Defendants, despite their belief that they have good defenses to the claims asserted against them in the End-Payor Class Actions, have nevertheless agreed to enter into this Stipulation to reduce and avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, and thereby to put to rest this controversy with respect to the End-Payor Class;

NOW, THEREFORE, it is agreed by and between the undersigned on behalf of Defendants and the End-Payor Plaintiffs that the End-Payor Class Actions and all claims of the End-Payor Class be settled, compromised and dismissed on the merits and with prejudice and, except as hereafter provided, without costs as to End-Payor Plaintiffs or Defendants, subject to the approval of the Court, on the following terms and conditions:

1.     <u>Class Definition</u>. Subject to the Court's approval, and for the purposes of this

Stipulation only, the undersigned agree and consent to the certification of the following End-

Payor Class in the End-Payor Class Actions (or to subclasses thereof[1] as approved by the Court):

> All persons or entities in the United States who purchased Relafen and/or its
> generic alternatives (known as nabumetone) during the period of September 1,
> 1998 through June 30, 2003 for consumption by themselves, their families,
> members, employees, insureds, participants, or beneficiaries.  Excluded from the
> class are governmental entities (provided, however, a government entity is
> included only to the extent it makes prescription drug purchases as part of a health
> benefit plan for its employees); Defendants and their officers, directors,
> management, employees, subsidiaries, and affiliates; persons or entities who
> purchased Relafen or its generic alternatives for purposes of resale; any person or
> entity whose only purchase(s) of Relafen were made directly from Defendants or
> its affiliates and/or whose only purchases of generic nabumetone were made
> directly from the manufacturer thereof; and persons or entities who suffered no
> economic harm as a result of Defendants' alleged conduct (the "End-Payor
> Class").

2.     <u>Definitions</u>. As used in this Stipulation, the following terms shall have the

indicated meanings:

(a)     "Class Period" means September 1, 1998 through June 30, 2003,

inclusive.

(b)     "Consumer" means any person falling within the definition of the End-

Payor Class defined in Paragraph 1 who is a natural person and not a TPP.

(c)     "Consumer Class Member" means Consumers who are not End-Payor

Opt-Outs.

(d)     "Court" means the Honorable William G. Young, or if he is unavailable,

another judge of the United States District Court for the District of Massachusetts.

---

[1] Potential separate sub-classes contemplated by the parties include separate classes for Group I States, Group II States, the State of Hawaii, the State of New York, the State of New Mexico, and the States of Florida, Maine, Michigan, Minnesota, North Carolina and North Dakota.

48993

(e)    "Defendants" means GlaxoSmithKline PLC, SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, Beecham Group PLC, and SmithKline Beecham, PLC.

(f)    "End-Payor Class Actions" means the consolidated claims of End-Payor Class Members in *In Re Relafen Antitrust Litigation*, Master File No. 01-12239-WGY (D. Mass.).

(g)    "End-Payor Class Member" means any person or entity falling within the definition of the End-Payor Class defined in Paragraph 1 above other than (a) any End-Payor Opt-Outs and (b) the members of the SHP Group.

(h)    "End-Payor Counsel" means all attorneys and law firms that have appeared in the End-Payor Class Actions on behalf of an End-Payor Plaintiff.

(i)    "End-Payor Lead Counsel" means the law firms of Heins Mills & Olson, P.L.C.; Milberg Weiss Bershad & Schulman LLP; Miller Faucher and Cafferty LLP; Spector Roseman & Kodroff PC.; and End-Payor Class Liaison Counsel Hagens Berman LLP.

(j)    "End-Payor Opt-Out" means any person or entity, with the exception of the members of the SHP Group, falling within the definition of the End-Payor Class who timely and validly submits a request for exclusion from the End-Payor Class in accordance with the procedures set forth in the Settlement Notice.

(k)    "End-Payor Plaintiffs" means the named plaintiffs in the Consolidated Class Action Complaint on behalf of Nationwide End-Payor Class, as filed with the Court.

(l)    "Escrow Account" means the account established pursuant to Paragraph 9 herein.

48993                                          6

(m)    "Group I States" means the District of Columbia, and the states of Arizona, California, Illinois, Iowa, Massachusetts, Nebraska, Nevada, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

(n)    "Group II States" means the territories of the United States and the states of Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Montana, Missouri, New Hampshire, New Jersey, Ohio, Oregon, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Virginia, Washington and Wyoming.

(o)    "GSK" means GlaxoSmithKline PLC, SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, Beecham Group PLC, and SmithKline Beecham, PLC.

(p)    "Nabumetone" shall mean Relafen and all AB-rated generic bioequivalent versions of Relafen.

(q)    "Nabumetone Purchases" means payments made for generic nabumetone prescriptions filled at United States pharmacies (including mail order pharmacies) during the Class Period.  For the purposes of this Stipulation, a TPP purchased generic nabumetone if it paid the pharmacy or reimbursed the individual consumer for all or any part of the purchase price; persons and entities "purchased" generic nabumetone if they paid some or all of the purchase price except if the payment for generic nabumetone was a flat co-payment by a Consumer under a health insurance, employee benefit or similar plan where the plan provided for the same flat co-payment for brand-name and generic prescription drug purchases; and "Nabumetone Purchases" does not include any purchase of generic nabumetone directly from the manufacturer thereof.

48993                                                        7

(r)     "Net Nabumetone Purchases" means the total amount of a Consumer claimant's Nabumetone Purchases less the total dollar amounts of reimbursements received as a result of Nabumetone Purchases. For purposes of calculating the Net Nabumentone Purchases made in a particular state, a purchase is considered to be made by a Consumer in the state in which he or she resided at the time of the purchase.

(s)     "Net Relafen Purchases" means the total amount of a Consumer claimant's Relafen Purchases less the total dollar amounts of reimbursements received as a result of Relafen Purchases. For purposes of calculating the Net Relafen Purchases made in a particular state, a purchase is considered to be made by a Consumer in the state in which he or she resided at the time of the purchase.

(t)     "Recognized Consumer Claim" means, subject to any modification of the Court, the total of:

(1)     ninety percent (90%) of all Net Relafen Purchases and Net Nabumetone Purchases made by the Consumer claimant during the Class Period in the state of Hawaii;

(2)     plus eighty-two and one half percent (82.5%) of all Net Relafen Purchases and Net Nabumetone Purchases made by the Consumer claimant during the Class Period in Group I States;

(3)     plus nine and two-tenths percent (9.2%) of all Net Relafen Purchases made by the Consumer claimant during the Class Period in Group II States;

(4)    plus sixty percent (60%) of all Net Relafen Purchases and Net Nabumetone Purchases made by the Consumer claimant during the Class Period in the states of Florida, Maine, Michigan, Minnesota, North Carolina and North Dakota;

(5)    plus fifty-two and one half percent (52.5%) of all Net Relafen Purchases and Net Nabumetone Purchases made by the Consumer claimant during the Class Period in the state of New York;

(6)    plus eighty-five percent (85%) of all Net Relafen Purchases and Net Nabumetone Purchases made by the Consumer claimant during the Class Period in the state of New Mexico.

(u)    "Recognized TPP claim" means, subject to any modification of the Court, the total of:

(1)    forty-five percent (45%) of all Relafen Purchases and Nabumetone Purchases made by the TPP claimant during the Class Period in the state of Hawaii;

(2)    plus forty-one and one quarter percent (41.25%) of all Relafen Purchases and Nabumetone Purchases made by the TPP claimant during the Class Period in Group I States and by the State Employee and Retiree Health and Welfare Benefits Program for the State of Maryland;

(3)    plus four and sixth tenths percent (4.6%) of all Relafen Purchases made by the TPP claimant during the Class Period in Group II states;

(4)    plus thirty percent (30%) of all Relafen Purchases and Nabumetone Purchases made by the TPP claimant during the Class Period in the states of Florida, Maine, Michigan, Minnesota, North Carolina and North Dakota;

48993                                        9

   (5)  plus twenty-six and one quarter percent (26.25%) of all Relafen

Purchases and Nabumetone Purchases made by the TPP claimant during the Class

Period in the state of New York;

   (6)  plus forty-two and one half percent (42.50%) of all Relafen

Purchases and Nabumetone Purchases made by the TPP claimant during the Class

Period in the state of New Mexico.

For purposes of calculating the Relafen Purchases and Nabumetone Purchases made in a

particular state, a purchase is considered to be made by the TPP in the state where the

prescription was filled, or if a TPP reimburses for a patient's purchase made by mail order, the

state in which the patient resides.

   (v)  "Relafen" shall mean the prescription drug nabumetone sold under the

trademark Relafen®.

   (w)  "Relafen Purchases" means payments made for Relafen prescriptions

filled at United States pharmacies (including mail order pharmacies) during the Class Period.

For the purposes of this Stipulation, a TPP purchased Relafen if it paid the pharmacy or

reimbursed the individual consumer for all or any part of the purchase price; persons and

entities "purchased" Relafen if they paid some or all of the purchase price except if the payment

for Relafen was a flat co-payment by a Consumer under a health insurance, employee benefit or

similar plan where the plan provided for the same flat co-payment for brand-name and generic

prescription drug purchases; and "Relafen Purchases" does not include any purchase of Relafen

directly from GSK.

   (x)  "Releasees" means the Defendants and their present and former direct

and indirect parents, subsidiaries, divisions, partners and affiliates, and their respective present

and former stockholders, officers, directors, employees, managers, agents, attorneys and any of

48993         10

their legal representatives, and the predecessors, successors, heirs, executors, trustees, administrators and assigns of each of the foregoing. As used in this Paragraph, "affiliates" means entities controlling, controlled by or under common control with a Releasee.

(y)     "Released Claims" has the meaning ascribed to it in Paragraphs 18 and 19 herein.

(z)     "Releasors" means each End-Payor Class Member, including, (1) a Consumer Class Member, the Consumer Class Member's successors, heirs, executors, trustees, administrators and assigns and (2) a TPP Class Member, including  any self-funded benefit plans for which the TPP, as a third party administrator, provides prescription drug benefit services, as well as the TPP Class Member's respective present and former direct and indirect parents, subsidiaries, divisions, partners and affiliates, their respective present and former stockholders, officers, directors, employees, managers, agents, attorneys and legal representatives, and any predecessors, successors, heirs, executors, trustees, administrators and assigns of each of the foregoing, all in their capacities as such.  As used in this Paragraph, "affiliates" means entities controlling, controlled by or under common control with a Releasor.

(aa)    "Settlement Fund" or "Settlement Amount" means the sum of Seventy-Five Million Dollars ($75,000,000), minus the SHP Group Initial Payment, that GSK shall pay into the Escrow Account, plus all interest or other income that accrues thereon.  The Settlement Fund shall be allocated into the "TPP Settlement Pool" and the "Consumer Settlement Pool" as provided for in Paragraph 9.

(bb)    "Settlement Notice" means the Notice of Pendency and Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Hearing substantially in the form annexed hereto as Exhibit 1 to Exhibit A and the Summary Notice for publication

48993

11

annexed hereto as Exhibit 2 to Exhibit A, as modified in accordance with the Court's rulings with respect to the motion for preliminary approval.

(cc)    "SHP Group" means the Settling Health Plans identified on Exhibit D to this Stipulation, together witih all self-funded healthcare plans and/or entities for whom they provide prescription drug benefit services as a third-party administrator.

(dd)    "SHP Group Counsel" means the law firms of Lowey Dannenberg Bemporad & Selinger, P.C. and Rawlings & Associates.

(ee)    "SHP Group Actual Recognized Claim Percentage" or "SHPRCP" means the total Recognized TPP Claim amount of all members of the SHP Group (as calculated in accordance with this Stipulation as though SHP members had not excluded themselves from the End-Payor Class) as a percentage of the total of all Recognized TPP Claims of (a) all TPPs who file acceptable claims, (b) all members of the SHP Group and (c) all TPP End-Payor Opt-Outs for which GSK receives a refund pursuant to Paragraph 11 hereof.

(ff)    "SHP Group Escrow Amount" means twenty percent (20%) of the SHP Group Initial Payment, or $1,600,000.00, which GSK shall require SHP Group Counsel, upon receipt of the SHP Group Initial Payment on behalf of the SHP Group, to retain in the attorney escrow account of Lowey Dannenberg Bemporad & Selinger, P.C. (the "SHP Group Escrow Account") and disburse such funds only in accordance with  Paragraph 12 of this Stipulation. GSK shall also provide in its agreement with the SHP Group that End-Payor Lead Counsel may enforce payment from the SHP Group Escrow Account in accordance with Paragraph 12 of this Stipulation.

(gg)    "SHP Group Reversion Amount" means an amount calculated (after all TPP claims have been processed and the total Recognized TPP Claim amounts for all TPP Authorized Claimants and all SHP Group members have been determined) as follows: The SHP Group Reversion Amount due to or from SHPs is the "TPP Class Distributable Amount" times the "SHP Tru-up Percentage" minus the "QP Differential," where:

i)    the "TPP Class Distributable Amount" is the amount of $50 million, less the SHP Group Initial Payment, less costs and expenses, including attorneys' fees, the Group II Cy  Pres Award attributable to the TPP Pool, and any incentive awards, all as deducted from the TPP Settlement Pool in accordance with Paragraph 17 below, less any refund paid to GSK pursuant to Paragraph 11 below, plus the "QP Differential;"

ii)    the "QP Differential," which may be a positive or negative number, is the SHP Group Initial Payment minus the amount which is the lesser of (a) Fifteen Million Dollars ($15,000,000) or (b) sixty percent (60%) of the SHPRCP (as defined in paragraph 2(dd) above) times Fifty Million Dollars ($50,000,000); and

iii)    the "SHP Tru-up Percentage" is the SHPRCP times 40%.

[Sample calculations of the SHP Group Reversion Amount are attached hereto as Exhibit D, and incorporated herein.]

(hh)    "SHP Group Initial Payment" means $8,000,000.00.

(ii)    "AF Differential" means, if End-Payor Counsel's Attorneys' Fees are awarded as a percentage of the End-Payor Class' recovery, then the "AF Differential" is the difference between (1) the amount of attorneys' fees payable to End-Payor Counsel as a percentage of the $75 million Settlement Amount, as reduced by the SHP Group Initial Payment and any modification of the Settlement Amount for opt-outs as provided under Paragraph 11 below (the "Gross TPP Recovery"), before any adjustment for the QP Differential; and (2) the

amount of attorneys' fees payable as a percentage of the Gross TPP Recovery adjusted for the QP Differential.  The AF Differential is calculated as the fee percentage awarded by the Court to End-Payor Counsel times the QP Differential.  If the QP Differential is a negative number, the AF Differential is the amount by which End-Payor Counsel's fee award is reduced.  If the QP Differential is a positive number, the SHP AF Differential is the amount by which End-Payor Counsel's fee award is increased.

(ff)    "Third-Party Payor" or "TPP" means a third party which was at risk, by contract, to pay all or part of the purchase price for Relafen and/or generic nabumetone prescriptions filled in the United States for individual beneficiaries of the TPP's drug coverage. A claim may be made pursuant to this Stipulation on behalf of a TPP Class Member by an agent thereof, including the third-party administrator of the TPP Class Member's prescription drug benefit plan, if the TPP Class Member authorizes the agent to make such a claim.

(gg)    "TPP Class Members" means those entities falling within the definition of the End-Payor Class defined in Paragraph 1 above, excluding Consumers,  members of the SHP Group or any TPP End-Payor Opt-Outs.

(hh)    "United States" means the United States of America including its states, commonwealths, territories and possessions.

3.    <u>Reasonable Best Efforts to Effectuate This Stipulation</u>.  The parties and their counsel agree to use their reasonable best efforts, including all steps and efforts contemplated by this Stipulation and any other steps and efforts that may be necessary or appropriate, by order of the Court or otherwise, to carry out the terms of this Stipulation.

4.      Motion for Preliminary Approval.  Concurrent with the submission of this Stipulation for consideration by the Court, Lead End-Payor Counsel shall submit to the Court a motion for preliminary approval of the settlement set forth in this Stipulation, and requesting entry of the Preliminary Approval Order substantially in the form annexed hereto as Exhibit A.

5.      Notice to End-Payor Class. In the event the Court preliminarily approves the settlement set forth in this Stipulation, End-Payor Lead Counsel shall, in accordance with Rule 23 of the Federal Rules of Civil Procedure and the Preliminary Approval Order, provide all those members of the End-Payor Class with the best notice practicable under the circumstances, as ordered by the Court, in the form annexed hereto as Exhibit 2 to Exhibit A, or as otherwise ordered by the Court, and by publication on the web site established by End-Payor Lead Counsel or the Claims Administrator.

6.      Entry of Final Judgment.  If, after the Settlement Fairness Hearing scheduled by the Court in the Preliminary Approval Order, the Court approves this Stipulation, then counsel for the parties shall request that the Court enter an Order and Final Judgment substantially in the form annexed hereto as Exhibit B.

7.      Effective Date. The Effective Date of Settlement shall be the date when all the following shall have occurred:

(a)      entry of the Preliminary Approval Order substantially in the form annexed hereto as Exhibit A, or entry of a Preliminary Approval Order not substantially in the form of annexed hereto with respect to which neither party invokes its termination rights within the period prescribed in Paragraph 8 below;

(b)      final approval by the Court of the Settlement, following notice to the End-Payor Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure; and

(c)      entry by the Court of an Order and Final Judgment, substantially in the form set forth in Exhibit B annexed hereto, and the expiration of any time for appeal or review of such Order and Final Judgment, or, if any appeal is filed and not dismissed, after such Order and Final Judgment is upheld on appeal in all material respects and is no longer subject to review upon appeal or review by writ of certiorari, or, in the event that the Court enters an order and final judgment in form other than that provided above ("Alternative Judgment") and none of the parties hereto elect to terminate this Settlement as permitted by Paragraph 8, the date that such Alternative Judgment becomes final and no longer subject to appeal or review.

8.      Notice of Termination.  Defendants' Counsel and End-Payor Lead Counsel shall each have the right to terminate the Settlement and this Stipulation by providing written notice of their election to do so ("Termination Notice") to all other parties hereto within thirty (30) days of:  (a) the Court declining to enter the Preliminary Approval Order substantially in the form annexed hereto as Exhibit A; (b) the Court's refusal to approve this Stipulation or any material part of it; (c) the Court declining to enter the Order and Final Judgment substantially in the form annexed hereto as Exhibit B; (d) the date upon which the Order and Final Judgment is modified or reversed in any material respect by the Court of Appeals or the Supreme Court; or (e) the date upon which an Alternative Judgment is modified or reversed in any material respect by the Court of Appeals or the Supreme Court.  A modification at any stage or reversal on appeal of (1) any amount of End-Payer Counsel fees and expenses requested by End-Payor Lead Counsel from the Settlement Fund, (2) the amount of incentive fees to be awarded to End-Payor Class representatives or (3) the proposed plan of distribution set forth in Paragraph 17 of this

Stipulation shall not constitute a material change that would entitle a party to terminate the Settlement pursuant to this paragraph.  If End-Payor Opt-Outs, other than Consumers, with an aggregate share of the overcharge damages exceeding a certain amount (as specified and calculated pursuant to the terms of a Supplemental Agreement between the parties) exclude themselves from the Class, GSK shall also be entitled to terminate the Settlement and this Stipulation pursuant to the terms of said Supplemental Agreement.  Should the Court decline to certify a class or classes encompassing all fifty states and the District of Columbia, GSK will likewise be entitled to terminate the settlement.

9.      <u>Settlement Consideration</u>. Subject to the provisions hereof, and in full, complete and final settlement of the End-Payor Class Actions as provided herein, the parties recognize that GSK has transferred Seventy-Five Million Dollars ($75,000,000) minus the SHP Group Initial Payment, or Sixty-Seven Million Dollars ($67,000,000) into an Escrow Account designated by the End-Payor Lead Counsel.  The Escrow Account shall be established and administered pursuant to an Escrow Agreement substantially in the form annexed hereto as <u>Exhibit C</u>.  Upon receipt of the Settlement Amount, $42,000,000.00 shall be segregated in an account for the TPP Settlement Pool and $25,000,000.00 shall be segregated into an account for the Consumer Settlement Pool.  The TPP Settlement Pool and the Consumer Settlement Pool shall be invested by the Escrow Agent (as defined in the Escrow Agreement) in short term United States Agency or Treasury Securities (or a mutual fund invested solely in such instruments) or other similar short-term United States government obligations, and any interest earned thereon shall become part of the respective TPP Settlement Pool and the Consumer Settlement Pool.  GSK's transfer of the Settlement Amount to the Escrow Account (and the transfer of the SHP Group Reversion Amount by GSK to the TPP Settlement Pool (if required by Paragraph 12 of the Stipulation) shall satisfy GSK's obligation to make payments under this Stipulation.  GSK shall not have any

liabilities, obligations or responsibilities with respect to the investment, payment, disposition or distribution of the Settlement Fund after such transfers.

10.     Qualified Settlement Fund. The Escrow Account is intended by the parties hereto to be treated as a single "qualified settlement fund" for federal income tax purposes pursuant to Treas. Reg. § 1.468B-1, and to that end the parties hereto shall cooperate with each other and shall not take a position in any filing or before any tax authority that is inconsistent with such treatment.  Whether or not final approval of this settlement has occurred, and whether or not the Escrow Account qualifies as a qualified settlement fund within the meaning of Treas. Reg. § 1.468B-1, the Escrow Agent shall cause to be paid from the Escrow Account any taxes or estimated taxes due on any income earned on the funds in the Escrow Account and all related costs and expenses.  The parties elect that the Escrow Account should be treated as a qualified settlement fund from the earliest possible date and agree to make any "relation back" election that may be available.  If amounts received by the End-Payor Class Members, or by GSK upon any refund or other reversion, are construed to be income, it is the recipient's sole responsibility to pay taxes on the amount construed to be income, plus any penalties or interest.

11.     Modification of the Settlement Fund.   In the event there are any TPP End-Payor Opt-Outs from the End-Payor Class, other than members of the SHP Group, that validly and timely request exclusion from the End-Payor Class settlement, GSK shall be entitled to a refund from the TPP Settlement Pool in an amount equal to $50 million times a percentage derived by dividing the amount of such Opt-Out's Recognized TPP Claim by the total of all Recognized TPP claims of (a) all TPP Class Members who file acceptable claims (b) all members of the SHP Group and (c) any other TPP End-Payor Opt-Outs.   In the event there are any Consumer End-Payor Opt-Outs that validly and timely request exclusion from the End-Payor Class Settlement, GSK shall be entitled to a refund in an amount equal to the number of Consumer End-Payor Opt-

Outs times the applicable minimum payment approved by the Court pursuant to Paragraph 17 for

Consumer Class Member(s) if he or she had otherwise remained in the Class. A refund under this

Paragraph shall also include any net income attributable to such amount.  Upon receipt of any

refund under this paragraph, thirty percent (30%)of the total refund due GSK pursuant to this

Paragraph resulting from both Consumer and TPP End-Payor Opt-Outs, other than the SHP

Group, shall be retained in escrow by Counsel for GSK (the "Refund Escrow") for a period of

two years.  GSK shall notify End-Payor Lead Counsel of any settlement between GSK and an

End Payor Opt-Out within ten days of execution of any settlement agreement between GSK and

an End Payor Opt-Out.  Within ten (10) days of  (1) notification by GSK of such settlement or

(2) the payment of the refund to GSK pursuant to this Paragraph, whichever is later, End-Payor

Lead Counsel shall submit to the Court a motion for costs and expenses, including attorneys'

fees, with respect to any portion of the refund amount paid to GSK that is attributable to an End-

Payor Opt-Out with whom GSK has reached a settlement.  The Court's decision on the motion

by End-Payor Lead Counsel shall be final and non-appealable and GSK shall distribute monies

from the Refund Escrow  in accordance with the Court's decision.

For purposes of implementation of this Stipulation, including Paragraph 8 and this

Paragraph 11, a TPP Opt-Out will be requested in the TPP Notice of Exclusion to provide its

Relafen and Nabumetone Purchases information for each individual state and the District of

Columbia during the Class Period.  If the TPP Opt-Out does not provide such information as part

of its TPP Notice of Exclusion, or if additional information is needed by the parties hereto or the

Claims Administrator from any TPP Opt-Out to implement this Paragraph or any other provision

of this Stipulation, the parties shall cooperate to obtain such information from the Opt-Out,

including, but not limited to, seeking an order of the Court to obtain such information.  End-

Payor Lead Counsel shall in the first instance calculate any refund due under this Paragraph.  If

GSK disputes the refund amount, or if GSK or End-Payor Lead Counsel disputes the application

of any provision of the supplemental agreement referred to in Paragraph 8 or if GSK or End-

Payor Lead Counsel, in the absence of sufficient Relafen and Nabumetone Purchases or other

information from an Opt-Out, are unable to determine the amount of the refund and, therefore, a

dispute exists regarding the refund, the parties shall attempt to informally resolve any such

dispute.  As part of any attempt to resolve such dispute, the Claims Administrator, upon request

by GSK, shall provide GSK with claims information and data necessary for GSK to evaluate the

validity of the refund calculation.  The parties agree promptly to submit any such unresolved

disputes to the Court, and the Court's decision shall be final and the parties waive any right to

appeal.  Any refund provided for in this Paragraph with respect to TPP End-Payor Opt-Outs shall

be paid from the TPP Settlement Pool, and any refund under this Paragraph with respect to

Consumer End-Payor Opt-Outs shall be paid from the Consumer Settlement Pool in accordance

with Paragraph 17.

      12.    <u>SHP Group Reversion Amount and Requirements</u>.

      (a)    On or before the deadline set for End-Payor Class Members to file claims

pursuant to this Stipulation, GSK shall submit to End-Payor Lead Counsel the following

material to be supplied to GSK by SHP Group Counsel:

      (1)    SHP Group Counsel's computation of the aggregate SHP Group

Recognized TPP Claims;

      (2)    computer reports provided by each member of the SHP Group

("SHP Member") summarizing the Relafen and Nabumetone Purchases and Recognized TPP

Claim (calculated as provided herein) for that SHP Member; and

(3)    a declaration made by a duly authorized employee of each SHP

Member certifying:

(i)    the employee's authority to submit a claim on behalf of

the SHP Member;

(ii)    the SHP Member's actual authority to settle the claims

asserted in the End-Payor Class Actions as to all of its Relafen and Nabumetone Purchases and

to release all claims related to such purchases;

(iii)    the total dollar amount of the Relafen and Nabumetone

Purchases by the SHP Member in Group I States;

(iv)    the total dollar amount of the Nabumetone

Purchases by the SHP Member in Group II States and the total dollar amount of Relafen and

Nabumetone Purchases made in each of the following states: Hawaii, Florida, Maine,

Michigan, Minnesota, North Carolina, North Dakota, New Mexico and New York;

(v)    the identity of each entity on whose behalf the SHP

Member is authorized to act by name and by the Federal Employer Identification Number

assigned to such entity by the United States Internal Revenue Service;

(vi)    that the SHP Member and each entity on whose

behalf the SHP Member is authorized to act waives any right it may have to receive any

distribution as a TPP Class Member under this Stipulation; and

(vii)        that the SHP Member has been represented, by Lowey Dannenberg Bemporad & Selinger, P.C. or Rawlings & Associates, P.L.L.C., for claims arising from its Relafen and Nabumetone Purchases.

(b)      Representations and Warranties.  It is understood that GSK, in submitting the information and data required by this paragraph to End-Payor Lead Counsel, is acting as a conduit only.  GSK makes no representations or warranties to End-Payor Class Counsel or to the End-Payor Class as to the accuracy of the information or data submitted.

(c)      Effect of Failure of an SHP Member to Submit Claim Documentation. To verify the accuracy of claim information and to prevent duplication of claims, the Claims Administrator may request additional information from SHP members as deemed appropriate by the Claims Administrator.  GSK shall set forth in its agreement with the SHP Group that SHP members will provide additional information to the Claims Administrator as requested. The calculation of the SHP Group Reversion Amount shall not include Recognized TPP Claims of any SHP Member that fails timely to submit the above claim documentation or additional claims documentation requested by the Claims Administrator.

(d)      Confidentiality. All claim documentation submitted by SHP Members pursuant to Paragraph 12 hereof shall be kept confidential and may be used or disclosed only for the purpose of effectuating this Stipulation, including disclosure to the Claims Administrator, GSK, End-Payor Counsel and the Court.  Adequate steps shall be taken to protect against unlawful disclosure of confidential patient identification information, if any is included in such claim documentation.

(e)      SHP Group Reversion Amount Computation.

48993                                    22

(1)     <u>Notice of Proposed Computation.</u>  At least thirty-five (35) days prior to any distribution of the Net TPP Settlement Pool under Paragraph 17(b)(vii) to TPP Class Members, End-Payor Lead Counsel shall provide SHP Group Counsel, with a copy to GSK, the proposed computation of the SHP Group Reversion Amount payment, including a list reflecting the Claims Administrator's determination of the amount of the SHP Group Members' Relafen and Nabumetone Purchases.  Such computation will become binding upon  the SHP Group and GSK unless within ten (10) business days of receipt of the computation SHP Group Counsel disputes the amount of the proposed SHP Group Reversion Amount payment in writing to End-Payor Lead Counsel with a copy to GSK.  In the event of such dispute, SHP Group Counsel may request and receive from End-Payor Lead Counsel a list of the TPP Class Members who have the 50 largest aggregate claims approved by the Claims Administrator and the amount of such claims (the "TPP List").  The TPP List shall be held in confidence by SHP Group Counsel, will be provided for attorney's eyes only, and shall not be provided or shared with any other person, including any member of the SHP Group or another TPP.  SHP Group Counsel shall be entitled to show the list to a single third party consultant who is not employed by any TPP, and who agrees in writing to be bound by the same confidentiality as SHP Group Counsel, solely for purposes of dispute resolution under this paragraph.  Other than the TPP List, the SHP Group and the SHP Group Counsel shall not be entitled to any other information collected or generated by the Claims Administrator or End-Payor Counsel, except to the extent permitted by the Court in a proceeding under subparagraph (d)(2) below.

(2)     <u>Dispute Procedure</u>. The End-Payor Lead Counsel, the SHP Group and GSK shall attempt to resolve any disputes raised pursuant to this Paragraph through good faith negotiations.  If the dispute cannot be informally resolved, it shall be submitted to the Court

for resolution.  The Court's resolution of a dispute under this Paragraph shall be final and all parties waive any right to appeal.

(f)     Payment of SHP Group Reversion Amount.

(1)     SHP Group Reversion Amount Payment. On or before five (5) days after the Effective Date, or within five (5) days of any resolution of a dispute under paragraph 12(d) above, or within five (5) days after all TPP claims have been processed and the total recognized claim amounts for all TPP authorized claimants and all SHP Group members have been finally determined, whichever is later, the parties shall cause the payment of the SHP Group Reversion Amount to be made as follows:

(i)     If the SHP Group Reversion Amount is a positive number, End-Payor Lead Counsel shall cause the Escrow Agent to pay GSK from the TPP Settlement Pool an amount equal to the SHP Group Reversion Amount and SHP Group Counsel may release the SHP Group Escrow Amount to SHP Group Members; or

(ii)     If the SHP Group Reversion Amount is a negative number, SHP Group Counsel shall cause payment to be made from the SHP Group Escrow Account to the TPP Settlement Pool in an amount equal to the SHP Group Reversion Amount provided, however, that such payment shall not exceed the SHP Group Escrow Amount

(iii)     If the SHP Group, pursuant to Paragraph B.4. of the separate Settlement Agreement between GSK and the SHP Group, exercises its option to have SHP Group Counsel pay the SHPs the  SHP Escrow Amount in lieu of any

further obligations or rights under that Settlement Agreement, the SHP Group
shall not be entitled to any SHP Group Reversion Amount, and no such Amount
shall be calculated or paid by End-Payor Lead Counsel and the provisions of this
Stipulation concerning the SHP Group Reversion Amount shall be of no effect.

(iv)     Under no circumstances shall GSK be liable for collective payment
in excess of the $75,000,000 transferred pursuant to Paragraph 9 and pursuant to
GSK's settlement agreement with the SHP Group, regardless of the outcome of
any disputes pursuant to Paragraph 12(d) or the calculation of the SHP Group
Reversion Amount pursuant to this paragraph.

(2)     AF Differential Payments. Within five (5) days after the payment
made under subparagraph (f)(1) above, End-Payor Lead Counsel and the Escrow Agent shall
cause the payment of the AF Differential to be made as follows:

(i)     If the QP Differential was a negative number, then End-Payor
Lead Counsel shall, if they have already received the fee award for End-Payor
Counsel, pay the AF Differential into the TPP Pool (or counsel's fee award shall
be reduced by the AF Differential if the fee award has not been paid); or

(ii)     If the QP Differential was a positive number, then the Escrow
Agent shall pay the AF Differential to End-Payor Class Lead Counsel if counsel
have already received the fee award for End-Payor Counsel (or counsel's fee
award shall be increased by the AF Differential if the fee award has not been
paid).

(g)     Conformance of GSK/SHP Agreement with this Stipulation. Any
provisions of this Stipulation, including the provisions of Paragraphs 2(dd), 5 and this

Paragraph 12, requiring the cooperation of the SHP Group or binding the SHP Group to act

shall be set forth as a binding requirement of the SHP Group in the separate Settlement

Agreement between GSK and the SHP Group.

(h)    The parties hereto agree that GSK's on-going involvement in transferring

payments or data or the resolution of disputes pursuant to Paragraph 12 of this Stipulation is

merely ministerial.  GSK bears no responsibility or liability for the accuracy of the data or

representations transferred or the calculations performed pursuant to this paragraph.  Members of

the End-Payor Class covenant not to sue GSK based on any claim or cause of action related to or

arising out of an allegation that data or representations provided under this paragraph are not

accurate or related to or arising out of a dispute between the SHP Group and the End-Payor Class

as to the accuracy of any of the calculations or allocation of funds under this Stipulation.

13.    Attorneys' Fees.  Understanding that the award of attorneys' fees for End-Payor

Counsel is a matter committed to the sole discretion of the Court, Defendants will not object to

End-Payor Counsel's request to this Court for a reasonable attorneys' fee not to exceed the sum

of thirty-three and one-third percent (33-1/3%) of the Settlement Fund.

14.    All Claims Satisfied by Settlement Fund. Each End-Payor Class Member shall

look solely to the Settlement Fund for settlement and satisfaction, as provided herein, of all

Released Claims.

15.    Payment of Expenses. The Defendants shall not be liable for any of the expenses

of the litigation of the End-Payor Class Actions, including without limitation attorneys' fees, fees

and expenses associated with the provision of notice to the members of the End-Payor Class, and

claims administration, fees and expenses incurred in administering the Escrow Account and the

Settlement Fund, fees and expenses of expert witnesses and consultants, and expenses associated

with discovery, motion practice, hearings before the Court and appeals, except as provided in Paragraph 21 below. All such fees and expenses as are approved by the Court shall be paid out of the Settlement Fund in accordance with this Stipulation.

16.   <u>Court Approval of Disbursements and Distributions</u>. Court approval shall be required prior to any disbursement or any distribution from the Settlement Fund, other than for any fees and expenses incurred to administer the Escrow Account and the Settlement Fund under the Escrow Agreement, taxes on the Settlement Fund or a refund to GSK pursuant to Paragraph 11.

17.   <u>Disbursements and Distributions from the Settlement Fund</u>. The Settlement Fund shall be distributed as follows or as otherwise ordered by the Court:

(a)   Prior to the Effective Date of this Stipulation:

(i)   Any fees and expenses incurred in administering the Escrow Account and the Settlement Fund shall be paid pursuant to the Escrow Agreement. The costs of notice and claim administration of the Settlement shall be paid by the Escrow Agent to the Claims Administrator as approved by the Court and at the direction of End-Payor Lead Counsel with notice of such payments provided to counsel for GSK. Such fees, expenses and costs referred to in this Paragraph 17(a)(i) shall be paid one-third (1/3) from the Consumer Settlement Pool and two-thirds (2/3) from the TPP Settlement Pool;

(ii)   Disbursements for the payment of any taxes (including any estimated taxes, interest or penalties) due, as a result of income earned by the Settlement Funds shall be made promptly by the Escrow Agent pursuant to the Escrow Agreement with notice of such disbursements provided to the End-Payor Lead Counsel and GSK. Such costs

shall be paid ratably from the Consumer Settlement Pool and the TPP Settlement Pool in proportion to the income earned in each such pool; and

(iii)    Any attorneys' fees and litigation expenses awarded by the Court to End-Payor Counsel shall be paid to End-Payor Lead Counsel for distribution to End-Payor Counsel.  Unless otherwise ordered by the Court, such attorneys' fees as are awarded by the Court shall be paid from the Consumer Settlement Pool and the TPP Settlement Pool in proportion to the total of the amounts deposited into the two Pools, less any amounts returned to GSK from the Consumer Settlement Pool or the TPP Settlement Pool, respectively, under Paragraph 11 above.  Unless otherwise ordered by the Court, such litigation expenses as are awarded by the Court shall be paid one-third (1/3) from the Consumer Settlement Pool and two-thirds (2/3) from the TPP Settlement Pool.  Notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the settlement or any part thereof, any attorneys' fees and litigation expenses awarded by the Court shall be paid promptly after entry of the order awarding such fees and expenses, subject to End-Payor Lead Counsel's obligation to make appropriate refunds or repayments to the Settlement Fund, if any, plus accrued interest at the same rate as is earned by the Settlement Fund, if and when, (a) as a result of any appeal and/or further proceedings on remand, or successful collateral attack, the fee or expense award is reduced or reversed, (b) there is a payment of a refund to GSK pursuant to Paragraph 11, from which attorneys fees have previously been calculated, or (c) the settlement is terminated pursuant to Paragraph 8 of this Stipulation.

(b)    After the Effective Date of this Stipulation the Settlement Fund shall be distributed as follows:

(i)     First, any remaining fees or expenses incurred in connection with the administration of the Escrow Account and the Settlement Fund shall be paid pursuant to the Escrow Agreement, and to the extent, if any, the reasonable fees and expenses incurred as part of notice and claims administration of the Settlement have not been paid, such fees and expenses shall be distributed to the Claims Administrator by the Escrow Agent with notice of such disbursements provided to the End-Payor Lead Counsel.  Such fees, expenses and costs shall be paid one-third (1/3) from the Consumer Settlement Pool and two-thirds (2/3) from the TPP Settlement Pool;

(ii)    Second, disbursements for the payment of any taxes (including any estimated taxes, interest or penalties) due as a result of income earned by the Settlement Fund shall be made promptly by the Escrow Agent pursuant to the Escrow Agreement with notice of such disbursements provided to the End-Payor Lead Counsel.  Such costs shall be paid ratably from the Consumer Settlement Pool and the TPP Settlement Pool in proportion to the income earned in the two pools;

(iii)   Third, any incentive award determined by the Court for services rendered to the End-Payor Class by the End-Payor Plaintiffs shall be distributed to the End-Payor Plaintiffs.  Any incentive award for a TPP End-Payor Plaintiff shall be paid from the TPP Settlement Pool and any incentive award to a Consumer End-Payor Plaintiff shall be paid from the Consumer Settlement Pool;

(iv)    Fourth, payment to GSK of any refund attributable to a Consumer or TPP Opt-Out under Paragraph 11, subject to the Refund Escrow provided for in Paragraph 11.  Any such refund shall be deducted from the Consumer Settlement Pool or the TPP Settlement Pool, respectively.

48993

(v)     Fifth, the sum of Five Hundred Thousand Dollars ($500,000.00) shall be awarded, as a *cy pres* distribution for the benefit of Consumers and TPPs in Group II States (the "Group II *Cy Pres* Award.")  The recipient(s) of the Group II *Cy Pres* Award shall be determined by the Court.  In the case of more than one recipient of the Group II *Cy Pres* Award, the Court shall also determine the total amount to be received by each recipient.  The Group II Cy Pres Award shall be paid one-third (1/3) from the Consumer Settlement Pool and two-thirds (2/3) from the TPP Settlement Pool.

(vi)     Sixth, the balance of the Consumer Settlement Pool after deducting the above fees, expenses, costs, Group II *Cy Pres* Award and any refund attributable to Consumer End-Payor Opt-Outs as set forth in Paragraph 17(a) and (b) (the "Net Consumer Settlement Pool"), shall be payable to Consumer Members of the Class who submit Proofs of Claim that are accepted by the Claims Administrator and approved by the Court ("Authorized Consumer Claimants").  If sufficient funds are available in the Net Consumer Settlement Pool and subject to Court approval, a single minimum payment shall be paid to an Authorized Consumer Claimant in the amount set forth below based on the state in which the Authorized Consumer Claimant is considered to have purchased Relafen and/or Nabumetone in accordance with Paragraph 2 (r) of this Stipulation:

(1)     Hawaii: $100

(2)     Group I states: $55

(3)     Florida, Maine, Michigan, Minnesota, North Carolina and North Dakota:  $40

(4)     New York:  $35

(5)     New Mexico:  $75

48993

30

If an Authorized Consumer Claimant made Relafen and/or Nabumetone Purchases in more than one state that are accepted by the Claims Administrator and approved by the Court, the minimum payment shall be the greater of the above amounts based on the states in which the purchases were made. In the event that the Net Consumer Settlement Pool is less than or equal to One Hundred Fifty percent (150%) of the total Recognized Consumer Claims of all Authorized Consumer Claimants (including the minimum payment in the amount set forth herein), the Authorized Consumer Claimants shall be paid the balance of the Net Consumer Settlement Pool in proportion to their Recognized Claims subject to the minimum payment provided for herein. In the event that the Net Consumer Settlement Pool is greater than One Hundred Fifty percent (150%) of the total Recognized Consumer Claims of all Authorized Consumer Claimants (including the minimum payment in the amount set forth herein), the Authorized Consumer Claimants shall be paid One Hundred Fifty percent (150%) of the full amount of their Recognized Claims (or the minimum amount as set forth herein) and the disposition of the balance of the Net Consumer Settlement Pool remaining after such payments shall be determined by the Court on the motion of End-Payor Lead Counsel. If the amount of the Net Consumer Settlement Pool is not sufficient to pay each Authorized Consumer Claimant his or her minimum amount as set forth herein, then each Authorized Consumer Claimant shall be paid their pro rata share of the claimants' Recognized Consumer Claim, subject to any minimum payment(s) established by the Court. The provisions set forth in this subparagraph (vi) for the distribution of the balance of the Net Consumer Settlement Pool shall apply to Consumers with Relafen Purchases made in Group II States only if the Authorized Consumer Claimant's Recognized Consumer Claim equals or exceeds twenty dollars ($20.00).

48993

31

(vii)    Seventh, any SHP Group Reversion Amount and any SHP AF Differential shall be paid from or to the TPP Settlement Pool as provided in paragraph 12(e) above;

(viii)    Eighth, the balance of the TPP Settlement Pool after the payments of fees, expenses, costs, the Group II *Cy Pres* Award and any refund attributable to TPP End-Payor Opt-Outs as set forth in Paragraph 17(a) and (b) (the "Net TPP Settlement Pool"), shall be payable to TPP Members of the Class who submit Proofs of Claim that are accepted by the Claims Administrator and approved by the Court ("Authorized TPP Claimants"). In the event that the Net TPP Settlement Pool is less than or equal to One Hundred Fifty percent (150%) of the total Recognized TPP Claims of all Authorized TPP Claimants, the Authorized TPP Claimants shall be paid the balance of the Net TPP Settlement Pool in proportion to their Recognized Claims. In the event that the Net TPP Settlement Pool is greater than One Hundred Fifty percent (150%) of the total Recognized TPP Claims of all Authorized TPP Claimants, the Authorized TPP Claimants shall be paid One Hundred Fifty percent (150%) of the full amount of their Recognized Claims and disposition of the balance of the Net TPP Settlement Pool remaining after such payment shall be determined by the Court on the motion of End-Payor Lead Counsel.

The provisions set forth in this subparagraph (viii) for the distribution of the balance of the Net TPP Settlement Pool shall apply to TPPs with Relafen Purchases made in Group II States only if the Authorized TPP Claimant's Recognized TPP Claim equals or exceeds twenty dollars ($20.00).

In the event that End-Payor Lead Counsel make a motion under this Paragraph 17(b)(vi) or (viii) for distribution of the balance of either the TPP or Consumer Net Settlement Pool, if any suggested recipients of such funds include persons or entities other than Consumers or TPP Class

48993                                     32

Members, the motion papers shall include a description of each such proposed recipient not to exceed three pages in length per recipient.

      18.   <u>Releases</u>.

          (a)     Upon the Effective Date of this Stipulation in accordance with Paragraphs 7 and 8, Defendants and their present and former direct and indirect parents, subsidiaries, divisions, partners and affiliates, and their respective present and former stockholders, officers, directors, employees, managers, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, trustees, successors and assigns of each of the foregoing) (the "Releasees") shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that End-Payor Plaintiffs or any member or members of the End-Payor Class who have not timely excluded themselves from the End-Payor Class Actions (as used throughout this Paragraph 18, references to the "Class" "members of the Class" or "End-Payor Class Members" includes any of their past, present or future officers, directors, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such), whether or not they object to the settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, arising out of any conduct, events or transactions, prior to the date hereof, alleged or which could have been alleged in the End-Payor Class Actions relating to the marketing, sale, manufacture, pricing or purchase of, or the enforcement of intellectual property related to, the drug Relafen or any form of Nabumetone

48993

(the "Released Claims"). Each member of the Class hereby covenants and agrees that it shall

not, hereafter, seek to establish liability against any Releasee based, in whole or in part, on any

of the Released Claims.

       (b)     In addition, each End-Payor Class Member hereby expressly waives and

release, upon the Settlement Agreement becoming effective, any and all provisions, rights and

benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 15.42. <u>General Release; extent</u>. A general release does not extend to
> claims which the creditor does not know or suspect to exist in his favor at the time
> of executing the release, which if known by him must have materially affected his
> settlement with the debtor;

or by any law or any state or territory of the United States, or principle of common law, which is

similar, comparable or equivalent to § 1542 of the California Civil Code. Each End-Payor Class

Member may hereafter discover facts other than or different from those which he, she or it

knows or believes to be true with respect to the claims which are the subject matter of this

Paragraph 18, but each End-Payor Class Member hereby expressly waives and fully, finally and

forever settles and releases, upon this Stipulation becoming effective, any known or unknown,

suspected or unsuspected, contingent or non-contingent Released Claims with respect to the

subject matter of the provision of this Paragraph 18 whether or not concealed or hidden, without

regard to the subsequent discovery or existence of such different or additional facts. Each End-

Payor Class Member also hereby expressly waives and fully, finally and forever settles and

releases any and all Released Claims it may have against Defendants under § 17200, *et seq.*, of

the California Business and Professions Code, which claims are expressly incorporated into this

Paragraph 18.

19.    <u>Reservation of Claims</u>.  Notwithstanding the above, the End-Payor Class Members intend by this Stipulation to settle with and release only the Releasees that such Class members have released pursuant to Paragraph 18, and the parties do not intend this Stipulation, any part hereof or any other aspect of the proposed settlement or release, to release or otherwise affect in any way any rights an End-Payor Class Member has or may have against any other party or entity whatsoever other than the Released Parties with respect to the Released Claims pursuant to Paragraph 18.  In addition, the releases set forth in Paragraph 18 shall not release any claims arising in the ordinary course of business between End-Payor Class Members and the Released Parties concerning product liability, breach of contract, breach of warranty, or personal injury.  Furthermore, the releases set forth in Paragraph 18 shall not act as release of any claim End-Payor Class Members have or may have as a class member in the putative class action captioned *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, pending in the United States District Court for the District of Massachusetts, or any related claim that End-Payor Class Members have or may have as a Class Member Opt-Out or otherwise apart from such putative class action, or any litigation alleging similar claims; provided, however, that in such litigation GSK preserves its right to assert that any recovery by the End-Payor Class Member in such litigation related to the drug Relafen should be set-off by one End-Payor Class Member's pro rata share of the Settlement Fund.  Moreover, the releases set forth in Paragraph 18 shall only apply to a governmental entity's purchases of Relafen or nabumetone made by the governmental entity as part of a health benefit plan for its employees and the releases in Paragraph 18 shall not act as a release of any claim the governmental entity has or may have with respect to any other purchases of Relafen or nabumetone by the governmental entity, including the marketing, sale, manufacture, pricing, or enforcement of intellectual property related to the governmental entity's other purchases of Relafen or nabumetone.

48993                                           35

20.    <u>Preservation of Rights</u>.  The parties hereto agree that this Stipulation, whether or not the Effective Date occurs, and any and all negotiations, documents and discussions associated with it shall be without prejudice to the rights of any party; shall not be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by Defendants or of the truth of any of the claims or allegations contained in the complaint or any other pleading; and evidence thereof shall not be discoverable or used directly or indirectly by the End-Payor Class or any third party, in any way (except that the provisions of this Stipulation may be used by the parties to enforce the provisions of the Stipulation), whether in the End-Payor Class Actions or in any other action or proceeding.  The parties expressly reserve all their rights if this Stipulation does not become final substantially in accordance with the terms of this Stipulation.

21.    <u>Termination</u>.  If this Stipulation is terminated pursuant to Paragraph 8 hereto, or the Effective Date is prevented from occurring for any reason, then (a) the Settlement Fund, together with any accrued income, shall be returned to GSK net of (i) taxes paid or due to be paid on the Settlement Fund, (ii) the fees and costs paid or incurred for notice and administration of the Settlement, (iii) any fees or costs paid or incurred for administration of the Escrow Account and Settlement Fund and (iv) any SHP Group Reversion Amount or opt-out refund previously repaid to GSK pursuant to Paragraph 11; (b) the Stipulation shall be of no force or effect, except for payment of notice and administrative fees and costs or refund as referenced herein from the Settlement Fund; (c) any release pursuant hereto shall be of no force or effect; and (d) the parties shall request that the Court vacate any order certifying the End-Payor Class.  The parties expressly reserve all of their rights if this Stipulation is terminated or does not become final.

22.    <u>No Admission</u>. Nothing in this Stipulation shall be construed as an admission in any action or proceeding of any kind whatsoever, civil, criminal or otherwise, before any court,

administrative agency, regulatory body or any other body or authority present or future, by

Defendants including, without limitation, that Defendants have engaged in any conduct or

practice that violates any antitrust statute, unfair and deceptive trade practices statute or other

law.  Neither this Stipulation, nor any negotiations preceding it, nor any proceedings undertaken

in accordance with the terms set forth herein, shall be construed as or deemed to be evidence of

or an admission or concession by Defendants as to the validity of any claim that End-Payor

Plaintiffs or the End-Payor Class have or could have asserted against them or as to any liability

by them, which liability is hereby expressly denied and disclaimed by Defendants.  Neither this

Stipulation, nor any of its provisions, nor any statement or document made or filed in connection

herewith nor the fact of this Stipulation, shall be filed, offered, received in evidence or otherwise

used in any action or proceeding or any arbitration, except in connection with the parties'

application for approval or enforcement of this Stipulation and all proceedings incident thereto,

including requests for attorneys' fees, costs and disbursements and compensation to the End-

Payor Class.

23.    <u>Stay and Resumption of Proceedings</u>. The parties agree, subject to approval of the

Court, that all proceedings in this litigation, other than proceedings relating to the settlement

contemplated herein (including but not limited to providing Notice of the Pendency of this action

as a class action), shall be stayed except to the extent discovery is necessary with respect to the

amount of Nabumetone Purchases or other information regarding End-Payor Opt-Outs,

information necessary to effectuate notice to Class Members and for purposes of administering

and consummating this Stipulation.  In the event that this Stipulation is not approved by the

Court or the settlement is terminated or the Effective Date is prevented from occurring, all such

stayed proceedings will resume in the End-Payor Class Actions in a reasonable manner to be

approved by the Court.

24.     <u>Consent to Jurisdiction</u>. Defendants and End-Payor Plaintiffs hereby irrevocably submit to the exclusive jurisdiction of the Court only for the specific purpose of any suit, action, proceeding or dispute arising out of or relating to this Stipulation or the applicability of this Stipulation.

25.     <u>Resolution of Disputes: Retention of Jurisdiction</u>. Any disputes between or among Defendants and any End-Payor Class Members concerning matters contained in this Stipulation shall, if they cannot be resolved by negotiation and agreement, be submitted to the Court.  The Court shall retain jurisdiction over the implementation and enforcement of this Stipulation.

26.     <u>Enforcement of Stipulation</u>. Notwithstanding Paragraph 20 above, this Stipulation may be pleaded as a full and complete defense to any action, suit or other proceeding that has been or may be instituted, prosecuted or attempted with respect to any of the Released Claims and may be filed, offered and received into evidence and otherwise used for such defense.

27.     <u>Binding Effect</u>. This Stipulation shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto.

28.     <u>Authorization to Enter Stipulation</u>. The undersigned representatives of Defendants represent that they are fully authorized to enter into and to execute this Stipulation on behalf of the Defendants.  End-Payor Lead Counsel represent that they are fully authorized to conduct settlement negotiations with defense counsel on behalf of the End-Payor Plaintiffs and to enter into, and to execute, this Stipulation on behalf of the End-Payor Class, subject to Court approval pursuant to Fed. R. Civ. P. 23(e).

29.     <u>No Party Is the Drafter</u>. None of the parties hereto shall be considered to be the drafter of this Stipulation or any provision hereof for the purpose of any statute, case law or rule

48993

of construction that would or might cause any provision to be construed against the drafter hereof.

30.    Choice of Law. All terms of this Stipulation shall be governed by and interpreted according to the substantive laws of the Commonwealth of Pennsylvania without regard to its choice of law or conflict of laws principles.

31.    Amendment or Waiver. This Stipulation shall not be modified in any respect except by a writing executed by all the parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving party.  The waiver by any party of any breach of this Stipulation shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, of this Stipulation.

32.    Execution in Counterparts. This Stipulation may be executed in counterparts. Facsimile signatures shall be considered as valid signatures as of the date thereof, although the original signature pages shall thereafter be appended to this Stipulation and filed with the Court.

33.    Integrated Agreement. This Stipulation, including the exhibits hereto and the Supplemental Agreement, contains an entire, complete, and integrated statement of each and every term and provision agreed to by and between the parties hereto.

34.    Construction. This Stipulation shall be construed and interpreted to effectuate the intent of the parties, which is to provide, through this Stipulation, for a complete resolution of the Released Claims with respect to the Releasees.

48993                                    39

IN WITNESS WHEREOF, the parties hereto, through their fully authorized representatives, have executed this Stipulation as of the date first herein above written.

Dated:  November 17, 2004

Assented and agreed by and among:

**DECHERT LLP**

By:  _Christine C L_____

Christine C. Levin, Esq.
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103-2793
Tel:  (215) 994-4000
Fax:  (212) 994-2222

*Counsel for GlaxoSmithKline PLC, SmithKline
Beecham Corporation, d/b/a GlaxoSmithKline,
Beecham Group PLC, and SmithKline Beecham PLC*


**HEINS MILLS & OLSON, P.L.C.**

By:  _Alan I. Gilbert_____  (EP)

Alan I. Gilbert, Esq.
80 South Eighth Street
3550 IDS Center
Minneapolis, MN 55402
Tel:  (612) 338-4605
Fax:  (612) 338-4692

    -AND-

**MILBERG WEISS BERSHAD & SCHULMAN LLP**

By:  _J. Douglas Richards_____  (EP)

J. Douglas Richards, Esq.
One Pennsylvania Plaza
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229

48993                              40

- AND -

**MILLER FAUCHER AND CAFFERTY LLP**

By:  _Patrick E. Cafferty_ (EN)
    Patrick E. Cafferty, Esq.
    101 North Main Street, Suite 450
    Ann Arbor, MI 48104
    Tel:  (734) 769-2144
    Fax:  (734) 769-1207

  -AND-

**SPECTOR ROSEMAN & KODROFF PC.**

By:  _Eugene A. Spector_ (EN)
    Eugene A. Spector, Esq.
    1818 Market Street, Suite 2500
    Philadelphia, PA 19103
    Tel:  (412) 642-2300
    Fax: (412) 642-2309

*END-PAYOR CLASS LEAD COUNSEL*

**HAGENS BERMAN LLP**

By:  _Thomas M. Sobol_ (EN)
    Thomas M. Sobol, Esq.
    One Main Street, 4th Floor
    Cambridge, MA 02142
    Tel:  (617) 482-3700
    Fax:  (617) 482-3003

*END PAYOR CLASS LIAISON COUNSEL*

48993

**CHIMICLES & TIKELIS**

By: _____

Nicholas E. Chimicles, Esq.
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Tel:  (610) 642-8500
Fax:  (610) 649-3633

*Third-Party Payor Counsel*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: _____

Fred Isquith, Esq.
270 Madison Avenue
New York, NY 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653

*Consumer Counsel*