UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE RELAFEN ANTITRUST LITIGATION | Master File No. 01-CV-12239-WGY |
| THIS DOCUMENT RELATES TO END-PAYOR ACTIONS: | |
| *Lynch v. SmithKline Beecham Corp.* | No. 02-CV-10163-WGY |
| *A.F. of L. – Building Trades Welfare Plan v. SmithKline Beecham Corp.* | No. 02-CV-10205-WGY |
| *Twin Cities Bakery Workers Health & Welfare Fund v. SmithKline Beecham Corp.* | No. 02-CV-985-(E.D.Pa.) |
| *Houchins v. SmithKline Beecham Corp.* | No. 02-CV-10424-WGY |
| *Teamsters Local No. 35 Health Plans v. SmithKline Beecham Corp.* | No. 02-CV-10487-WGY |
| *Smithfield Foods, Inc. v. SmithKline Beecham Corp.* | No. 02-CV-010589-WGY |
| *Franklin v. SmithKline Beecham Corp.* | No. 02-CV-10671-WGY |
| *Fox v. SmithKline Beecham Corp.* | No. 02-CV-11543-WGY |
| *Kravitz v. SmithKline Beecham Corp.* | No. 02-CV-11805-WGY |

**Proposal of Brigham and Women's Hospital and Community Catalyst for Cy Pres Award for "Generics Are Powerful Medicine" Project**

The Division of Pharmacoepidemiology & Pharmacoeconomics at Brigham and Women's Hospital and Community Catalyst, Inc. ("the applicants") respectfully submit this proposal for a *cy pres* award from the fund established in paragraph 17(b)(v)[1] of the Fourth Amended Stipulation and Agreement of Settlement ("The Group II cy pres fund"), approved by this

---

[1] This subsection reads "The sum of Five Hundred Thousand Dollars ($500,000.00) shall be awarded, as a cy pres distribution for the benefit of Consumers and TPPs in Group II States (the "Group II Cy Pres Award.") The recipients of the Group II Cy Pres Award shall be determined by the Court. In the case of more than one recipient of the Group II Cy Pres Award, the Court shall also determine the total amount to be received by each recipient."

- Epidemiologic studies of the relationship between COX-2 drugs for arthritis and cardiovascular disease; and
- Defining optimal treatment approaches to hemophilia patients with refractory bleeding.

The Division serves an advisory function to BWH's clinical services and its Pharmacy & Therapeutics committee in helping assess drugs proposed for addition to the BWH formulary, as well as monitoring the appropriateness of use of existing drugs. Educational interventions are then disseminated as needed to improve use of specific medications, using both printed materials and computer-based order-entry decision support.

Since 1980, the Division's director, Dr. Jerry Avorn, and his colleagues have pioneered innovative programs to educate physicians and patients in evidence-based use of medications. He has done this work in conjunction with the AARP, Consumers Union, the U.S. Pharmacopeia, the Food and Drug Administration, the Massachusetts Department of Health, and Blue Cross-Blue Shield of Massachusetts. Research in the division is presently supported by grants from the National Institutes of Health, the Agency for Health Care Research and Quality, the Arthritis Foundation, and corporations.

Dr. Avorn pioneered the practice of "academic detailing." Academic detailing is a program of proactive educational outreach aimed at improving the clinical appropriateness and cost-effectiveness of physicians' prescribing. To do this, educators (usually pharmacists) with special training in specific drug-use issues and social marketing conduct one-on-one visits with physicians to present evidence-based data on the optimal use of targeted drug classes. Academic detailing programs have been shown to be a cost-effective way of improving physicians' drug choices as well as enhancing patient care. Successful programs using this approach are currently in place in Australia, a number of European countries, and several Canadian provinces, as well as in multiple health-insurance settings in the United States. One of the Division's programs currently underway is in one of the Group II States, Pennsylvania. The goals of the Pennsylvania Academic Detailing Program are to improve the appropriateness and contain the costs of medication use by patients in the targeted counties covered by Medicaid, Pharmaceutical Assistance Contract for the Elderly (PACE), state employee and retiree insurance plans, and other state-supported drug entitlement programs.

Brief profiles of key Project personnel at BWH are attached in Appendix A.

**2. Community Catalyst**

Community Catalyst, Inc., ("CC") located in Boston, Massachusetts, is a national nonprofit advocacy organization that builds consumer and community participation in the shaping of the U.S. health system to ensure quality, affordable health care for all. It works in numerous states with state and local organizations as well as with other national organizations. Community Catalyst is a nationally-recognized leader in health care advocacy and consumer education. CC has extensive experience managing multi-state projects that have a national support component, including grant and contract management.

*In re Relafen Antitrust Litigation*
*Cy Pres Proposal of Brigham and Women's Hospital and Community Catalyst*

Since its founding in 1997, Community Catalyst has used a capacity-building approach to establish institutional and policymaker engagement with communities for expanding access to health care. Its multi-disciplinary staff provide technical assistance to community-based, statewide, and national organizations on a wide range of policy and organizational capacity-building issues. This assistance constitutes a blend of policy analysis, legal intervention, organizational development, and public education through the media.

Community Catalyst and its staff have in-depth knowledge of the pharmaceutical industry and the issues facing consumers and third party payors who pay for prescription drugs. Through its Prescription Access Litigation Project, CC provides education and technical assistance to a coalition of over 105 consumer organizations in 35 states and the District of Columbia that work on issues related to the cost of prescription drugs. The groups in this coalition have a combined membership of over 15,000,000 individuals.

In addition, Community Catalyst has extensive expertise in advising and assisting consumer organizations on the state and local level on implementing consumer education campaigns and on translating such education into active involvement in the shaping the health care system. CC's assistance to such organizations has covered a very broad range of issues in health care, including:
- Conversion of non-profit hospitals and health plans;
- Access to health care coverage for low-income populations through state Medicaid and other public programs;
- Hospital policies on free care, community benefits and billing uninsured patients;
- Racial and ethnic diversity of the physician workforce; and
- Quality of care for low-income chronically ill and disabled patients.

CC publishes and distributes numerous educational materials for consumers and advocates. CC is a leader in identifying and promoting "best practices" in health care. See Appendix D, "Community Catalyst Tools and Services," for a list of our publications and programs.

Community Catalyst has previously been selected by a Court for a *cy pres* award. In the settlement of a series of California and Florida state court actions[3] against the manufacturer of a dietary supplement, the Courts approved a cy pres award of $125,000 for CC's "Health Care Access Circuit Rider Project." This project will improve access to health care for women by supporting the outreach efforts of at least 4 state-based consumer health advocacy organizations to inform uninsured and underinsured women and their families about various local and state, public and private health coverage and services programs for which they may be eligible.

Brief profiles of key Project personnel at CC are attached in Appendix A.

---

[3] *Teranci v. Rexall Sundown* (California Superior Court, Los Angeles County, Case No. BC232370), *Levine v. Rexall Sundown* (California Superior Court, Los Angeles County, Case No. BC238060), and *Laraia et. al. v. Rexall Sundown* (Fifteenth Judicial Circuit of Florida, Palm Beach County, Case No. CL007021AF).

## B. Criteria and Principles for the Court to Consider

The Group II cy pres fund is an unusual and innovative feature of the Settlement in this case. Typically, *cy pres* in class action lawsuits arises when providing recovery to individual class members is impossible or impractical, when class members are not readily identifiable, or when settlement funds remain after eligible classmembers have submitted claims. Here, however, the parties agreed to, and the Court preliminarily approved, an "upfront" cy pres award of $500,000 to benefit consumers and TPPs in Group II states. Thus the Court here is not confronted with a question of *whether* to award the $500,000 fund, but merely the question of *to whom* and *to what purpose*. The applicants offer the following guidelines to the Court for its consideration.

The principle criterion which applies in the award of *cy pres* distributions is that which derives from the translation of the term from the Norman French – "as near as possible." That is, ideally a *cy pres* distribution ought to go to an organization that does work "combating harms similar to those that injured class members. Such a donation may serve the *cy pres* principle of indirectly benefiting all class members."[4] Generally, Courts look for a nexus between the award and the subject matter and class at issue in the litigation. The ideal scenario is one in which the *cy pres* award will directly benefit the absent class members.[5]

However, the very situation that most often necessitates a *cy pres* award – the absence of certain class members resulting in unclaimed funds – makes it difficult in most class actions to fashion an award that will *directly* and exclusively benefit those class members. Thus, it is common for Courts to approve awards that benefit the absent class members *indirectly*. One example of such an award is found in *County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112 (2d Cir. 1997). There, the defendant, in addition to paying class members $390 million in damages, was required to fund a community based oversight agency that would advocate for all ratepayers in the future, not just those who made claims from the class settlement fund.

If it is not possible to distribute a *cy pres* award that benefits only class members, then an award can be made to benefit broader categories of people who share with the class characteristics relevant to the subject matter of the litigation.[6] Such an award can and often does benefit absent class members, as such class members are reached by the award that benefits the larger group of which they are a part.

The Court in *Superior Beverage Company v. Owen-Illinois*[7] found that "in recent years, the [cy pres] doctrine appears to have become more flexible. Funds remaining in antitrust cases have been awarded to law schools to support programs having little or no relationship to

---

[4] See *Jones v. National Distillers*, 56 F.Supp.2d 355, 358 (S.D.N.Y.1999);
[5] See *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 179 (2nd Cir. 1987) (certain remaining funds used to establish assistance programs to provide various benefits to all members of the class)
[6] See *In re: Airline Ticket Commission Antitrust Litigation*, 307 F.3d 679 (8th Cir. 2002) (Court approved award to travel agencies not in the class because it "relate[d] directly to the antitrust injury alleged in this lawsuit and settled by the parties.")
[7] 827 F. Supp. 477 (N.D. Ill. 1993)

5

antitrust law, competition or the operation of our economy."[8] However, as between a distribution that relates to the subject matter of the litigation and one that does not, the former is preferable. The Court in *Superior Beverage* went on to say that "the use of cy pres funds for purposes closely related to their origin is still the best cy pres application."[9]

### C. Appropriate distribution of the Group II cy pres Fund

The allegations of the plaintiffs in this case were that the defendants engaged in a number of illegal acts for the purpose of extending and maintaining their monopoly on Relafen. The plaintiffs alleged that the members of the class were thus deprived of the ability to purchase less expensive, generic versions of Relafen and forced to pay higher prices for nabumetone products than they would have paid.

Members of the class in this case include all persons or entities who purchased Relafen during the class period. Relafen is indicated for acute and chronic treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis.[10] Arthritis patients spend twice as much money on health care as do patients without arthritis.[11] The harm suffered by the class is that they were forced to spend more for prescription drugs than they would have otherwise. The Project the applicants propose addresses that harm by reducing what members of the class and similarly situated consumers will have to pay for prescription drugs.

Given the difficulty of directly reaching absent class members exclusively, we recommend a *cy pres* distribution which will reach two overlapping groups that contain numerous absent class members in the Group II states as well as other similarly situated individuals:
- Patients who use pain medications for arthritis
- Consumers who purchase prescription drugs for which generic versions exist

In the following section, we provide details about the applicants' proposal which we feel meets the above criteria for an appropriate distribution of the Group II cy pres Fund.

### D. Applicants' Proposal for "Generics are Powerful Medicine"

#### 1. The value and importance of educating consumers about generic drugs.

Generic drugs currently save Americans billions of dollars a year. Yet the savings potential from generic drugs has not been fully realized. Consumers and third party payors could save many billions of dollars more from greater use of generic drugs. A Congressional Budget

---

[8] *Id.* at 478.

[9] *Id.* at 479. *See also In re Airline Ticket Commission Antitrust Litigation, supra* note 6 at 682-683 (stating that "the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interest of class members, and the interest of those similarly situated" and rejecting a *cy pres* award to a legal services organization that "cannot claim any relation to the substantive issues in this case.")

[10] "Relafen Prescribing Information," us.gsk.com/products/assets/us_relafen.pdf (accessed April 26, 2005)

[11] "Arthritis Patients Spend Twice as Many Health Care Dollars," American College of Rheumatology, www.rheumatology.org/press/2004/almagor.asp (accessed April 26, 2005)

Office report found that Americans could have saved an additional $17 billion in 2003 alone from using generics instead of higher-priced brand-name drugs.[12]

Generic drugs are not just cheaper than brand-name drugs as an absolute measure, but also the rate of inflation of generic drug prices is much lower than that of brand-name drug prices. Two recent studies by the AARP of several hundred commonly prescribed medications showed that in 2004, the price of generic drugs rose by only 0.5%, while that of brand-name drugs rose by 7.1%.[13] Thus, the price of the brand-name drugs studied rose more than <u>14 times faster</u> than the price of the generic drugs.

There are several principal reasons why consumers do not take full advantage of cheaper generic drugs. The brand-name drug industry spent $4.2 billion in 2004 on "Direct to Consumer Advertising" to convince Americans to buy only the latest, newest and most expensive brand-name drugs.[14] This leads to significant inappropriate use of brand-name drugs. For instance, over 25,000,000 patients took Vioxx and Celebrex, the prescription drugs known as Cox-2 inhibitors. Yet only 2% of patients were at risk for the gastrointestinal conditions these drugs were intended to prevent. They offered no greater pain relief than much cheaper generic and over-the-counter pain medications such as ibuprofen. More than 70% of patients who took these drugs in the first three years they were available were not at risk for such complications, and would have done as well on generic or over-the-counter drugs that were a miniscule fraction of the cost.[15]

The overwhelming reason for this massive overuse of expensive brand-name prescription drugs was the aggressive and ubiquitous marketing of these drugs to consumers and physicians. Studies have demonstrated that widespread advertising of brand-name prescription drugs to consumers has an effect on physicians' prescribing patterns. Physicians are far more likely to write a prescription when a patient asks for a specific brand-name drug than when the patient does not.[16]

While brand-name drugs are heavily marketed to both physicians and consumers, generics are not. This accounts for consumer familiarity with popular and expensive brand-name

---

[12] Reported in "Report on Prescription Drug Importation," Appendix E, p. 126, Department of Health and Human Services, December 2004, http://www.hhs.gov/importtaskforce/Report1220.pdf (accessed April 27, 2005). *See also* "Economic consequences of underuse of generic drugs: evidence from Medicaid and implications for prescription drug benefit plans," Fischer MA, Avorn J., *Health Serv Res* 2003;38:1051-1063. (showing that state Medicaid plans could have saved between $229 million and $450 million in the year 2000 alone from increased use of generic drugs), *and* "Potential savings from increased use of generic drugs in the elderly: What the experience of Medicaid and other insurance programs means for a Medicare drug benefit," Fischer MA, Avorn J., *Pharmacoepidemiol Drug Saf* 2004.

[13] "Trends in Manufacturer Prices of Prescription Drugs Used by Older Americans Research Report," AARP, April 2005, http://www.aarp.org/research/health/drugs/aresearch-import-869-2004-06--IB69.html (accessed April 28, 2005)

[14] Reported by TNS Media Intelligence

[15] "National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release: Nonselective Diffusion of a Selectively Cost-effective Innovation," Archives of Internal Medicine, Carolanne Dai, BSc, MSc; Randall S. Stafford, MD, PhD; G. Caleb Alexander, MD, MS, Arch Intern Med. 2005;165:171-177.

[16] See, e.g., "Influence of Patients' Requests for Direct-to-Consumer Advertised Antidepressants: A Randomized Controlled Trial," Journal of the American Medical Association, April 27, 2005, JAMA. 2005;293:1995-2002.

drugs but not with generics. However, it has been shown that "advertising" generics in general to consumers can produce significant savings. For example, a third party payor in Michigan saved more than $30 million in one year through increased use of generics, as a result of a campaign that got pharmacists to tell customers about the safety, reliability and low cost of generic drugs as opposed to their better known (and more expensive) brand-name counterparts.[17] This demonstrates that a well-designed and targeted campaign of consumer education can have a significant effect on prescription drug purchasing patterns and save consumers and third party payors money.

### 2. "Generics are Powerful Medicine" Project

If awarded the Group II cy pres Fund, the applicants will design and implement a program of consumer education about the value and safety of generic drugs in Group II states, including the following:

- Design a broad variety of bilingual (English and Spanish) consumer education materials, including brochures, fact sheets, template articles for consumer newsletters, websites, radio public service announcements, and other items about generic drugs and smart prescription drug choices. These will include a subset of materials for doctors, since they play a key role on what drugs are prescribed and an individual doctor can educate hundreds of patients about generics.

- Identify non-profit consumer organizations in Group II states to act as Generics are Powerful Medicine Partners, with a focus on organizations serving populations that include Relafen class members, e.g. seniors, arthritis sufferers and the disabled.
    - Several illustrative examples of possible partners are described in detail in Appendix C. These include the Pennsylvania Alliance for Retired Americans and New Jersey Citizen Action.

- Create a subgrant program in which non-profit organizations in the Group II states will apply for grants from the funds awarded to the applicants to carry out consumer education campaigns using the materials developed. This subgrant program will involve:
    - Development of criteria for grant awards, with a focus on organizations that have demonstrated consumer education experience, that serve communities and populations that include class members, that can leverage pre-existing programs and infrastructure, and that have broad reach to significant numbers of individuals.
    - Submission of applications by partner organizations and review of those applications by a committee of staff from the applicants.

---

[17] "Generic Drugs and the Bottom Line: A Special Report Provided by Blue Cross Blue Shield of Michigan," http://www.theunadvertisedbrand.com/pdfs/genericdrugs_specialreport.pdf (accessed April 27, 2005)

- o Awarding of at least 50% of the funds received by the applicants from the Group II cy pres fund in grants, with minimum grants of $10,000 and a goal of awarding grants in at least in 20 (twenty) of the Group II states.

- o Regular communications between and among subgrantees, other partner organizations and the applicants, to foster sharing of best practices, troubleshooting and networking. Communications will include e-mail lists, conference calls and web presentations.

- o Submission of reports by each grantee at the end of the grant period, describing the activities carried out with the grant, the adherence to the grant criteria and the success and lessons of the projects undertaken.

- o Compilation of the individual grantee reports into a Master Report for submission to the Court. In addition, publication and dissemination of an article describing the successes and lessons of the program overall, in order to contribute to the increased effectiveness of consumer health education campaigns generally.

- Distribute the materials to both subgrantees and other interested organizations for dissemination to consumers. The materials will be made widely and freely available through a website dedicated to the project.

  - o The applicants will utilize their extensive networks and contacts to publicize the availability of the materials to organizations and individuals in the Group II states. Community Catalyst works closely with a number of national organizations that have numerous local chapters in the Group II states, including AARP, the Alliance for Retired Americans, USAction, and the state PIRGs (Public Interest Research Groups). We will work with those national partners to disseminate the materials through their state chapters in the Group II states, greatly increasing the number of consumers reached by the project.

- Develop and distribute a **"Generics Are Powerful Medicine" Toolkit** to assist and guide organizations in carrying out consumer education campaigns using the materials. This toolkit will offer advice on designing and managing campaigns, sample press releases and templates for outreach to newspapers and radio stations, and similar assistance.

### 3. Qualifications of the Applicants

**The Division of Pharmacoepidemiology & Pharmacoeconomics**
The Division of Pharmacoepidemiology & Pharmacoeconomics is one of the premier academic medical programs in the United States studying the appropriate use of prescription medication. Its faculty research and analyze a wide variety of issues related to physicians' prescribing practices, policies to control prescription drug spending, the cost-effectiveness of different pharmaceutical treatments, the effects of prescription drug marketing, patient compliance with drug regimens, and the cost savings potential of generic drugs.

*In re Relafen Antitrust Litigation*
*Cy Pres Proposal of Brigham and Women's Hospital and Community Catalyst*

The Division and its faculty have decades of collective experience in the issues and populations represented by this case, particularly geriatrics, pain medications and generic drug usage. In addition to the clinical and academic familiarity with the subject matter of the Project, the Division and its faculty have extensive experience in designing education materials about appropriate prescription drug use. Some samples of their physician education materials are enclosed in Appendix B. They have particular expertise in providing an objective and unbiased counterbalance to pharmaceutical company sales materials. Dr. Jerry Avorn, the founder and director of the Division, is the creator of the concept of "academic detailing," peer-based outreach programs designed to educate physicians about proper prescribing practice that maximizes both clinical and cost effectiveness.

Based on its extensive experience in analyzing prescription drugs and prescribing patterns and implementing educational programs to foster best practices in prescribing, the Division is ideally suited to create the consumer education materials to be used in the Project. The reputation of Brigham and Women's Hospital and Harvard Medical School will also lend the Project a credibility that will increase its impact and reach.

**Community Catalyst**
Community Catalyst ("CC") is a nationally recognized leader in health care advocacy. CC has extensive experience in designing consumer education campaigns, providing technical assistance to non-profit organizations, coordinating coalitions, administering grants and documenting best practices in advocacy and policy.

Community Catalyst has provided hands-on technical assistance to hundreds of state-based consumer and health advocacy groups on a broad range of health care issues, including conversion of non-profit hospitals and health plans, free care and community benefits, Medicaid coverage, community philanthropy, and organizational development. CC publishes numerous guides, curricula and manuals for advocates and health care policymakers, such as "An Advocates Guide to Negotiating with Providers to Improve Access to Healthcare," "Holding On: Fighting to Preserve Essential Services at a Community Hospital," and others (see Appendix D for a complete catalog of CC programs and publications). CC recently created a toolkit on Medicaid, called "Medicaid Matters," which consists of an innovative internet-based set of materials and tools for advocates working to preserve Medicaid coverage (see www.medicaidmatters.org)

Community Catalyst has deep knowledge of the pharmaceutical industry and the issues presented by this case. Through its Prescription Access Litigation Project (PAL), CC engages over 100 consumer organizations on prescription drug issues. PAL works to facilitate the involvement of community groups in prescription drug price lawsuits in order to bring the consumer perspective to such cases and help them educate their members and the public about prescription drug issues. PAL closely tracks developments in the pharmaceutical industry, in the agencies regulating prescription drugs and in the world of health care coverage, and acts as an ambassador and educator to organizations seeking to understand and get involved in these issues. PAL's network of affiliated organizations includes groups in many of the Group II states, providing the Project with a ready pool of possible partners. The combined membership of PAL's coalition is over 15 million people.

### 4. The Benefits of a Nationally-Coordinated Project

An award of the Group II cy pres Fund to a nationally-coordinated project such as this maximizes the reach of the funds while taking advantage of economies of scale. The Project will create extremely high quality materials of a caliber that smaller state-based efforts would not be able to produce. National coordination allows the funds to be widely distributed but not so dispersed as to dilute their impact. The Project's subgranting process takes advantage of the knowledge and expertise of the applicants to ensure that subgrants go to organizations that have the skills and resources to implement a successful consumer education campaign. Subgranting also ensures that much of the funds actually goes to groups "on the ground" that will be able to reach a large number of consumers.

The subgranting process will foster a broad diversity of approaches and programs. Thus, the project will act as a laboratory for innovative techniques and promote the development of "best practices" in consumer education and outreach. Community Catalyst will use the lessons learned from this program about best practices to disseminate information to improve consumer education efforts both in the Group II states and nationwide, contributing to an improved understanding of health care and prescription drugs in the population as a whole.

### 5. Timeline
This timeline assumes receipt of the funds in late Spring/early Summer 2005, with a project start date of July 1, 2005. The dates below would change accordingly if the funds were awarded at a later date.

**July – December 2005:**
- Development of consumer education materials, toolkit and website
- Drafting of subgrant criteria, Request for Proposals (RFP) and application form
- Dissemination and publicizing of RFP and receipt of applications
- Review of applications and decisions on subgrantees
- Awarding of subgrants

**January – December 2006:**
- Implementation of subgrantee projects
- Dissemination and publicizing of consumer education materials
- Technical assistance to subgrantees and partner organizations using the materials
- Ongoing feedback about usefulness of the materials and successful strategies, with possible changes to materials or development of additional materials
- Communications among subgrantees, project partners and the applicants
- Preparation and submission of reports by subgrantees

**January – June 2007:**
- Compilation and evaluation of subgrantee reports
- Evaluation of overall success of Project
- Preparation of Project report for submission to Court

- Preparation of article or publication on the Project for dissemination to health advocates, policymakers and consumer educators.

## 6. Budget

| | |
|---|---|
| **Project Personnel Salaries** | **$56,000** |
| Taxes and benefits @25% | $14,000 |
| **Salary & Benefit Total** | **$70,000** |
| | |
| **Direct Project Expenses** | |
| (Telecommunications, print/copy/postage, occupancy, supplies and equipment) | **$30,000** |
| | |
| **Consumer Education Materials** | |
| (Graphic design, focus groups, graphic designer, clinical content experts, public-service marketing consultant, translation, website design and maintenance, printing and mailing) | **$200,000** |
| | |
| **Subgrants** | |
| Minimum grants of $10,000, Goal of grants in 20 Group II states | **$200,000** |
| | |
| **Total Project Expenses** | **$500,000** |

The direct recipient of the funds would be Brigham and Women's Hospital, Division of Pharmacoepidemiology & Pharmacoeconomics, which would then subcontract with Community Catalyst.

## 7. Conclusion

Based on the foregoing, the applicants believe they would be an appropriate and ideal recipient of the Group II cy pres Fund and respectfully request that the Court award these funds to them to carry out the Generics are Powerful Medicine Project in the Group II states.

*In re Relafen Antitrust Litigation*
*Cy Pres Proposal of Brigham and Women's Hospital and Community Catalyst*

# APPENDIX A

## BIOGRAPHIES OF KEY PERSONNEL

**Jerry Avorn, M.D.**
Jerry Avorn, M.D. is Professor of Medicine at Harvard Medical School and Chief of the Division of Pharmaco-epidemiology and Pharmaco-economics in the Department of Medicine at Brigham and Women's Hospital. An internist, geriatrician, and drug epidemiologist, he studies the intended and adverse effects of drugs, physician prescribing practices, and medication policy.

The division he founded at the Brigham and Women's Hospital includes faculty with backgrounds in internal medicine and its subspecialties as well as epidemiology, health services research and policy, geriatrics, psychiatry, and biostatistics. His major areas of research include: the scientific, policy, and social factors that shape physicians' drug choices; medication compliance by patients; the identification and prevention of adverse drug effects; programs to improve the appropriateness of prescribing and drug taking; and pharmaceutical cost-effectiveness analysis. His Division also serves as a resource to the Brigham on appropriate medication use, and helps train its interns and residents in making optimal prescribing decisions. Dr. Avorn pioneered the "academic detailing" approach in which evidence-based information about drugs is provided to doctors through educational outreach programs run by non-commercial sponsors; such programs are now in widespread use throughout the U.S., Canada, Australia, Europe, and the developing world.

Dr. Avorn completed his undergraduate training at Columbia University in 1969, received the M.D. from Harvard Medical School in 1974, and was a resident in internal medicine at the Beth Israel Hospital in Boston. He has served on several national and international panels as an expert on the determinants and consequences of medication use, and is a past President of the International Society of Pharmaco-Epidemiology. Dr. Avorn is the author of over 200 papers in the medical literature on medication use and its outcomes, and is one of the most highly-cited researchers working in the area of medicine and the social sciences. His book, Powerful Medicines: The Benefits, Risks, and Costs of Prescription Drugs, was recently published by Knopf.

Book website: www.powerfulmedicines.org
Division website: www.DrugEpi.org

**Renée Markus Hodin, J.D.**
Renée Markus Hodin is Associate Director of the Prescription Access Litigation Project at Community Catalyst. In this role, she coordinates a broad coalition of over 100 organizations that work to make prescription drugs accessible and affordable.

Prior to joining PAL, Ms. Hodin worked for five years as a staff attorney with the Community Health Assets Project, another project of Community Catalyst. In that role, she provided assistance and technical advice to consumer groups, regulators, legislators and others about