UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                  )
IN RE RELAFEN ANTITRUST           )  MASTER FILE
LITIGATION                        )  NO. 01-12239-WGY
_____ )
```

MEMORANDUM

YOUNG, C.J.                                    September 28, 2005

## I.    INTRODUCTION

### A.    General Considerations

This is a nationwide consumer class action.  The Court has certified an expanded fifty-state class solely for the purpose of settlement.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) (certifying a class for settlement purposes only). Before the Court may approve this class action settlement, it must find that the settlement "is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  As explained in the Manual for Complex Litigation:

> [T]he judge is required to scrutinize the proposed
> settlement to ensure that it is fair to the persons
> whose interests the court is to protect.  Those
> affected may be entitled to notice and an opportunity
> to be heard.  This usually involves a two-stage
> procedure.  First, the judge reviews the proposal
> preliminarily to determine whether it is sufficient to
> warrant public notice and a hearing.  If so, the final
> decision on approval is made after the hearing.

Manual for Complex Litigation, Fourth § 13.14 at 171
(footnotes and citations omitted).

> The judicial role in reviewing a proposed settlement is critical . . . . Even after notice of a proposed settlement is sent, a judge's statement of concerns about the settlement during the fairness hearing might stimulate the parties to renegotiate in order to avoid possible rejection by the judge.  If the fairness hearing leads to substantial changes adversely affecting some members of the class, additional notice, followed by an opportunity to be heard, might be necessary.

> To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation.  Judicial review must be exacting and thorough.  The task is demanding because the adversariness of litigation is often lost after the agreement to settle.  The settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks.  If objectors do not emerge, there may be no lawyers or litigants criticizing the settlement or seeking to expose flaws or abuses.  Even if objectors are present, they might simply seek to be treated differently than the class as a whole, rather than advocating for class-wide interests.  The lack of significant opposition may mean that the settlement meets the requirements of fairness, reasonableness, and adequacy.  On the other hand, it might signify no more than inertia by class members or it may indicate success on counsel's part in obtaining, from likely opponents and critics, agreements not to object.  Whether or not there are objectors or opponents to the proposed settlement, the court must make an independent analysis of the settlement terms.

Id. at 309-10 (footnote and citations omitted).

This memorandum addresses these issues.

**B.   This Case**

This case presents a consolidated action against SmithKline Beecham Corporation and GlaxoSmithKline PLC (collectively "SmithKline") for violations of antitrust laws in connection with its patent for the chemical compound nabumetone -- which is sold commercially as "Relafen."  Parties who purchased Relafen from sources other than SmithKline for purposes other than resale (the "End Payors" or "End Payor Plaintiffs") move for final approval of the proposed settlement pursuant to Federal Rule of Civil Procedure 23(e).  End Payor Pls.' Mem. of Law in Supp. of Final Approval of Proposed Settlement ("End Payors' Mem.") [Doc. No. 415].

The class plaintiffs -- individual consumers, health care plans, and insurers -- are seeking damages incurred as a result of SmithKline's alleged misrepresentations made in their successful pursuit of a patent for nabumetone.  <u>See</u> Consolidated Class Action Compl. on Behalf of Nationwide End-Payor Class [No. 01-CV-12222, Doc. No. 68] ("Class Action Compl.") ¶¶ 34-84.

On November 24, 2004, this Court preliminarily certified a settlement class consisting of consumers and third party payors. Order Granting Preliminary Approval of Settlement, Certifying Class for Purposes of Settlement, Directing Notice to the Class, and Scheduling Fairness Hearing ("Preliminary Approval Order") [Doc. No. 373] (dated November 24, 2004).  It also granted initial approval to a proposed settlement agreement between

SmithKline and "[a]ll persons or entities in the United States who purchased Relafen and/or its generic alternatives (known as nabumetone) during the period of September 1, 1998 through June 30, 2003." Id. The parties now seek final approval of the settlement, permanent certification of the class, award of a cy pres award, and entry of final judgment. In addition, class counsel seeks attorney's fees, costs, and incentive awards for the named plaintiffs.

A fairness hearing was held before this Court on May 4, 2005. A number of objectors[1] were permitted to intervene as objectors to the settlement, each of whom participated in the hearing through retained counsel. See Tr. of H'rg of 5/4/05. Having considered the evidence presented at the hearing, all objections, the arguments of counsel, additional briefs allowed by this Court, and the full record of the case, the Court grants the motion for final certification of the class, and approves the proposed settlement. Moreover, the Court grants the End Payors' Joint Petition for Attorney's Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs [Doc. No. 419] in its

---

[1] Objectors include Yolanda Prohias ("Prohias"), [Doc. No. 391], Jacqueline Pio ("Pio") [Doc. No. 397], Barbara Wortham ("Wortham") [Doc. No. 404], Dot Kensinger ("Kensinger") [Doc. No. 411], Pamela Taylor ("Taylor") [Doc. No. 413], Steve Robinson ("Robinson") [Doc. No. 423], Linda Marshall, Charles L. Taylor and Hazel Martin ("Marshall") [Doc. No. 425], and Melanie Blake ("Blake") [Doc. No. 432]. In addition, a group of third party payors also filed an objection, [Doc. No. 430], which was overruled. Tr. of H'rg of 5/4/05 at 8.

entirety.

## II.  BACKGROUND

### A.   Factual Background[2]

On December 13, 1983, after its initial rejection, the United States Patent and Trademark Office (the "Patent Office") issued SmithKline United States Patent No. 4,420,639 (the "'639 patent") for the compound nabumetone, a non-steroidal anti-inflammatory drug also described as methoxy ketone.  In re '639 Patent Litig., 154 F. Supp. 2d 157, 169 (D. Mass. 2001) (Lindsay, J.).[3]  In February of 1992, after receiving approval from the Food and Drug Administration (the "FDA"), SmithKline commenced commercial sales of the patented compound under the brand name Relafen.  See id. at 159.

In August and December of 1997, Copley Pharmaceutical, Inc. ("Copley"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA ("Teva"), and Eon Laboratories, Inc. ("Eon") filed abbreviated new drug approvals, or ANDAs, with the FDA seeking approval to market generic nabumetone products.  In re

---

[2] For greater detail on the factual and procedural background of this case, see the memorandum of this Court in In re Relafen Antitrust Litig., 221 F.R.D. 260 (D. Mass. 2004).

[3] This constituted a reversal of its earlier decision of November 2, 1982, where the Patent Office rejected SmithKline's sixth application to patent nabumetone. The Patent Office rejected the application due to the publication of a 1973 article authored by J.N. Chatterjea and R. Prasad.  In re '639 Patent Litig., 154 F. Supp. 2d at 160, 162-63, 169.

5

Relafen Antitrust Litig., 221 F.R.D. 260, 264 (D. Mass. 2004); In re '639 Patent Litig., 154 F. Supp. 2d at 160.  In each of their applications, the generic drug manufacturers certified that the '639 patent was, to the best of their knowledge, invalid or unenforceable.  See In re '639 Patent Litig., 154 F. Supp. 2d at 160.  On October 27, 1997, November 13, 1997, and February 17, 1998, SmithKline commenced lawsuits to enforce the '639 patent against Copley, Teva, and Eon respectively.  In re Relafen Antitrust Litig., 221 F.R.D. at 264.  As provided by statute, the litigation triggered a thirty-month stay period, during which the FDA's tentative approval of the ANDAs could not be made effective.  This allowed SmithKline to continue marketing Relafen without competition.  See 21 U.S.C. § 355(j)(5)(B)(iii).  The stay expired in May 2000.

The three patent suits were consolidated and tried before Judge Lindsay of this District.  On August 14, 2001, following a sixteen-day non-jury trial, Judge Lindsay entered judgment for Copley, Teva, and Eon, ruling that the '639 patent was unenforceable as anticipated by prior art as well as because of SmithKline's inequitable conduct before the Patent Office.  In re '639 Patent Litig., 154 F. Supp. 2d at 194-95.  The Federal Circuit affirmed the district court decision declaring the '639 patent invalid, but did not reach the issue of inequitable conduct.  SmithKline Beecham Corp. v. Copley Pharm., Inc.  45

Fed. Appx. 915, 917 (Fed. Cir. 2002) (unpublished opinion).[4]

Shortly after the District Court entered judgment, the FDA finalized its approval and Teva,[5] the first applicant to submit an ANDA, began marketing generic nabumetone during the 180-day exclusivity period. See 21 U.S.C. § 355(j)(5)(B)(iv). In February of 2002, upon expiration of the exclusivity period, Eon also began marketing generic nabumetone. In re Relafen Antitrust Litig., 218 F.R.D. 337, 341 (D. Mass. 2003).

**B. Procedural Background**

This action consolidates the claims of several plaintiffs, including Eon, one of SmithKline's competitors, and various customers of SmithKline. The three sets of purchasers include (A) End Payors -- a class of parties that purchased nabumetone from sources other than SmithKline for purposes other than resale; (B) direct purchasers -- a class of pharmaceutical wholesalers that purchased Relafen directly from SmithKline ("Direct Purchasers"); and (C) drugstore plaintiffs -- drugstores that indirectly purchased Relafen and the generic drug nabumetone for resale ("Drugstore Plaintiffs").

The case filed by Eon Laboratories on March 18, 2003 has

---

[4] Under the Local Rules for the Federal Circuit, unpublished decisions are not to be cited as precedent, but may be relied upon in asserting "claim preclusion, issue preclusion, judicial estoppel, law of the case, or the like." Fed. Cir. R. 47.6(b).

[5] Teva acquired Copley in August, 1999. In re Relafen Antitrust Litig., 218 F.R.D. 337, 341 n.3. (D. Mass. 2003).

settled and was closed on February 13, 2004.  Order of 2/13/04
[Eon Labs., Inc. v. SmithKline Beecham Corp., Civ. A. No. 03-
10506-WGY, Doc. No. 62].

The Direct Purchasers, defined as "persons or entities in
the United States or its territories who purchased Relafen
directly from [SmithKline]," Compl. [Doc. No. 1], filed a
consolidated class action complaint on December 26, 2002.  Direct
Purchasers Compl. [Teva Pharm. v. SmithKline, Civ. A. No. 01-
12222, Doc. No. 60].  They alleged that SmithKline violated
Section 2 of the Sherman Act, 15 U.S.C. § 2, with its scheme to
mislead the Patent Office and the FDA and to prosecute sham
litigation against generic manufacturers.  On October 29, 2003,
the Court allowed the Direct Purchasers' motion and certified a
Direct Purchaser class.  Order of 10/29/03 [Doc. No. 151].  The
Direct Purchasers settled with SmithKline and the action was
closed on April 9, 2004.  Order of 4/9/04 ("Direct Purchasers'
Settlement") [Doc. No. 297].

Drugstore Plaintiffs filed complaints against SmithKline on
March 29, 2002, and January 7, 2003.  Walgreen's Compl. [Walgreen
Co. v. SmithKline Beecham Corp., Civ. A. No. 02-10588-WGY, Doc.
No. 1]; CVS Compl. [CVS Meridian, Inc. v. SmithKline Beecham
Corp., Civ. A. No. 03-10040-WGY, Doc. No. 1].  The Drugstore
Plaintiffs asserted claims under sections 15 and 26 of the
Sherman Act, 15 U.S.C. §§ 15, 26.  The Drugstore Plaintiffs

settled with SmithKline and the action was closed on January 20, 2004.  Order of 1/20/04 [<u>Walgreen</u>, Civ. A. No. 02-10588-WGY, Doc. No. 28]; Order of 1/20/04 [<u>CVS</u>, Civ. A. No. 03-10040-WGY, Doc. No. 11].

On January 30, 2002, the first End Payor action was filed in this Court.[6]  <u>Lynch</u> v. <u>SmithKline Beecham Corp.</u>, No. 02-CV-10163. Other End Payor suits followed.[7]  On February 11, 2003, the End Payor Plaintiffs filed a consolidated class action complaint asserting claims under (1) the Sherman Act, 15 U.S.C. § 16, (2) the antitrust, unfair competition, and consumer protection statutes, and (3) the unjust enrichment doctrines of 24 states. Class Action Compl.  The parties conducted discovery, resulting

---

[6] An End Payor class action, <u>Marganti</u> v. <u>SmithKline Beecham Corp.</u>, No. 01-140615 CZ (Wayne County Cir. Court) which was originally filed in this Michigan state court in November, 2001, "was voluntarily dismissed on February 11, 2002, in order to facilitate coordination of actions in this Court." Joint Decl. of Class Counsel in Supp. of Proposed Settlement ("Joint Decl.") [Doc. No. 416] ¶ 4 n.2.

[7] <u>A.F. of L. - AGC Bldg. Trades Welfare Plan</u> v. <u>SmithKline Beecham Corp.</u>,[Civ. A. No. 02-10205-WGY](filed February 6, 2002); <u>Houchins</u> v. <u>SmithKline Beecham Corp.</u>, [Civ. A. No. 02-10424-WGY] (filed March 11, 2002); <u>Teamsters Local No. 35 Health Plans</u> v. <u>SmithKline Beecham Corp.</u>,[Civ. A. No. 02-10487-WGY](filed March 18, 2002); <u>Smithfield Foods, Inc.</u> v. <u>SmithKline Beecham Corp.</u>, [Civ. A. No. 02-10589-WGY] (filed March 29, 2002); <u>Franklin</u> v. <u>SmithKline Beecham Corp.</u>,[Civ. A. No. 02-10671-WGY] (filed April 9, 2002); <u>Fox</u> v. <u>SmithKline Beecham Corp.</u>,[Civ. A. No. 02-11543-WGY] (filed July 31, 2002); <u>Kravitz</u> v. <u>SmithKline Beecham Corp.</u>,[Civ. A. No. 02-11806-WGY] (filed September 12, 2002). <u>Cities Bakery Workers Health and Welfare Fund</u> v. <u>SmithKline Beecham Corp.</u>,[Civ. A. No. 02-985] was filed in the Eastern District of Pennsylvania.  Joint Decl. ¶ 4.

in "the analysis of more than one million pages of documents

produced by [SmithKline], other parties and non parties; more

than fifty depositions of fact witnesses, and reports from, and

depositions of, more than twenty-five expert witnesses," in

addition to the discovery in connection with the depositions and

trial testimony in the '639 Patent Litigation.  Joint Decl. of

Class Counsel in Supp. of Proposed Settlement [Doc. No. 416]

("Joint Decl.") ¶ 16.

Following an October 23, 2003 hearing on class

certification, this Court denied the End Payors' motion for class

certification, but did not foreclose the possibility of a multi-

state class that could be considered on an exemplar basis.  Tr.

of H'rg of 10/23/2003 at 26-27, 29-31.  The Court suggested the

End Payor Plaintiffs propose an order with such a class in mind.

Id.

On November 21, 2003, this Court declined to certify the

class proposed by the End Payor Plaintiffs with respect to their

federal law claims, but tentatively certified: (1) an exemplar

class with respect to their state law antitrust, unfair

competition, and consumer protection claims including

> All persons or entities who purchased Relafen or
> its generic alternatives in the states of Arizona,
> California, Massachusetts, or Vermont during the
> period of September 1, 1998 through June 30, 2003
> for consumption by themselves, their families,
> members, employees, insureds, participants, or
> beneficiaries.

10

and (2) an exemplar class with respect to their unjust enrichment claims including

> All persons or entities in the United States who purchased Relafen in the states of Arizona, California, Massachusetts, Tennessee, or Vermont during the period September 1, 1998 through June 30, 2003 for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

Order of 11/21/03 [Doc. No. 168] at 3, 5; see also In re Relafen Antitrust Litig., 221 F.R.D. 260.  The Court designated Louise Houchins, Emily Feinberg and Tyler Fox as class representatives. Order of 11/21/03 at 5.

On May 20, 2004, SmithKline and the End Payors stipulated to a settlement agreement and filed a proposed order to certify a nationwide class. [Doc. No. 302].  On July 1, 2003, sought an order for preliminary approval of the proposed settlement.  On July 7, 2004, the states of Arkansas [Doc. No. 324], Idaho [Doc. No. 322], Illinois [Doc. No. 320], Maryland [Doc. No. 318], Oregon [Doc. No. 316], and Washington [Doc. No. 314] filed motions to intervene, all of which raised issues prescinding from Illinois Brick v. Illinois, 431 U.S. 720 (1977).  To assist the parties in their ongoing analysis, the Court issued a memorandum on September 2, 2004, analyzing the implications of Illinois Brick in determining the fairness and adequacy of a nationwide class.  In re Relafen Antitrust Litig., 346 F. Supp. 2d 349, 367-70 (D. Mass. 2004).  Thereafter, hearings were held on

11

September 14, 2004, October 5, 2004, and November 10, 2004.
[Doc. Nos. 342, 368, 372].

On November 24, 2004, the Court issued a preliminary order
of settlement certifying a nationwide settlement class and
identifying its remaining responsibilities under Rule 23(e).
Preliminary Approval Order.  On May 4, 2005, this Court held a
fairness hearing.  Tr. of H'rg of 5/4/05.  The Court heard a
status update from class counsel as to the claims process,
addressed several objections, and set a briefing schedule for the
objections concerning the allocation between the third party
payor claimants and consumer claimants.  Id.  It also allowed
objectors further to brief their objections as to the percentage
of recovery assigned to their respective states.  Id.

On August 23, 2005, class counsel filed a status report
detailing the final number of individuals included in the
consumer class.  Status Report Concerning Results of Consumer
Claims Process and Subpoena Project ("Consumer Class Status
Report") [Doc. No. 455].  On September 20, 2005, class counsel
filed the final count of third party payors.  Final Claims Report
Prior to Entry of Judgment Concerning Results of Consumer Claims
Process and Subpoena Project ("Consumer Class Final Report")
[Doc. No. 456].  The record is complete, and it is appropriate
for the Court to now address the fairness of the Settlement and
to rule on all other matters presently before it.

12

1.   Settlement Negotiations

During the initial stages of settlement negotiations, co-lead counsel learned that SmithKline "had been approached by counsel for a number of large third-party health plans who were absent members of the putative End Payor Class."  Joint Decl. ¶ 30.  These health plans, referred to as the Settling Health Plans, agreed to work with class counsel for purposes of mediation with SmithKline.  Joint Decl. ¶¶ 30, 31.  The parties were unsuccessful in their November 2003 attempts at reaching an alternative resolution, and the parties continued to prepare for trial.  Id. at ¶ 32.

The following month, co-lead counsel designated Fred Taylor Isquith ("Isquith") of Wolf Hadenstein Adler Freeman & Herz LLP and Nicholas E. Chimicles ("Chimicles") of Chimicles & Tikellis to represent consumer class members and third party payor class members, respectively, to negotiate a potential settlement fund that could fairly be allocated between the two groups.  Decl. of Fred Taylor Isquith and Nicholas Chimicles in Supp. of End-Payor Pls.' Mot. for Prelim. Approval of Settlement [Doc. No. 310] ("Isquith & Chimicles Decl.") ¶¶ 2-3; 5-7.; Joint Decl. ¶ 34.  Counsel for the Settling Health Plans also participated in these intramural negotiations.  Id.  "Class Counsel adopted this structural protection because it had been approved by several district courts presiding over end-payor class actions."  Id.

(citing <u>In re Cardizem CD Antitrust Litig.</u>, 218 F.R.D. 508, 515
(E.D. Mich. 2003) and <u>In re Warfarin Sodium Antitrust Litig.</u>, 212
F.R.D. 231, 260 (D.Del. 2002), <u>aff'd</u>, 391 F.3d 516, 532-33, 539
(3d Cir. 2004)).

Isquith and Chimicles state:

[f]rom the outset of the Relafen Action, we viewed our
loyalty to the class of end payors of the Relafen drug
as unfettered and complete.  Both of us recognized that
it was important to assure that our own clients' rights
were not prejudiced in any way by reason of the manner
in which they came to be end-payors -- third-party
consumers and payors, respectively.  Therefore,
throughout the course of the Relafen Action, we were
diligent in assuring that the positions of our clients
were properly presented and kept in balance.

Isquith & Chimicles Decl. ¶ 4.

Ultimately, the negotiations resulted in "an allocation of
two-thirds of a settlement fund for [third party payors] and one-
third for consumers." Joint Decl. ¶ 34.  Over the course of
these intramural negotiations, Isquith and Chimicles consulted
the Report of Raymond S. Hartman Calculating Damages to the Class
of End-Payor Purchasers of Relafen of September 5, 2003 (the
"Hartman Report"), which calculated the consumer share of the
damages at 58% of the overcharge, and the third party payors'
share at 42% of the overcharge.  Decl. of Raymond S. Hartman
[Doc. No. 312] (Hartman Decl.) ¶¶ 4-5; 13; Isquith & Chimicles
Decl.¶ 10.  They also reviewed the Settling Health Plans'
contention that the "third party payor damages were understated
by using excessive rebate amounts and that consumer damages were

overstated through high co-pay amounts."   Isquith & Chimicles
Decl. ¶ 13.

On March 18, 2004, after considering a variety of factors,
Isquith & Chimicles submitted a joint proposal as to the
allocation of funds.   <u>Id.</u> at ¶23.   "The proposal called for an
initial allocation of one-third of the settlement fund for
consumers and two-thirds for third-party payors" as well as "a
distribution matrix governing payments to be made from the two
dedicated amounts created from the settlement fund."   <u>Id.</u>

> According to Isquith and Chimicles,
>
> the proposed settlement agreement attempts to reflect
> and balance competing allocation viewpoints, thereby
> assuring that consumers are incentivized to participate
> in the settlement and receive considerable recoveries,
> while still providing the third-party payors with
> significant compensation for their losses.

<u>Id.</u> at ¶ 25.   As the consumer representative, Isquith believed a
structure ensuring a separate consumer fund was imperative to
maximize individual consumer's claims.   <u>Id.</u> at ¶ 26.   ("After
considerable debate and compromise, it was agreed that between us
consumers would have a set-aside equal to one-third of the
settlement fund which would be used to pay each consumer who
filed a proof of claim up to 150% of his or her loss, but no less
than $50.00.   This structure was viewed as creating a significant
incentive for consumers to file proofs of claims.   These are
extremely important terms for the allocation of the settlement as
they guarantee a minimum dollar amount of as much as 150% of each

15

consumer's loss without the dilution of his/her claims by third party payor claims.").

In early 2004, negotiations between class counsel and SmithKline "intensified." Joint Decl. ¶ 37. The process faltered temporarily in February 2004, but eventually "the parties reached an agreement in principle" to settle for $75,000,000.00. Id. After the details were negotiated, the parties entered into a settlement agreement on May 20, 2004. Stipulation of Agreement of Settlement [Doc. No. 302]. This initial settlement plan did not differentiate between states.

Soon after the parties entered into the Stipulation of Agreement, this Court held a scheduling hearing on June 1, 2004, during which it noted its "serious reservations about the adequacy of [class counsel's] representation of [a] nationwide class." Tr. of H'rg of 6/1/04 at 5. At this point, the Court reviewed its understanding of the effect of a state's status as an Illinois Brick repealer, or non-repealer, on the strength of End Payor Claims. Id. at 5-6.

In response to the Court's concern, the End Payors amended the Settlement Agreement to favor Illinois Brick repealer states in the event funds were insufficient, but which otherwise provided no differentiation between repealer and non-repealer states. In light of state law, on September 2, 2004, this Court issued a Memorandum intended to assist counsel with its

16

negotiations.  <u>In re Relafen Antitrust Litig.</u>, 225 F.R.D. 14 (D. Mass. 2004).

On September 14, 2004, class counsel informed this Court of its intentions to employ another level of intramural negotiations to determine the role differences in state law should play in the settlement.  Tr. of H'rg of 9/14/04 at 5-6.  Counsel explained that

> the notion then is that there will be designation by lead counsel of lawyers and class representatives for constituencies.  Those lawyers, separately representing the groupings that are determined, will undertake an arm's length negotiation without  without any necessary presupposition about where things need to end or what the lay of the land is for them to come to a[n] allocation, if they deem one appropriate, of the proposed overall settlement dollars.

<u>Id.</u>

An "Allocation Committee" was established and "engaged in intense negotiations for approximately two weeks" resulting in the allocations included in the Second Amended Stipulation and Agreement and Settlement [Doc. No. 351].  The Court declined to approve the allocations set forth in the Second Amended Agreement and allowed the parties four weeks for further briefing.  The Allocation Committee subsequently reconvened and continued its negotiations.  Joint Decl. ¶ 50.  The results are, for the most part, what constitutes the current iteration of the Settlement Agreement.  <u>Id.</u> at ¶ 51; Fourth Amended Stipulation and Agreement of Settlement [Doc. No. 369] ("Fourth Am. Stipulation").

On November 10, 2004, the Court found that the terms of the agreement, in light of the structural protections, addressed its concerns, and other than some modest suggestions, preliminarily found the terms to be fair.  Tr. of H'rg of 11/10/04 at 7.

2.   Notice

Notice to the class was disseminated by Complete Claim Solutions, Inc. ("Complete Claim Solutions"), the administration firm appointed by the Court to implement the Notice Plan.  Order of 11/24/04 ¶¶ 5-10; Decl. of Thomas R. Glenn Regarding Mailing and Publication of Notice ("Glenn Decl.") [Doc. No. 418] ¶ 2; see Relafen Antitrust Litig. Settlement Notice Plan, Ex. A to End Payor Pls.' Notice of Submission of Revised [Proposed] Order Granting Preliminary Approval of Settlement, Certifying Class for Purposes of Settlement, Directing Notice to the Class and Scheduling Fairness Hearing ("Settlement Notice Plan") [Doc. No. 370].

The notice plan approved by the Court provided for both direct notice to class members, where practicable, and nationwide publication notice.  Settlement Notice Plan.  Mile Marker Zero, LLC ("MMZero"), a marketing and advertising firm, was retained by Complete Claim Solutions to provide notice to members.  "MMZero completed the media plan included in [the] Notice Plan, which targeted consumers based on syndicated research, along with demographic and reach analyses."  Glenn Decl., Ex. C, Decl. of

Linda Young Regarding Media Publication Program ("Young Decl.") ¶ 3. In addition, notice was effectuated through the posting of point of sale placards at the prescription counters of major pharmacy and supermarket chains. These point of sale placards were mailed "to approximately 51,339 pharmacies in the United States." Glenn Decl. ¶ 8.

The most unique aspect of the Notice Plan included the subpoena of consumer information by End Payor Plaintiffs. The End Payors, with the approval of this Court,

> issued subpoenas to the ten largest providers of retail pharmacy services in the United States as well as the mail-order pharmacies associated with the five largest providers of pharmaceutical benefit management in the United States to obtain electronic files of the names and addresses of any consumers of Relafen/nabumetone as well as information concerning the consumer's expenditures during the Class period.
> As of April 14, 2005, seven (7) entities ha[d] complied with the subpoena and provided [Complete Claim Solutions] with electronic files . . . . The data contained in the electronic files encompasses approximately 2,624,795 transactional records. The data was scrubbed to eliminate duplicate and aggregate co-pay payments, resulting in approximately 836,750 Class Members that are potentially eligible Class Members.

Glenn Decl. ¶¶ 9-10 (paragraph structure altered).

This Court chooses $10 as the minimum recognized claim amount required for a consumer to receive a check via the settlement subpoena process. See Consumer Class Final Report at 2-3. The final tally from the subpoena program of consumers with a Minimum Recognized Amount of $10 is 268,648. Consumer Class

19

Status Report at 5.   This represents a victory of sorts.   One of the challenges for a court in a class action is to ensure that <u>consumers</u> actually receive compensation for the damages they have suffered, and not just the attorneys or institutional plaintiffs. Ofttimes, tremendous funds are spent in trying to reach the harmed consumers, with little in the way of results.

In addition, notice was effectuated through the establishment of a claims information website (www.RelafenSettlement.com), Glenn Decl. ¶ 11, and a toll-free telephone number to receive questions from class members, <u>id.</u> at ¶ 13.   "As of April 20, 2005, more than 14,922 'visits' ha[d] been made to the website and 19,763 forms were viewed and/or downloaded."   <u>Id.</u> at ¶ 12.   Additionally, as of that date "more than 19,895 telephone calls were made to the toll-free telephone number."   <u>Id.</u> at ¶ 13.   Notice was placed in 979 newspapers and summary notice was also published in magazines targeting the population of individuals that uses Relafen.   End Payors' Mem. at 6.

To reach third party payor class members, "notice was mailed to 13,466 employee welfare benefit plan providers and insurers," and notice appeared in targeted business publications.   End Payors' Mem. at 7.   The End Payors estimate that "published notice reached more than 90% of the consumer Class Members at least once."   <u>Id.</u>

3.   The Proposed Settlement

Under the Settlement, SmithKline will pay $75,000,000.00

("Settlement Fund") dispersed as follows:

- $25,000,000 (1/3) for payments to consumers
- $50,000,000 (2/3) for payments to third party payors, minus the $8,000,000 paid installment to the Settling Health Plans[8]

---

[8] A significant group of third party payors (the "Settling Health Plans") executed a separate agreement and release with SmithKline. They received a preliminary payment of $8,000,000, which represents an estimated 60% of the Settling Health Plans' claims. The remaining $42,000,000 is allocated to the other third party payors class members and the remaining payment to the Settling Health Plans. End Payors' Mem at 1-2; Joint Decl. ¶ 40. The Settlement Agreement further provides that

[i]n order to reconcile or "true up" this advance payment to [the Settling Health Plans], the [Settling Health Plans] are to submit claims documentation to the Settlement Administrator as part of the [third party payor] claims process. A determination will be made of the [Settling Health Plans'] final share of [third party payors] monies after all [third party payor] claims have been submitted. [The Settling Health Plans] are entitled to 60% of the total amount of their payment (calculated as if they had participated in the claims process) free of attorney's fees and all costs. The remaining 40% of their payment from the [third party payors] Settlement Pool is subject to attorney's fees and costs. [The Settling Health Plans] have escrowed $1.6 million of the $8 million advance payment to cover the possibility that the $8 million advance payment exceeds what they would be entitled to in the [third party payors] claims process. In that eventuality, any overpayment already made to [the Settling Health Plans], up to the $1.6 million escrowed amount, will be returned to the [third party payors] fund. If the $8 million advance payment represents less than the share of the total [third party payors] funds, payment will be made to the [Settling Health Plans] from the [third party payors] Settlement Pool at the same time distribution is made to all Third Party Payors under the claims process, with an offset for the $8 million already paid.

End Payors' Mem. at 4; Joint Decl. ¶ 40.  Attorney's fees and expenses and incentive payments for class representatives are to be subtracted from each pool.  Although at this point it seems unlikely that unclaimed funds will remain, any unclaimed surplus will be distributed by this Court upon motion by class counsel.  SmithKline is entitled to a refund from the pool in proportion to the value of the claims of those consumers or third party payors that opt out of the class settlement.  Joint Decl. ¶51(d).

According to the settlement, consumer payments are based on the consumer's "Recognized Claim" which is a "percentage of the total cost of their purchases after netting out any reimbursement they may have received for those purchases."[9]  The percentage used depends on the state in which the purchase was made.[10]  The percentages used to calculate the Consumer Recognized Claims are as follows:

1.  Hawaii - 90% of all net Relafen and nabumetone purchases

2.  New Mexico - 85% of all net Relafen and nabumetone purchases

---

Joint Decl. ¶ 51(c)

[9] A "purchase" has not been made under the agreement where a consumer only paid a co-pay, and under the health plan there was no differentiation between co-payments for brand name drugs versus generic drugs.

[10] The state of purchase is determined by the Consumer's residence at the time of the purchase.

3.   Group I States[11] – 82.5% of all net Relafen and nabumetone purchases

4.   Florida, Maine, Michigan, Minnesota, North Carolina, North Dakota – 60% of all net Relafen and nabumetone purchases

5.   New York – 52.5% of all net Relafen and nabumetone purchases

6.   Group II States[12] – 9.2% of net Relafen purchases only

Fourth Am. Stipulation at 8-9.

In addition, the Fourth Amended Stipulation specifies that, assuming sufficient funds, consumers (excluding consumers in Group II States) will be paid a minimum amount if their recognized claim does not exceed that amount.

|  | Consumer Recognized Claim % of net Relafen and nabumetone purchases | Consumer Minimum Payment |
|---|---|---|
| 1. Hawaii | 90% | $100 |
| 2. New Mexico | 85% | $75 |
| 3. Group I | 82.5% | $55 |
| 4. FL, ME, MI, NC, ND | 60% | $40 |

---

[11] "Group I" states are the District of Columbia, Arizona, California, Illinois, Iowa, Massachusetts, Nebraska, Nevada, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

[12] "Group II" states are Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Montana, Missouri, New Hampshire, New Jersey, Ohio, Oregon, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Virginia, Washington, Wyoming, and Territories of the United States.

| 5. New York | 52.5% | $35 |
|---|---|---|
| 6. Group II | 9.2%<br>(Relafen only) | No minimum payment. No cash payments will be made unless the Recognized Claim is $20 or more |

Id.

If sufficient funds are available after all claims are made,
consumers are eligible to receive up to 150% of their Recognized
Claim on a pro-rata basis and subject to the minimum payments."
Id. If there is not enough money to make the proposed minimum
payment, consumers will receive a portion of the available funds
on a pro-rated basis in relation to the size of their Recognized
Claim. Id. If funds remain, they are to be distributed at the
Court's discretion upon application of counsel. Id.

If funds allow for payment between 100% and 150% of the
Recognized Claim, the consumers will receive a pro-rata share of
the funds. If the available funds result in payments less than
100% of the Recognized Claim, consumers will be paid pro-rata,
subject to any minimum payment determined by this Court. Id.

In light of the requirement of a minimum Recognized Claim of
$20 in Group II States, the Settlement provides $500,000 to be
set aside as a cy pres award for the benefit of consumers unable
to claim the minimum amount. Id. One-third of the cy pres award
is to be funded from the Consumer Settlement Pool with the
remaining two-thirds funded by the third party payor settlement

pool.  Id.

A third party payor's "Recognized Claim" is calculated in a
similar manner as above.  The "Recognized Claim" is "a percentage
of the total cost of the [third party payor's] purchases after
netting out any reimbursement they may have received for those
purchases," or minus any co-pay paid by their insureds.  Id.  The
percentages are half of that of the consumers:

|  | Consumer Recognized Claim % of net Relafen and Nabumetone purchases | Third Party Payor Recognized Claim % of net Relafen and Nabumetone purchases |
|---|---|---|
| 1. Hawaii | 90% | 45% |
| 2. New Mexico | 82.5% | 41.25% |
| 3. Group I | 85% | 42.5% |
| 4. FL, ME, MI, NC, ND | 60% | 30% |
| 5. New York | 52.5% | 26.25% |
| 6. Group II | 9.2% (Relafen only) | 4.6% (Relafen only) |

Fourth Am. Stipulation at 9-10.

Unlike the framework for consumers, there are no minimum
payments for third party payor claimants generally.  Group II
third party payors, however, must meet the $20 minimum in order
to receive a cash payment.  Joint Decl. at ¶ 51(b), 60.

As with the consumers, if sufficient funds remain after all
claims are made, all third party payors are eligible to receive
up to 150% of their Recognized Claim.  Id. at ¶ 51(b).  If there

are not sufficient funds, they will be shared pro-rata.  Id.  If there are excessive funds they will be distributed at the discretion of the Court.

As noted above, a group of health plans have entered into a separate agreement with SmithKline, and have received an $8,000,000 advance on the $75,000,000 settlement.  Id. at ¶ 51(c).  The Settling Health Plans made at least 25% of the total third party payor purchases.  The Settling Health Plans' share is calculated as though the Settling Health Plan members had not excluded themselves from the End Payor class.  This portion of the settlement will then be deducted from the third party payor settlement pool.  Under the external agreement, the Settling Health Plans are entitled to 60% of any payments free of attorney's fees and all costs (with a $15,000,000 cap), with the remaining 40% and any portion above the cap subject to attorney's fees and costs.  See Fourth Am. Stipulation at 2.

## III. CLASS CERTIFICATION

Before this Court can determine whether the settlement is fair, it must finally certify the class.  The Settlement Agreement defines the Class as

> All persons or entities in the United States who
> purchased Relafen and/or its generic alternatives
> (known as nabumetone) during the period of September 1,
> 1998 through June 30, 2003 for consumption by
> themselves, their families, members, employees,
> insureds, participants, or beneficiaries.  Excluded
> from the class are governmental entities (provided,
> however, a government entity is included only to the

extent it makes prescription drug purchases as part of a health benefit plan for its employees); Defendants and their officers, directors, management, employees, subsidiaries, and affiliates; persons or entities who purchase Relafen or its generic alternatives for purposes of resale; any person or entity whose only purchase(s) of Relafen were made directly from Defendants or its affiliates and/or whose only purchases of generic nabumetone were made directly from the manufacturer thereof; and persons or entities who suffered no economic harm as a result of Defendants' alleged conduct (the "End-Payor Class").

Fourth Am. Stipulation ¶ 1.

On November 23, 2004, this Court preliminarily certified the class for purposes of settlement.  Preliminary Approval Order.  As the End Payors have moved for final certification, this Court has reconsidered the submissions before it and again concludes that the class should be certified under Rule 23(b)(3).

### A.   Legal Standard

In order to certify a class "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23." Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003) (citing General Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)).  Although this Court's analysis should not involve a "preliminary hearing on the merits," Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974), it may, but need not, "probe behind the pleadings" to consider other matters, including the probable course of litigation.  General Tel., 457 U.S. at 160 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978)) (internal quotation marks omitted); Waste Mgmt. Holdings, Inc. v.

<u>Mowbray</u>, 208 F.3d 288, 298 (1st Cir. 2000).  A plaintiff bears
the burden of establishing the elements necessary for class
certification: "the four requirements of Rule 23(a) and one of
the several requirements of Rule 23(b)."  <u>Smilow</u>, 323 F.3d at 38
(citing <u>Amchem</u>, 521 U.S. 591); <u>Guckenberger</u> v. <u>Boston Univ.</u>, 957
F. Supp. 306, 325 (D. Mass 1997) (Saris, J.).

     Rule 23(a) imposes four "threshold requirements" applicable
to all class actions:

> (1) the class is so numerous that joinder of all
> members is impracticable, (2) there are questions of
> law or fact common to the class, (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).  <u>See</u> <u>Amchem</u>, 521 U.S. at 613;  <u>Tardiff</u> v.
<u>Knox County</u>, 365 F.3d 1, 4 (1st Cir. 2004).

     In addition to the Rule 23(a) requirements of numerosity,
commonality, typicality, and adequacy of representation, <u>Smilow</u>,
323 F.3d at 38, the party seeking to obtain class certification
must demonstrate that the action may be maintained under Rule
23(b)(1), (2), or (3).  <u>Amchem</u>, 521 U.S. at 614.  Plaintiffs here
originally sought to certify their class pursuant to Rule
23(b)(2) or (3).  The Court denied the motion to certify with
respect to Rule 23(b)(2).

     Rule 23(b)(3) has been described by the First Circuit as
"the cute tiger cub that has grown into something unexpectedly

28

fearsome in civil rights and mass tort litigation,[because it] is a joinder device for consolidating separate but similar claims." Tardiff, 365 F.3d at 4.  This form of class action has provided for the "vindicat[tion of] claims of consumers and other groups of people whose individual claims would be too small to warrant litigation."  Smilow, 323 F.3d at 41.

Rule 23(b)(3) permits a class action when "the court finds that questions of law or fact common to the members of the class predominate over any question affecting only individual members," and resolution via class action is "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Matters "pertinent" to evaluating predominance and superiority include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Id.  This list of pertinent factors is "nonexhaustive."  Amchem, 521 U.S. 616; Tardiff, 365 F.3d at 4 (recognizing that "the subsection lists non-exclusive factors for making the determination").

One exception to the requirement that a court "conduct a rigorous analysis of the prerequisites established by Rule 23"

29

arises in the settlement-only certification context.  Smilow, 323
F.3d at 38.  In this context, the Court "need not inquire whether
the case, if tried, would present intractable management
problems."  Amchem, 521 U.S. at 620 (citing Fed. R. Civ. P.
23(b), (c)).  The other requirement is "designed to protect
absentees by blocking unwarranted or overbroad class
definitions," and calls for "undiluted, even heightened,
attention in the settlement context[,] . . . [as the] court asked
to certify a settlement class will lack the opportunity, present
when a case is litigated, to adjust the class, informed by the
proceedings as they unfold."  Amchem, 521 U.S. at 620.  As noted
in a recent decision by Judge Stearns of this District, however,
despite this "heightened scrutiny," and "[t]his cautionary
approach notwithstanding, the law favors class action
settlements."  In re Lupron Mktg. and Sales Practices Litig., 228
F.R.D. 75, 88 (D. Mass. 2005) (Stearns, J.) (quoting City P'ship
Co. v. Atlantic Acquisition Ltd. P'ship, 100 F.3d 1041, 1043 (1st
Cir. 1996)).

>     **B.   Rule 23(a)**

>          1.   Numerosity

The first requirement, that "the class [be] so numerous that
joinder of all members is impracticable," Fed. R. Civ. P.
23(a)(1), is easily met in this case.  "[T]he end payor
plaintiffs have established such impracticability here."  In re

Relafen Antitrust Litig., 221 F.R.D. at 267.  There is evidence

that "more than four million units of Relafen were dispensed

between January and October 2000, and more than three million

additional units were dispensed between January and December

2001."  Id. (citing Decl. of Patrick Cafferty, [Doc. No. 128],

Exs. 1-2 (excerpts from 2001 Red Book (Medical Economics Staff

ed., 2002) and 2002 Red Book (Medical Economics Staff ed.,

2002))).  See In re Cardizem CD Antitrust Litig., 200 F.R.D. 326,

334-35 (E.D. Mich. 2001).

          2.   Commonality

     The second element described by Rule 23(a) requires that the

"resolution of the common questions affect all or a substantial

number of the class members."  Duhaime v. John Hancock Mut. Life.

Ins. Co., 177 F.R.D. 57, 63 (D. Mass. 1997) (O'Toole, J.)

(quoting Jenkins v. Raymark Indus., 782 F.2d 468, 472 (5th Cir.

1986)).  The rule does not require that all issues of fact and

law be common, Massachusetts Assoc. of Older Ams. v. Spirito.  92

F.R.D. 129, 131 (D. Mass. 1981) (McNaught, J.) (noting that,

"[a]lthough there may be differences in the facts relating to the

alleged delays for individual applicants, the pattern of conduct

of defendant is at issue").  The threshold of commonality is not

a difficult one to meet.  Jenkins, 782 F.2d at 472.

     In this case, there are a number of common issues of fact

and law that the class members would be required to establish to

prove the defendants' liability, as well as their entitlement to

damages.  As noted in <u>In re Relafen Antitrust Litig.</u>,

> The end payor plaintiffs have identified a number of
> common questions, the resolution of which will "affect
> all or a substantial number of the class members."
> <u>Duhaime</u> v. <u>John Hancock Mut. Life. Ins. Co.</u>, 177 F.R.D.
> 54, 63 (D. Mass. 1997) (O'Toole, J.) . . . . The
> questions common to all class members' claims include
> whether SmithKline engaged in the alleged conduct and
> whether SmithKline is shielded from liability for any
> resulting injuries.  Because each of the end payor
> plaintiffs claims injuries resulting from the same
> alleged conduct, resolving these common questions
> collectively will "advance the litigation." <u>Cardizem</u>,
> 200 F.R.D. at 335.

221 F.R.D. at 267 (internal citation omitted).

### 3.  Typicality

Plaintiffs may establish typicality by demonstrating that

the "named plaintiffs' claims arise from the same course of

conduct that gave rise to the claims of the absent [class]

members." <u>Duhaime</u>, 177 F.R.D. at 63 (quoting <u>Burstein</u> v. <u>Applied

Extrusion Techs., Inc.</u>, 153 F.R.D. 488, 491 (D. Mass. 1994)

(Collings, M.J.) (internal quotation marks omitted)).  "The

'typicality' requirement focuses less on the relative strengths

of the named and unnamed plaintiffs' case than on the similarity

of the legal and remedial theories behind their claims."

<u>Jenkins</u>, 782 F.2d at 472.  For purposes of demonstrating

typicality, "[a] sufficient nexus is established if the claims or

defenses of the class and the class representative arise from the

same event or pattern or practice and are based on the same legal

theory." In re Terazosin Hydrochloride Antitrust Litig., 220
F.R.D. 672, 686 (S.D. Fla. 2004)(quoting Kornberg v. Carnival
Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984)).

Here, as this Court previously noted, "the claims of each of
the end payor plaintiffs . . . arise from the same course of
conduct: SmithKline's alleged efforts to delay generic
competition. Accordingly, the claims of the named plaintiffs are
typical of those asserted by other members of the class." In re
Relafen Antitrust Litig., 221 F.R.D. at 267 (internal citation
omitted).

　　　　4.　Adequacy

The final element articulated by Rule 23(a) requires that
the proposed class representatives "fairly and adequately protect
the interests of the class." Fed. R. Civ. P. 23(a)(4). This
requirement "has two parts. The moving party must show first
that the interests of the representative party will not conflict
with the interests of any of the class members, and second, that
counsel chosen by the representative party is qualified,
experienced and able to vigorously conduct the proposed
litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130
(1st Cir. 1985). "In complex actions such as this one, named
plaintiffs are not required to 'have expert knowledge of all
details of the case, . . . and a great deal of reliance on the
expertise of counsel is to be expected.'" County of Suffolk v.

33

Long Island Lighting Co., 710 F. Supp. 1407, 1416 (E.D.N.Y.
1989)(citations omitted).

Many of the objectors, in challenging the fairness of the
settlement, assert that there is an intra-class conflict of
interest that renders class counsel inadequate.  See, e.g.,
Objection to Class Action Settlement of Jacqueline Pio ("Pio
Obj.") [Doc. No. 397] at 1-4.  The adequacy element was of great
concern to this Court in its memorandum of September 2, 2004.
This Court noted that it "may not certify a class including end
payors from previously excluded exemplar states without, at a
minimum, ensuring that absent class members receive the
'structural protection' required by Amchem."  In re Relafen
Antitrust Litig., 225 F.R.D. at 23 (citation omitted).  As is
discussed in detail below, class counsel ensured here that such
"structural protections" were put in place.  Thus, this Court
holds that the element of adequacy has been satisfied.

   **C.   Rule 23(b)(3)**

In addition to satisfying the four elements identified by
Rule 23(a), the plaintiffs must also show that "the questions of
law or fact common to the members of the class predominate over
any questions affecting only individual members and that a class
action is superior to other available methods for the fair and
efficient adjudication of the controversy."  Fed. R. Civ. P.
23(b)(3).  Simply put, the plaintiffs must show predominance and

superiority.

    1.   Predominance

The predominance inquiry is more demanding than the commonality requirement discussed above.  See Amchem, 521 U.S. at 623-24.  Nevertheless, under First Circuit case law, predominance under Rule 23(b)(3) does not require an entire universe of common issues, but does require "a sufficient constellation" of them. Waste Mgmt., 208 F.3d at 298; Smilow, 323 F.3d at 39 ("Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class.").  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623.  This inquiry is "an individualized, pragmatic evaluation of the relationship between and the relative significance of the common and individual issues."  In re Relafen Antitrust Litig., 218 F.R.D. at 343 (citing Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, 7A Federal Practice and Procedure § 1778 (2d ed.)).

In this case, the issues common to the class predominate over those that are personal to class members.  The main issues involve the manner in which the defendants obtained and then sued to enforce the '639 patent, delaying the availability of a less expensive generic alternative.  Individual issues primarily involve the amount of damages to be awarded to individual class

members, a factor disfavored in determining predominance.  Thus,
despite some individual differences, the common issues
predominate.

     2.   Superiority

    Rule 23(b)(3) requires that a class action be "superior to
other available methods for the fair and efficient adjudication
of the controversy."  Fed. R. Civ. P. 23(b)(3).

> The matters pertinent to the findings include: (A) the
> interest of members of the class in individually
> controlling the prosecution or defense of separate
> actions; (B) the extent and nature of any litigation
> concerning the controversy already commenced by or
> against members of the class; (C) the desirability or
> undesirability of concentrating the litigation of the
> claims in the particular forum; (D) the difficulties
> likely to be encountered in the management of a class
> action.

Id.

    As stated by the Supreme Court in Amchem, the requirement of
superiority, like that of predominance, ensures that resolution
by class action will "achieve economies of time, effort, and
expense, and promote . . . uniformity of decision as to persons
similarly situated, without sacrificing procedural fairness or
bringing about other undesirable results."  Amchem, 521 U.S. at
615 (citation omitted, alteration in original).  With its focus
on individuals' interests in conducting separate lawsuits, the
superiority requirement appears directly to address the Advisory
Committee's concern with "vindication of the rights of groups of
people who individually would be without effective strength to

bring their opponents into court at all." Id. at 617 (citation and internal quotation marks omitted).  Permitting additional recourse to the courts "is not troublesome when the action is predicated on a statutory mandate that is designed to promote the private rectification of conduct thought undesirable or to effectuate some other expression of public policy."  Wright, et al. at § 1779.

"[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative-no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied-to no litigation at all."  Carnegie, 376 F.3d at 661.  In this case, in light of the fact the other elements of Rule 23 are satisfied, a class action is surely the superior method for resolving the claims in light of the large number of harmed individuals and organizations.  Especially for the individual consumer, where the individual losses are low, the transaction costs in bringing suit are likely prohibitive.

## IV.  FAIRNESS DETERMINATION

### A.    General Considerations

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court "may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate."  Fed. R. Civ. P.

23(e)(1)(C).  Although there is overlap between this Rule 23(e)
analysis and the decision to certify, this Court is required to
analyze fairness as a separate and distinct issue.  Rule 23(e)
"was designed to function as an additional requirement, not a
superseding direction, for the 'class action' to which Rule 23(e)
refers is one qualified for certification under Rule 23(a) and
(b)."  Amchem, 521 U.S. at 621.

As this Court recently noted, "[b]oth the United States
Supreme Court and the Courts of Appeals have repeatedly
emphasized the important duties and responsibilities that devolve
upon a district court pursuant to Rule 23(e) prior to final
adjudication and settlement of a class action suit."  In re
Relafen Antitrust Litig., 360 F. Supp 2d. 166, 192 (D. Mass.
2005) (citations omitted).  Although settlement is often a more
favorable result than litigation, "the court has a fiduciary duty
to absent members of the class in light of the potential for
conflicts of interest among class representatives and class
counsel and the absent members."  In re Lupron, 228 F.R.D. at 94
(citing In re General Motors Corp. Pick Up Truck Fuel Tank
Prods., 55 F.3d 768, 805 (3d Cir. 1995) ("Rule 23(e) imposes on
the trial judge the duty of protecting absentees, which is
executed by the court's assuring the settlement represents
adequate compensation for the release of the class claims.")).
See Amchem, 521 U.S. at 623 (noting that Rule 23(e) prohibits

settlement of a class action without the court's approval and
that Rule 23(e) protects unnamed class members from "unjust or
unfair settlements" agreed to by "fainthearted" or self-
interested class representatives"); Duhaime, 183 F.3d at 2
(indicating the court approval and notice required prior to final
settlement of a class action and noting that Rule 23(e) "scrutiny
entails a detailed inquiry into whether the proposed class action
settlement is fair, reasonable, and adequate" (citing In re
General Motors Corp., 55 F.3d at 804-19)).  See also Marek v.
Chesney, 473 U.S. 1, 33 n.49 (1985); Deposit Guar. Nat'l Bank v.
Roper, 445 U.S. 326, 332 n.5 (1980); Reynolds v. Beneficial Nat'l
Bank, 288 F.3d 277, 279-80 (7th Cir. 2002) (Posner, J.) (noting
the concern that a lawyer's self interest may trump the interests
of the class members "requires district judges to exercise the
highest degree of vigilance in scrutinizing proposed settlements
of class actions.  We and other courts have gone so far as to
term the district judge in the settlement phase of a class action
suit a fiduciary of the class, who is subject therefore to the
high duty of care that the law requires of fiduciaries."); In re
Relafen Antitrust Litig., 360 F. Supp. 2d at 192 (quoting
Reynolds, 288 F.3d 277)).

    In addition to the requirement that a settlement be fair,
adequate, and reasonable, a settlement must be untainted by
collusion.  "When sufficient discovery has been provided and the

parties have bargained at arms-length, there is a presumption in favor of the settlement." City P'ship, 100 F.3d at 1043.

As noted by the court in In re Compact Disc Minimum Advertised Price Antitrust Litig.,

> [t]here is no single test in the First Circuit for determining the fairness, reasonableness, and adequacy of a proposed class action settlement. In making this assessment, other circuits generally consider the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial. Specifically, the appellate courts consider some or all of the following factors: (1) comparison of the proposed settlement with the likely result of litigation; (2) reaction of the class to the settlement; (3) stage of the litigation and the amount of discovery completed; (4) quality of counsel; (5) conduct of the negotiations; and (6) prospects of the case, including risk, complexity, expense and duration. Finally, the case law tells me that a settlement following sufficient discovery and genuine arm's length negotiation is presumed fair.

216 F.R.D. 197, 206 (D. Me. 2003) (citations omitted).

Another "list" of factors, recently endorsed by Judge Stearns in In re Lupron, 228 F.R.D. at 93, comes originally from City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974), overruled on other grounds by Missouri v. Jenkins, 491 U.S. 274 (1989). The Grinnell factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the

best possible recovery; (9) the range of reasonableness
of the settlement fund to a possible recovery in light
of all the attendant risks of litigation.

Grinnell, 495 F.2d at 463 (citations omitted).

**B.   The Grinnell Factors**

1.   The Complexity, Expense and Likely Duration of the
Litigation

This case has the potential to impose enormous costs on all

of the parties.   The End Payor Plaintiffs contend that "[w]hile

the ultimate result of trial cannot be foreseen, an expensive,

complex and time-consuming process is assured."   End Payors' Mem.

at 24.   Costs would include notice to the Exemplar Classes, the

classes that would proceed to trial, in addition to the cost of a

four-week trial which promises to feature a battle of various

experts.   Id.   The Plaintiffs note that in light of the high

stakes involved, "an appeal is certain to follow regardless of

the outcome at trial."   Id. at 25.   This Court agrees that "[t]he

complexity, expense and likely duration of the litigation . . .

weighs heavily in favor of final approval of this Settlement."

Id. at 27.

2.   The Reaction of the Class to the Settlement

Class members had until April 15, 2005 to opt out of the

class.   See Preliminary Approval Order.   As of April 21, 2005 the

Claims Administrator received timely exclusions from 100

consumers and 40 third party payors.   As of September 20, 2005

the Claims Administrator has received 3,581 consumer claims,

41

Consumer Class Final Report at 2, and 1,908 third party payors'
claims.  Consumer Class Status Report at 6.  There have been ten
consumer class members who have filed objections to certain
aspects of the Settlement.  See supra n.1.

The overall reaction to the settlement has been positive.
There have been no objections to the overall amount of the
Settlement Fund.  The objections have focused on: (1) the
allocation of the Settlement Fund, both as between the consumer
and the third party payors, Yolanda Prohias's Objection to Class
Settlement, Request to be Heard at Final Fairness Hearing, and
Notice of Intention to Appear ("Prohias Obj.") [Doc. No. 391],
and the differing allocations based on differences in state law,
Pio Obj.; Objection to Portions of the Proposed Settlement by
Barbara Wortham ("Wortham Obj.") [Doc. No. 404]; Objections to
Proposed Class Action Settlement by Linda Marshall, Charles L.
Taylor, and Hazel Martin ("Marshall Obj.") [Doc. No. 425]; (2)
the Settling Health Plans participation in the Settlement,
Prohias Obj.; and (3) objections to attorney's fees.  Pio Obj.;
Wortham Obj.; Prohias Obj.

            3.   Stage of the Proceedings and the Amount of
                 Discovery Completed

As is clear from the procedural history, this complex case
has been in litigation for nearly four years.  During the course
of the case, the parties engaged in "extensive discovery"

42

including

> the analysis of more than one million pages of
> documents produced by [SmithKline], other parties and
> non-parties; more than fifty depositions of fact
> witnesses, and reports from, and depositions of, more
> than twenty-five expert witnesses.  The discovery also
> included deposition and trial testimony from the '639
> Patent Litigation which, by stipulation, could be used
> as if it were taken in this litigation.

Joint Decl. ¶ 17.  In addition, there was significant motion

practice during the course of the litigation.  The parties filed

motions to dismiss, for summary judgment, and for class

certification.

This is not a case where the bulk of the attorneys' time was

spent on negotiations.  Class counsel has consistently and

vigorously been preparing for trial, which, were this Court to

reject the Settlement, would commence in the near future.  Joint

Decl. ¶ 66.

4.   The Risks of Establishing Liability and Damages

The End Payors, while consistently asserting their

confidence in the strength of their case, note that "there are

serious questions of law and fact that render the ultimate

outcome of this litigation uncertain and unpredictable."  End

Payors' Mem. at 15.  The End Payors note that, in order to

achieve full damages, they would need to succeed on each of

several "complex and hotly disputed legal and factual issues."

Joint Decl. ¶ 64.  For example, in order to succeed on their

state law antitrust and consumer protection claims, the End

43

Payors would have to prove that SmithKline "intentionally and fraudulently procured the '639 Patent," and that SmithKline had a monopoly which it acquired through anti-competitive means, and that, as a result, the class suffered injury.  End Payors' Mem. at 16, 18.  Moreover, the End Payors correctly note in a "trial [that] would undoubtedly become a battle of experts, with conflicting testimony on esoteric economic principles applied to the complex pharmaceutical market," that it is possible "the jury might reject their claims."  Id. at 21.

> 5.   Ability of the Defendant to Withstand a Greater
>      Judgment

This "defendant oriented" consideration, see In re Lupron, 228 F.R.D. at 97, is largely neutral as this is, evidently, a "defendant[] with classic deep pockets."  Id. at *20.

> 6.   The Amount of the Settlement Fund in Contrast to
>      the Best Possible Recovery

A fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist. Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972) ("[I]n any case there is a range of reasonableness with respect to a settlement." (emphasis added)).  Moreover, "[a] high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes." Reynolds, 288 F.3d at 285.  This Court has already noted that "[g]iven the uncertainties here [the aggregate amount of the

settlement] . . . seems . . . to make eminent sense."  Tr. of
H'rg of 6/1/04 at 5.

One objector challenges the Court's ability to assess the
adequacy of the settlement because "[t]he Notice and Settlement
Agreement are void as to the amount of the potential damages the
Class has suffered."  Marshall Obj. ¶ 3 (citing Reynolds, 288
F.3d at 284-85 (noting its concern that there may have been
collusion in arriving at a settlement and stating that "in the
suspicious circumstances that we have recited the judge should
have made a greater effort (he made none) to quantify the net
expected value of continued litigation to the class.").  The
objector does not challenge the amount as insufficient.  See
Marshall Obj. ¶ 3.  Unlike Reynolds, the events of this case have
not raised suspicions about collusion between the defendant and
class counsel at the expense of the class.  Nevertheless, this
Court still must consider whether the amount of the settlement is
sufficient.

In his report, Dr. Hartman determined that the overcharge
during the relevant period amounted to $147,076,354 for the
original 24 states assigned to Group I.  End Payors' Mem. at 22-
23 (citing the Hartman Report).  This number was vigorously
attacked by SmithKline, both in a challenge that the Plaintiffs
would not be able to prove any damages, as well as contentions
that the Hartman report overstated the figure by $79,400,000.

Expert Rep. of Paul Godek, Ph.D. at 4-11 & Table 2.

"[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." In re General Motors Corp., 55 F.3d at 806 (as quoted in In re Lupron, 228 F.R.D. at 97). The End Payors note that if this Court assumes that the number of transactions is proportionate in each state, the "nationwide 'overcharge' damages would be approximately double the calculation [offered by the Hartman Report,] i.e. $294,000,000 . . . or $135,000,000 under Dr. Godek's criticism of that approach." End Payors' Mem. at 23. If true, the Settlement would represent approximately 26% or 55% of the alleged damages as calculated, respectively, by the End Payors' expert and the defense expert.

"Although fully litigating the claims through trial could possibly result in a higher recovery, the settlement represents a necessary compromise between inherent risks of doing so and a guaranteed cash recovery." In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 394 (D.D.C. 2004).

C.   **Procedural Considerations**

As this Court is well aware,

[s]ettlment of a large nationwide class action does not
afford the same procedural safeguards to absent members
of a class that full litigation of the same action
would.  Among other things, the opportunity and
potential incentive for collusion between class counsel
and the defendants is greater in the case of a

negotiated settlement.  For this reason, a court must
carefully scrutinize the process by which the entire
action was litigated and the settlement negotiated.

Duhaime, 177 F.R.D. at 67.  Thus, in addition to the Grinnell

factors addressed above, this Court has carefully scrutinized the

procedures used by class counsel in order to ensure that the

various classes were properly and vigorously represented.

1.   Negotiation of the Allocations

There are two bases upon which the Settlement Fund will be

allocated, each of which has provoked objections from members of

the consumer class.  The first is the division of the Settlement

Fund between third party payors and consumers.  "Intramural"

negotiations led to consumers receiving one-third of the

settlement amount, with third party payors receiving two-thirds.

See Isquith & Chimicles Decl. ¶ 23.

In response to this Court's concern as to how the Settlement

Fund was to be allocated, Mr. Sobel explained:

There is a co-lead group . . . for the end-payors
as a whole. . . .
In addition to that . . . very early on in the
case there are appointed lawyers to represent solely
the consumer interests.  And similarly there are
lawyers who are appointed solely to represent the third
party payer interest.
And as a result during the prosecution of the
case, and obviously more concretely when it comes down
to negotiating and resolving the settlement itself,
there has been arm's length negotiations separately by
separate lawyers who are not co-lead counsel for the
consumer interests and for the third-party payer
interest in order to make sure that those interests are
separately represented.

47

Tr. of H'rg of 6/1/2004 at 11-12.

The attorneys to which Mr. Sobel referred became involved with this litigation through their representation of individual plaintiffs.  Fred Taylor Isquith, ("Isquith") is a senior partner at Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"), the law firm that filed an action against SmithKline on behalf of an individual consumer.  Isquith & Chimcles Decl. ¶ 2; Elliot Franklin v. Smithkline Beecham Corp., No. 02-10671-RCL.  Nicholas E. Chimicles ("Chimicles") is a senior partner at Chimicles & Tikellis LLP ("Chimicles & Tikellis"), a firm which filed an action on behalf of the trustee of a third party payor.  Isquith & Chimcles Decl. ¶ 3; Lynch v. Smithkline Beecham Corp., No 02-CV-10163-WGY.  Both of these action were later consolidated into the case currently at issue.  "Class Counsel adopted this structural protection because it had been approved by several district courts presiding over end-payor class actions."  Joint Decl. ¶ 34 (citing In re Cardizem CD Antitrust Litig., 218 F.R.D. at 515, and In re Warfarin Sodium Antitrust Litig., 212 F.R.D. at 260).

The Prohias Objection argues that the consumers must receive a higher percentage of the settlement fund in light of the Hartman Report, which noted that consumers suffered 58% of the damages while third party payors only suffered 42% of the damages.  End Payors' Mem. at 31-32.  The End Payor Plaintiffs

48

argue that "[w]hat Prohias fails to acknowledge is that Dr. Hartman's report was only one of several factors considered by the negotiating parties." Id. at 32. Moreover, although the consumer settlement fund is half that of the third party payor fund, the third party payor "Recognized Claim" -- the percentage of net Relafen and Nabumetone purchases -- is half that of the consumers in the same state or group of states.[13]

In addition to the attorneys directly involved in the case, a consumer advocate group, the Prescription Access Litigation Project ("PAL")[14] was at least peripherally involved in the negotiations. Rosenfeld Decl. ¶ 9 ("Throughout the course of the instant case, PAL has evaluated settlement proposals and made recommendations and suggestions concerning provisions to [its members who became plaintiffs in this case], to lead counsel and to the designated consumer representative."). According to its former interim director "[i]t is PAL's opinion that the current

_____

[13] For example, the Recognized Claim of a consumer from Hawaii would be 90% of her net Relafen and nabumetone purchases, whereas the Recognized Claim of a third party payor from Hawaii would be 45%. Both types of claimants would be entitled to 150% of their Recognized Claim if there are sufficient funds.

[14] "PAL is a coalition of 92 organizations in 34 states and the District of Columbia. PAL's coalition consists of consumer advocacy organizations, senior citizen organizations, labor unions, state and local health care access coalitions and legal services providers . . . . PAL seeks to make prescription drugs more affordable for consumers by using class action litigation and public education to bring an end to illegal pharmaceutical price inflation." Rosenfeld Decl. ¶¶ 2-3 (paragraph structure altered).

settlement proposal fairly and adequately protects and furthers the interests of the consumer class in this case.  We also feel that a prompt resolution of this matter is in the interests of the End-Payor Class, as it will enable the claims to be paid more promptly."  <u>Id.</u> at ¶ 11.

The second "division" of settlement funds is the state grouping and assigned percentage used to determine the claimant's Recognized Claim.  As described above, these state classifications were based on determinations of individual state law, including, primarily, whether a state had repealed <u>Illinois Brick</u>, 431 U.S. 720, thus empowering its citizens to obtain recovery even though they did not purchase directly from SmithKline.  The initial settlement proposal, provided for no such divisions.  This Court determined that it would be unfair to claimants residing in states that had repealed <u>Illinois Brick</u> to allow claimants from states that had not repealed <u>Illinois Brick</u> to share equally in a settlement since they would likely receive nothing at trial.  As this Court has noted, "[i]t is not the province of this Court to go changing the law."  Tr. of H'rg of 6/1/04 at 19-20.  In response to the Attorneys General who filed motions to intervene on behalf of residents in their states, the Court suggested that they "go to their state legislatures and

change the statute of limitations and take on <u>Illinois Brick</u>."[15]
Tr. of H'rg of 6/1/04 at 19.

Several objectors argued vigorously that establishing
differential percentage levels of recovery dependant on state law
was unfair.  One objector stated that class counsel "was too lazy
(or too selfish)" to ensure that residents of different states
were fairly represented.  Objections to Proposed Settlement of
Class Action by Dot Kensinger ("Kensinger Obj.") [Doc. No. 411]
at 5.  Despite this Objector's contention, the record
demonstrates otherwise.  In response to this Court's concerns
about a nationwide settlement class, class counsel established
the Allocation Committee and approached independent counsel for
each group of states.  Joint Decl. ¶¶ 46-47.[16]  This Committee

---

[15] Apparently at least one Attorney General has done exactly
that.  Assistant Attorney General Meredyth Smith Andrus appeared
on behalf of the State of Maryland at the Fairness Hearing on May
4, 2005.  She advised the Court that during "this legislative
session the Maryland General Assembly has enacted an <u>Illinois
Brick</u> repealer for all purchases of health care products in cases
brought by the Attorney General."  Tr. of H'rg of 5/4/05 at 27.

[16] The Allocation Committee consisted of the following:
Joseph Barton of Gold Bennett Cera & Sidener LLP (Group I);
Robert M. Foote of Foote, Meyers, Mielke & Flowers L.L.C. (Group
II); John P. Zuccarini of Elwood S. Simon & Associates, P.C.
(Group III); Andrew Whiteman of Hartzell & Whiteman, L.L.P.
(Group IV - North Carolina and North Dakota); Robert A. Marks of
Price Okamoto Himeno & Lum and Thomas R. Grande of Davis Levin
Livingston Grande (Group IV - Hawaii); David Freedman of
Freedman, Boyd, Daniels, Hollander, Goldberg & Cline (Group IV -
New Mexico); Robert Kaplan and Richard Kilsheimer of Kaplan Fox &
Kilsheimer LLP (Group IV - New York). Joint Decl. ¶ 47; <u>see</u> Exs.
to Decl. of Thomas M. Sobol in Supp. of End-Payor Pet. for
Attorney's Fees (declarations of the members of the Allocation

"engaged in intense negotiation for approximately two weeks,"
before making its initial recommendations, and reconvened
following the October 5, 2004 hearing.  Joint Decl. ¶¶ 48, 49-50.

The bulk of the objections surrounding the allocation among
states arise from objectors residing in Group II states.  These
objections are ineffective.  In the considered judgment of this
Court, had this case proceeded to trial and judgment, claimants
from Group II states would have recovered nothing at all.  In re
Relafen Antitrust Litig., 346 F. Supp. 2d. at 358-70.  The
decision to cut them a slice of the pie at all is borne out of
SmithKline's unwillingness to bargain for less than a global
settlement nationwide as well as the inherent vicissitudes of
litigation.  The consent of differential percentage levels of
recovery is the Great Compromise.[17]

It is the claimants from the Group I states who rightly have
cause to complain, since their recovery has been diluted by the
need to "take care of" the claimants from the Group II states to
afford SmithKline the nationwide settlement it demands.  Notably,
there is only one such objector, Pio, who is from Florida, a
Group I state.  Pio's concern is that "there has been no

---

Committee) ("Sobol Attorney's Fees Decl.") [Doc. No. 421].

[17] The Great Compromise, of course, is the decision of the
Constitution Convention to give each state an equal voice in the
Senate and the people an equal voice in the House of
Representatives.  Catherine Drinker Bowen, Miracle in
Philadelphia (Boston, Little Brown 1986) (1966).

structural assurance" that the differing treatment of claimants from different states has been the product of actual arm's length bargaining.  She contends that a disparity between subclasses is permissible "only where separate sub-classes have been established and separately represented."  Pio Obj. at 1 (citing Smith v. Sprint Communications Co., 387 F.3d 612 (7th Cir. 2004)).  Pio makes no developed argument, however, concerning how she has been actually shortchanged by the proposed settlement.

This Court rules that the structural protections put in place by class counsel were sufficient under all of the circumstances and that the allocation in light of state law is fair and adequate.

### D.    The Fairness of the Settlement

"When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement."  City P'ship, 100 F.3d at 1043 (citing United States v. Cannons Eng'q Corp., 720 F. Supp. 1027, 1036 (D. Mass. 1989) (Wolf, J.)).  As the First Circuit continued to point out, however, "[t]he presence of a conflict of interest would render the settlement suspect."  City P'ship, 100 F.3d at 1044 (citing In re Pacific Enters. Sec. Litiq., 47 F.3d 373, 378 (9th Cir. 1995) ("If, however, the settlement negotiations are biased, or skewed by a conflict of interest, we cannot presume that the attorneys have reached a fair settlement.")).  Throughout the

entire negotiation process, this Court has been clear about its concerns, both in regard to the relative weakness of claims arising in "Group II" states as well as its concerns as to the allocation of the Settlement Fund between the consumer class and the third party payor class.  Class counsel has kept the Court apprised, and all arguments and objections presented before this Court have been considered.  In light of the structural protections used by the parties, and this Court's understanding of the risks the Exemplar Class would face at trial, the Court finds that the proposed settlement is fair, reasonable, and adequate.

## V.   ATTORNEYS FEES AND COSTS

Under the terms of the Settlement, and subject to this Court's approval, class counsel may seek reasonable attorney's fees not to exceed 33-1/3% of the $67,000,000 settlement fund.[18] Class counsel has submitted a request for $22,311,000 in fees and $1,297,301.10 for costs and expenses.  Joint Pet. Mem. at 1. Several objectors assert that the requested fees are excessive. Pio Obj. at 5-7; Kensinger Obj. ¶ 7; Marshall Obj. ¶ 4;

---

[18] Although the total Settlement fund is actually $75,000,000, a portion of that fund was paid to the Settling Health Plans as part of their separate settlement agreement with SmithKline. Mem. of Law in Supp. of End-Payor Plaintiffs' Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Pls. ("Joint Pet. Mem.") [Doc. No. 420] at 1 n.1. The petition for fees is based on the portion of the Settlement Fund that remains. See id.

Preliminary Objection of Steve Robinson to Proposed Class
Settlement ("Robinson Obj.") [Doc. No. 423] at 8-9; Notice of
Objection and Intent to Appear by Melanie Blake ("Blake Obj.")
[Doc. No. 432] at ¶ 4.[19]

### A.    General Principles

Under the "common fund doctrine," an attorney who succeeds
in creating a fund for the benefit of the class is entitled to "a
reasonable attorney's fee from the fund as a whole."  Boeing Co.
v. Van Gemert, 444 U.S. 472, 478 (1980) (citations omitted); In
re Thirteen Appeals Arising Out of the San Juan Dupont Plaza
Hotel Fire Litig., 56 F.3d 295, 305 n.6 (1st Cir. 1995) ("The
common fund doctrine is founded on the equitable principle that
those who have profited from litigation should share its
costs.").

The two methods of calculating attorneys fees are the
lodestar method and percentage of fund method.  Id. at 305.  The
lodestar method requires the court to determine the number of
hours reasonably expended multiplied by a reasonable hourly rate
for attorneys of similar skill within that geographic area.  Id.
Under the percentage of fund method "the court shapes the counsel
fee based on what it determines is a reasonable percentage of the
fund recovered for those benefitted by the litigation."  Id.

---

[19] Several objectors also adopt any and all meaningful
objections made; however, there is no need to address these as
separate from the articulated objections.

(noting that, "[c]ontrary to popular belief it is the lodestar method, not the [percentage of fund] method, that breaks from precedent.") (citation omitted); see Blum v. Stenson, 465 U.S. 886, 900 n.16 (describing the common fund doctrine as the calculation of a "reasonable fee . . . based on a percentage of the fund bestowed on the class.").

Objector Pio challenges the appropriateness of the use of the percentage of fund method. Pio Obj. at 5-7; Marshall Obj. ¶ 4. Pio asserts that because "[t]his action was brought for violations of federal antitrust law, a fee shifting statute[,] . . . [the] attorney's fees must be based upon a lodestar analysis, as they would be if the plaintiffs were successful at trial and won a judgment against the Defendants." Pio Obj. at 5. See also Marshall Obj. ¶ 4 (arguing that "this Court should not allow Class Counsel an attorney's fee award in excess of Counsel's lodestar.").

In support, Pio cites to Brytus v. Spang & Co., 203 F.3d 238 (3rd Cir. 2000). Brytus was an ERISA case that went to judgment, and the attorneys were awarded a statutory fee. The attorneys in that case were seeking a percentage of fund of the judgment awarded to the plaintiffs in addition to the statutory fee.

Pio's reliance on Brytus is misplaced for several reasons. First, as this Court has previously noted, "the end payor plaintiffs' claims for damages and restitution arise solely under

56

state law." In re Relafen, 221 F.R.D. at 275.  Second, this case does not involve a common fund awarded as a result of a successful suit; rather, it arises out of a settlement prior to trial.  Moreover, the Court has made clear it did not hold that "the common fund doctrine may never be applied in a case for which there is a statutory fee provision and which goes to judgment." Brytus, 203 F.3d at 247.

Pio also cites to Staton v. Boeing, 327 F.3d 938, 966 (9th Cir. 2003), as support for the conclusion that a fee must not be higher than a fee established under the lodestar method.  The facts here differ from Staton.  Again, in Staton, there was no "common fund" but rather the parties constructed "a hypothetical fund" and then portrayed their total fee as 28% of the "fund," a percentage that would be "well within" the percentage allowed in actual common fund cases in the Ninth Circuit.  Staton, 327 F.3d at 966.

Finally, Pio and Marshall rely on City of Burlington v. Daque, 505 U.S. 557 (1992), for the proposition that "enhancement for contingency is not permitted under the [federal] fee shifting statutes at issue." Pio Obj. at 6 (quoting Daque, 505 U.S. at 562).  Again, Daque differs from this case.  In Daque, the case had gone to final judgment, the plaintiffs received fees as a "prevailing party," and the district judge "enhanced" the lodestar calculation because the attorneys had taken the case on

57

a contingency basis.  505 U.S. at 557.  Further, the End Payor
Plaintiffs note that "it has been well-settled for more than a
decade that fee-shifting cases such as Dague do not apply to
common fund cases."  End Payors' Resp. at 8 (citing In re
Thirteen Appeals, 56 F.3d at 308).  In In re Thirteen Appeals,
the First Circuit specifically noted, "[s]ince Dague, fairly
read, does not require abandonment of the [percentage of fund]
method typically used in common fund cases, it is not controlling
here."  56 F.3d at 308 (citing Swedish Hosp. Corp. v. Shalala, 1
F.3d 1261, 1267-70 (D.C. Cir. 1993) as "concluding that Dague
does not bar the use of the [percentage of fund] method in common
fund cases.")

     The First Circuit and several district courts in this
circuit have approved the use of the percentage of fund method in
common fund cases where a pool of money is to be divided among
class members.  Id. at 307 (approving the percentage of fund
approach as an acceptable method and recognizing "that use of the
[percentage of fund] method in common fund cases is the
prevailing praxis [with] . . . . distinct advantages"); Bussie v.
Allamerica Financial Corp., 1999 WL 342042 (D. Mass. May 19,
1999) (Gorton, J.) (unreported opinion); see In re Centennial
Techs. Litig., 20 F. Supp. 2d 119 (D. Mass. 1998)(Keeton, J.).
In In re Thirteen Appeals, 56 F.3d 295, the First Circuit held
that "in a common fund case the district court, in the exercise

of its informed discretion, may calculate counsel fees either on a percentage of the fund basis or by fashioning a lodestar."  56 F.3d at 307 (noting that "[i]n complex litigation–and common fund cases, by and large, tend to be complex–the [percentage of fund] approach is often less burdensome to administer than the lodestar method" and recognizing that "using the [percentage of fund] method in a common fund case enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency" because "attorneys . . . have a monetary incentive" to bill as many hours as possible, and there is "a strong disincentive to settlement").  <u>See also</u> <u>Bussie</u>, 1999 WL 342042 at *2 ("From a public policy standpoint, the [percentage of fund] method of calculating fees 'more appropriately aligns the interests of the class with the interests of class counsel–the larger the value of the settlement, the larger the value of the fee award.'  Furthermore, the [percentage of fund] method encourages efficiency and avoids the disincentive to settle cases early created by the lodestar method.").

Thus, this Court rules that the percentage of fund method is appropriate in these circumstances.  Nevertheless, this Court has the duty carefully to scrutinize the requested fees in light of the potentially misaligned incentives.  Courts have used the lodestar as a cross check to the percentage of fund.  Objector Pio argues that "the Court must ensure that class counsel's

requested percentage fee does not exceed their lodestar." Pio
Obj. at 6. The suggestion that the Court may not award fees
beyond the lodestar is not supported by the law. Instead, the
Court should look to a variety of factors to determine if the fee
request is excessive.

**B.  The Requested Award is Fair and Reasonable**

Class counsel argues that the requested fees are reasonable
in light of the result achieved for the class as well as the
"immense effort the litigation and subsequent settlement has
required from Class Counsel." Joint Pet. Mem. at 2. In
addition, class counsel notes that "End-Payor Counsel have taken
at least three creative and challenging steps to effectuate this
settlement that are unusual if not unprecedented in class action
settlements." Id. at 3. These steps include the subpoena
process to identify consumer claimants; the process of an
"intramural negotiation" among counsel assigned to represent the
various state groups; and the solicitation of cy pres proposals.
Id. In total, class counsel states that it has "expended more
than 29,000 hours over a four-year period," and "expended
$1,297,301.10" on necessary expenses.

1.  Factors to Assist in the Court's Determination

The First Circuit has not endorsed a specified set of
factors to be used in determining whether a fee request is
reasonable. The Second and Third Circuits have described several

factors district courts should consider in the decision as to
attorney's fees.  Those factors include

> (1) the size of the fund created and the number of
> persons benefitted; (2) the presence or absence of
> substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3)
> the skill and efficiency of the attorneys involved; (4)
> the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to
> the case by plaintiffs' counsel; and (7) the awards in
> similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir.
2000).  See also Goldberger v. Integrated Res., Inc., 209 F.3d
43, 50 (2d Cir. 2000) (articulating additional factors including
"the risk of the litigation," "the requested fee in relation to
the settlement," and "public policy considerations").

Although not controlling precedent, the listed factors are
helpful in framing the Court's analysis.

> a.   The Size of the Fund Created and the Number
>      of Persons Benefitted.

The size of the fund is $75,000,000 -- although, after the
Settling Health Plans' portion is subtracted, the remainder is
$67,000,000.  What is unique about this case is the number of
consumers who will benefit from this settlement.

There are 1,908 third party payors and 3,581 consumers who
have filed claims.  Consumer Class Final Report at 2.  In
addition there are 268,648 consumers who have been identified
through the subpoena program described above.  Consumer Class

Status Report at 5.[20]   This innovative approach will allow an

extraordinary number of consumers to benefit from the Settlement

Fund.

>    b.   The Presence of Objections

Four consumers have specifically objected to the size of the

requested fees.  Although this is a small number relative to the

size of the class -- 272,229 consumers -- this Court has examined

and carefully considered each of the objections.

>    c.   The Skill and Efficiency of Counsel

This Court has consistently noted the exceptional efforts of

class counsel.  Tr. of H'rg of 6/1/04 at 4-5 ("[T]his proposed

settlement is the result of a great deal of very fine lawyering

on behalf of the parties and counsel that are before the

Court."); Tr. of H'rg of 11/10/04 at 9 ("There's been outstanding

lawyering throughout.").

>    d.   Complexity and Duration of Litigation

This case has spanned four years.  It has included complex

legal issues including the concerns over Illinois Brick, as well

as "some highly technical and complex issues with regard to

pharmaceutical pricing and distribution, health insurance and

federal regulation and preemption issues."  Joint Pet. Mem. at

19.  Counsel here was consistently working toward trial, even as

---

[20]This results in 272,229 consumers receiving payment in
connection with this class action and as a result of this
settlement.

it aggressively sought to settle the case.

     e.   Financial Risks to the Attorneys

Objector Robinson suggests that there was less risk in this case than is typical, describing this as "in essence, a follow-on case riding the wake of the Eon Laboratories case." Robinson Obj. at 9. Hardly. <u>Eon</u>, Civ. No. 03-10506-WGY, commenced March 18, 2003, after the consolidated class action complaint was filed, and well after the first individual End Payor action was filed on January 30, 2002, <u>Lynch</u>, Civ. No. 02-10163-WGY. Eon's favorable result is simply not an indicator that this case represents "an unusual lack of risk." Robinson Obj. at 9.

As class counsel notes,

> [i]ndeed, when Class Counsel undertook representation of the End-Payor Purchaser Class, there were no assurances that any fees would be received. Class Counsel were aware that they would likely have to expend thousands of hours, and hundreds of thousands of dollars, in prosecuting this case over an extended period of time before having even a possibility of recovering a fee. Class Counsel alone bore the risk of the case being dismissed at the pretrial stage, of not prevailing at trial, or even losing on appeal.

Joint Pet. Mem. at 21.

     f.   Amount of Time Devoted to the Case

This case has advanced through various stages of litigation for four years. There have been no delays, either by Court or counsel. Indeed, vigorous unremitting trial has been the rule throughout. Class counsel certainly has expended tens of thousands of hours and this Court agrees that "this litigation

required all out effort." Class counsel successfully countered a motion to dismiss and succeeded in part in defeating a summary judgment motion. There was a mass of discovery in this case, including "hundreds of hours" consulting with experts, as well as the review of "hundreds of boxes of documents."[21] These efforts continued beyond the class certification process, wherein the Court certified an Exemplar Class and tailed off only once a global settlement in principle had been reached.

In addition, the class attorneys in this case have worked with enthusiasm and have been creative in their attempt to compensate as many members of the consumer class as possible.

g.   The Awards in Similar Cases

In support of the objections, Marshall cites Theodore Eisenberg and Geoffrey Miller's <u>Attorney's Fees in Class Action Settlements: An Empirical Study</u>, and concludes that "the mean fee percentage that should be awarded in a matter such as this should be no greater than 23.9%." Marshall Obj. ¶ 2 & Ex. A [Doc. No. 425] (N.Y.U. Ctr. for Law and Bus., Working Paper No. CLB-03-017, Sept. 24, 2003). <u>See also</u> Kensinger Obj. ¶ 7 (citing <u>Attorney Fee Awards in Common Fund Class Actions</u>, 24 Class Action Reps., 167 (Mar.-Apr. 2003)). This Court welcomes citation to these thorough and objective studies; they provide but a starting

---

[21] The record directly contradicts objector Kensinger's assertion that "there was not a massive amount of discovery." Kensinger Obj. ¶ 7.

place.  Here the court concludes it would be inappropriate to use

a mean -- an <u>average</u> -- categorized according to the size of the

settlement fund as the be all and end all of analysis.  Rather,

this Court respectfully notes these authorities[22] but pursues this

nuanced analysis looking at the complexity, duration, and type of

the case, and the skill and efficiency of the attorneys involved.

   Objectors are correct in pointing out that 33-1/3% is a high

_____

[22] Eisenberg and Miller address one-third contingencies and
do not suggest that such fees are inappropriate.  The authors
note that"one-third is the benchmark for privately-negotiated
contingent fees" and recognize that the "aggregate nature of
class action cases" could lead to lower fees, and
        other factors might tend to increase fee awards.
        Because aggregating claims increases the litigation
        stakes, the parties can be expected to expend more
        resources to litigate a class action than an individual
        case.  These increased expenditures may justify a
        higher fee.  Class actions are also by their nature
        more complex than individual actions.
<u>Id.</u> at 8.  Moreover, according to the data the authors compiled
from Class Action Reports Data, in non-securities cases where
recovery is in the $38-$79 million dollar range, the mean fee
percent is 23.9% with a standard deviation of 9.   <u>Id.</u> at 37.
        Our suggestion is that fee requests falling within one
        standard deviation above or below the mean should be
        viewed as generally reasonable and approved by the
        court unless reasons are shown to question the fee.
        Fee requests falling within one and two standard
        deviations above or below the mean should be viewed as
        potentially reasonable but in need of affirmative
        justification.  Fee requests falling more than two
        standard deviations above or below the mean should be
        viewed as presumptively unreasonable; attorneys seeking
        fees above this amount should be required to come
        forward with compelling reasons to support their
        request.
<u>Id.</u> at 38.
        While this Court does not purport to adopt this method, it
notes the amount requested here falls just outside of one
standard deviation.

percentage for a large settlement fund.  See, e.g., Conley v. Sears Roebuck & Co., 222 B.R. 181, 187 (D. Mass. 1998)(Saris, J.); In re Fleet/Norstar Sec. Litig., 935 F. Supp. 99, 109 (D.R.I. 1996).

There are also several cases that suggest that the standard percentage is generally lower as the common fund increases. Nevertheless, the requested fee is not out of proportion with large class actions.  See In re Pacific Enters. Sec. Litig., 47 F.3d at 379 (affirming the district courts award of 33% of the $12 million dollar settlement fund and noting that although "[t]wenty-five percent is the 'benchmark' that district courts should award in common fund cases[,] . . . [t]he district court may adjust that benchmark when special circumstances indicate a higher or lower percentage would be appropriate.").  But see Mazola v. May Dept. Stores Co., 1999 WL 1261312 at *4 (D. Mass. Jan. 27, 1999) (Gertner, J.) (unreported opinion) ("[I]n this circuit, percentage fee awards range from 20% to 35% of the fund. This approach mirrors that taken by the federal courts in other jurisdictions.").

2.   The Lodestar Cross Check

The First Circuit does not require a court to cross check the percentage of fund against the lodestar in its determination of the reasonableness of the requested fee.  See In re Thirteen Appeals, 56 F.3d at 307; Vizcaino v. Microsoft Corp., 290 F.3d

1043, 1050 (9th Cir. 2002) ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful <u>perspective</u> on the reasonableness of a given percentage award." (emphasis added)); Manual for Complex Litigation § 14.122 ("The lodestar is . . . useful as a cross-check on the percentage method by estimating the number of hours spent on the litigation and the hourly rate, using affidavits and other information provided by the fee applicant.  The total lodestar estimate is then divided into the proposed fee calculated under the percentage method.  The resulting figure represents the lodestar multiplier to compare to multipliers in other cases.").

The total lodestar in this case through March 31, 2005, as calculated by class counsel is $11,049,934.95.  Joint Pet. Mem. at 23 & Ex. A.  This yields a multiplier of 2.02, a number which has decreased with each additional hour Counsel has invested since March 31, 2005.

A multiplier of 2.02 is appropriate.  <u>See</u> <u>In re Rite Aid Corp. Sec. Litig.</u>, 396 F.3d 294, 298-299, 303-04 (3rd Cir. 2005)(finding no abuse of discretion where district court approved attorneys fees with a "fairly common" lodestar multiplier of 4.07, despite objection that lodestar multiplier could not be above 3.); <u>Vizcaino</u>, 290 F.3d at 1051 n.6 (charting attorney's fees awards and multipliers in common fund cases of $50-$200 million from 1996-2001, and noting "a range of 0.6 -

67

19.6 with most (20 of 24, or 83%) from 1.0-4.0 and a bare majority (13 of 24, or 54%) in the 1.5-3.0 range"); <u>Conley</u> v. <u>Sears Roebuck and Co.</u>, 222 B.R. 181 (awarding multiplier of 8.9 to arrive at a $7,500,000 fee).

It appears that the one-third percentage of fund fee is not unreasonable as matter of law, when there is such a large fund, though it may be at the high end in this type of litigation.  In light of the work done by the class counsel, the result attained from those efforts, and the lodestar cross check, the Petition for Attorney's Fees is GRANTED.

## VI.   INCENTIVE AWARDS

"Class counsel request that the Court approve incentive awards in the amount of $8,000 for each named consumer Plaintiff, $9,000 for each named consumer organization, and $14,000 for each named [third party payor] Plaintiff that participated in the litigation."  Joint Pet. Mem. at 25.

A single objector argues that the incentive awards are excessive.  Robinson Obj. at 4-5 (citing <u>Staton</u>, 327 F.3d at 975-78).  "Incentive awards are recognized as serving an important function in promoting class action settlements, particularly where as here, the named plaintiffs participated actively in the litigation."  <u>In re Lupron</u>, 228 F.R.D. at 98 (citing <u>Denney</u> v. <u>Jenkens & Gilchrist</u>, 2005 WL 388562, *31 (S.D.N.Y. Feb. 18, 2005)).  At least one district court in the First Circuit has

addressed the appropriateness of such an award.   In In re Compact Disc Antitrust Litig., the court noted that "[b]ecause a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit."   292 F. Supp. 2d at 189 (citing Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998)).

Counsel notes that the named plaintiffs have been active and have

> consistently worked to support the prosecution of this case.  They reviewed the complaints and other litigation documents, provided discovery requested by defendants, and sat for depositions that generally lasted several hours.  The [third party payor] Plaintiffs made further efforts, spending significant time looking for documents, communicating with their pharmaceutical benefits managers ("PBMs") to get usage reports for Relafen and nabumetone, and providing Class Counsel with important information on their purchase and payment practices and how the [SmithKline] rebate system worked.

Joint Pet. Mem. at 26.

Moreover, the amount of the award is in line with awards granted by courts in the past.  Thus, this Court approves the request for incentive awards.

## VII. THE CY PRES AWARD

In light of the limits to the claims from Group II, coupled with the requirement of a minimum Recognized Claim in order to receive any payment, many Group II claimants will not receive direct payments from the Settlement fund.  Accordingly, the Settlement Agreement provides for a $500,000 cy pres distribution

for the benefit of consumer and third party payor claimants in the Group II States.

Objector Robinson argues that "indirect 'benefits' to class members who otherwise receive nothing else should be considered insufficient as consideration in a settlement."  Robinson Obj. at 7.  Although this Court agrees that a cy pres award is insufficient in many cases, and has made great efforts to ensure that individual consumers will actually reap some benefit from this case, the cy pres award here is made in light of the very weakness of the claims of residents in Group II states.  Thus, the objection to the cy pres award is overruled.

Several organizations submitted proposals in application of the cy pres award.  The Court grants the cy pres award to the Brigham and Women's Hospital and Community Catalyst for their "Generics are Powerful Medicine" program, a consumer education program about the value and safety of generic drugs in Group II States.  This program will include a broad variety of bilingual consumer education materials about generic drugs and smart prescription choices.  These will include a subset of materials for doctors, each of whom play a key role in drug prescription and can educate hundreds of patients about generic medicines.  In addition, this applicant will locate non-profit organizations in Group II states to act as program partners, with a focus on organizations serving populations that include Relafen class

members.  This applicant will also create a sub-grant program for non-profit organizations in Group II states to carry out consumer education campaigns using the materials developed.

## VIII.     ORDER

For the reasons stated, the Court orders the following.

The Objections put forth by Prohias [Doc. No. 391], Pio [Doc. No. 397], Wortham [Doc. No. 404], Kensinger [Doc. No. 411], Taylor [Doc. No. 413], Robinson [Doc. No. 423], Marshall, Taylor and Martin [Doc. No. 425], and Blake [Doc. No. 432] are OVERRULED.

The End Payor Plaintiff's Motion for Final Approval of the Proposed Settlement, see Doc. No. 415, is GRANTED.

The End Payor Plaintiffs' Joint Petition for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards to Named Plaintiffs, Doc. No. 419, is GRANTED in its entirety.

The cy pres is awarded to the Brigham and Women's Hospital and Community Catalyst. Doc. No. 436.

## IX.  REFLECTIONS

The Court having found the proposed settlement fair, adequate and reasonable, it is approved pursuant to Rule 23 of the Federal Rules of Civil Procedure and this litigation comes to an end.

What has been accomplished?

A few reflections are in order.

In quantitative terms, the changes wrought by this litigation are subject to measurement.

- Caught out committing fraud on the United States Patent Office, In re '639 Patent Litig., 154 F. Supp. 2d 157 (D. Mass. 2001) (Lindsay, J.), aff'd on other grounds, SmithKline Beecham Corp., 45 Fed. Appx. 915. SmithKline faced serious consequences. Due to Rule 23, it has been able to buy peace nationwide without any admission of liability for an aggregate payment of $175,000,000 to wholesale pharmaceutical firms and $75,000,000 to consumers and their insurers. Mem. in Supp. of Direct Purchasers Class Pl.'s Mot. for Final Approval of Settlement [Doc. No. 290] at 1; Fourth Am. Stipulation at 3.

- 268,648 consumers will receive a minimum of $10 (a total of at least $2,686,480) without any need for the filing of daunting and cumbersome claim forms.

- 3,581 consumer claimants will receive $1,320,225.44. Consumer Class Status Report at 2; Consumer Class Final Report at 2.[23]

- Tentatively, 1,980 third party payors will receive $50,212,378.85. Consumer Class Final Report at 3

- A fee of $58,333,333 has been paid to the attorneys for the wholesale pharmaceutical firms. Direct Purchasers' Settlement at 8.

- $25,000,000 will be paid to the attorneys for the consumers and their insurers. Fourth Am. Stipulation at 4, 17.

---

[23] See Consumer Class Final Report at 3 ("Final review of [third party payor] claims and calculation of the respective payments to [third party payors] and payments attributable to [third party payor] opt-outs will require months. After entry of judgment, a postjudgment disbursement tally will be presented for the Court's approval before final payment of claims is made, analogous to what was submitted to the Court in connection with the direct purchaser settlement.")

- One state, Maryland, repealed <u>Illinois Brick</u>, better to empower its consumers in future similar situations. <u>See</u> <u>supra</u> n.15.

- These results have been achieved at a transaction cost (other than attorneys' fees) of $1,799,023 to the wholesale pharmaceutical firms, Direct Purchasers' Settlement at 24, and $ 1,284,657.91 to consumers and their insurers.  Joint Pet. Mem. at 1.

Was it worth it?

This more profound question is far more difficult to answer. <u>Compare</u> <u>Nichols</u> v. <u>SmithKline Beecham Corp.</u>, No. 00-6222 (E.D. Pa. Apr. 22, 2005) (approving a settlement of "$65 million, or between 9.3% and 13.9% of damages" and noting that "[t]his percentage is consistent with those approved in other complex class actions"); <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 205 F.R.D. at 369 (indicating that a settlement recovery of $100 million, or more than 80% of the damages indicated in the complaint, and a recovery by consumers of over $71 million, representing 65% of the estimated harm to consumers, "is not surprising, and ultimately does not render the terms of the settlement unfair, unreasonable, or inadequate").  One thing is clear beyond peradventure – were it not for the class action procedures prescribed under Rule 23, not a single consumer would ever have received a dime from SmithKline.

Born of the genius of Benjamin Kaplan, the legendary reporter to the Standing Advisory Committee on the Federal Rules

at the time of their adoption in 1939,[24] and later a Justice of
the Massachusetts Supreme Judicial Court, Rule 23 has been hailed
as perhaps the consumers' most potent procedural tool to check
corporate misconduct.  Amchem, 521 U.S. at 617 (emphasizing the
importance of class actions as a tool to protect "the rights of
groups of people who individually would be without effective
strength to bring their opponents into court at all") (quoting
Benjamin Kaplan, A Prefatory Note, 10 B.C. Indus. & Com. L. Rev.
497, 497 (1969)); John Bronstein & Owen Fiss, The Class Action
Rule, 78 Notre Dame L. Rev. 1419, 1419-1422 (2003) (noting that
class actions "provide for the private enforcement of laws that
are aimed at protecting the public" and emphasizing they should
be used to serve this "social purpose"); Kaplan, Continuing Work,
81 Harv. L. Rev. at 390 (describing the positive outcomes of
class action suits, including "economy of effort" and "uniformity
of result").

No longer.

Today, society sees Rule 23 primarily as a unwarranted

---

[24]Benjamin Kaplan, A Prefatory Note, 10 B.C. Indus. & Com.
L. Rev. 497 (1969); Marvin E. Frankel, Some Preliminary
Observations Concerning Civil Rule 23, 43 F.R.D. 39, 52 (1967,
1968) ("citing an observation of Professor Kaplan, Reporter of
the new Civil Rules, who said . . . that it will take a
generation or so before we can fully appreciate the scope, the
virtues, and the vices of the new Rule 23"); Benjamin Kaplan,
Continuing Work on the Civil Committee: 1966 Amendments of the
Federal Rules of Civil Procedure, 81 Harv. L. Rev. 356, 375-400
(1967).

obstacle to private capital formation.  As a consequence,
Congress has significantly watered down its potency.  <u>See</u> The
Private Securities Litigation Reform Act of 1995, 18 U.S.C. §§
77z-1, 77z-2, 78u-4, 78u-5, 78j-1 (2005); <u>Crowell</u> v. <u>Ionics</u>, 343
F. Supp. 2d 1 (D. Mass. 2004) (addressing the pleading
requirements of the Private Securities Litigation Reform Act); <u>In
re Allaire Corp. Sec. Litig.</u>, 224 F. Supp. 2d 319 (D. Mass. 2002)
(same);  Class Action Fairness Act of 2005, Pub. L. No. 109-2
(2005) (the "Act") (amending 28 U.S.C. §§ 1332, 1453).[25]

What went wrong?

Conventional measures, driven in part by the goals of
special interests, are collected in this Court's recent decision
in <u>Natale</u> v. <u>Pfizer</u>, 379 F. Supp. 2d 161 (D. Mass. 2005), <u>aff'd</u>,
--- F.3d. ---, 2005 WL 2253622 (1st Cir. Sept. 16 2005).  I focus
here on another -- and perhaps more controversial -- aspect of
the answer: the failure of the federal judiciary fully and
adequately to implement all the interlocking procedural
safeguards of Rule 23.  Specifically, judges have been too quick
to approve counsel as adequate to represent sprawling and

---

[25]The effect of this recent legislation, however, may not be
quite what the drafters intended.  <u>See</u> Pamela A. MacLean,
<u>Antitrust Dilemma Emerges in U.S. Courts: Price-Fixing Actions
Flood in from States</u>, Nat'l. L.J., Sept. 19, 2005 at 1 (noting
the effect of the Class Action Fairness Act of 2005 which, when
combined with the Department of Justice's amnesty program, has
caused "antitrust cases [to] . . . flood[] back to federal
court").

amorphous classes, and then overeager to accept a settlement --
any settlement -- that will bring pending litigation to an end.
The result all too often has been a virtual collusion between
plaintiffs' counsel and corporate interests bent on buying peace
and excluding consumers from access to court.  Cf. Elliot J.
Weiss & John S. Beckerman, Let the Money do the Monitoring: How
Institutional Investors Can Reduce Agency Costs in Securities
Class Actions, 104 Yale L.J. 2053, 2079 (1995) (asserting that
"the most significant problem is . . . that cases [that] are
settled . . . lack merit"); Developments, The Paths of Civil
Litigation, 113 Harv. L. Rev. 1806, 1808 (2000) ("[T]he class
action seeks to enhance procedural fairness by ensuring that
people who have been wrongfully harmed have access to the
judicial system.  Procedural fairness encompasses litigants'
access to the courts as well as assurances that, within the
context of such adjudication, courts will evaluate claims and
defenses solely on their merits.").  Had these two tendencies
been resisted more vigorously by the judiciary, the class action
procedural mechanism could more easily (and successfully) have
withstood the winds of change.  See John C. Coffee, Jr., Class
Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L.
Rev. 1343, 1350 (1995) (describing the "historic significance" of
the "transformation" of the use of the mass tort class action –
"once a sword for plaintiffs, the modern class action is in some

76

contexts increasingly becoming a shield for defendants . . . .
[T]he mass tort class action now often provides a means by which
unsuspecting future claimants suffer the extinction of their
claims even before they learn of their injury.").

My own missteps -- and attempts at correction -- will
illustrate these pitfalls.  First, I here approved of class
counsel with little more than a cursory look to assure myself
that counsel were experienced, competent, and vigorous.  This was
fine as far as it went.  Class counsel here exceeded my
expectations in these respects in every way.  I neglected to ask,
"how does counsel expect actually to benefit the consumers on
whose behalf this action is ostensibly being brought?"  This is a
crucial question and none of my experience in securities class
action litigation, <u>Orton</u> v. <u>Parametric Tech. Corp.</u>, 344 F. Supp.
2d 290 (D. Mass. 2004); <u>Crowell</u> v. <u>Ionics, Inc.</u>, 343 F. Supp. 2d
1 (D. Mass. 2004); <u>In re Allaire Corp. Sec. Litig.</u>, 224 F. Supp.
2d 319 (D. Mass. 2002); <u>Fitzer</u> v. <u>Security Dynamics Techs., Inc.</u>,
119 F. Supp. 2d 12 (D. Mass. 2000); <u>Chalverus</u> v. <u>Pegasystems,
Inc.</u>, 59 F. Supp. 2d 226 (D. Mass. 1999); <u>In re Number Nine
Visual Tech. Corp. Sec. Litig.</u>, 51 F. Supp. 2d 1 (D. Mass. 1999);
<u>In re Peritus Software Servs., Inc. Sec. Litig.</u>, 52 F. Supp. 2d
211 (D. Mass. 1999); <u>Lirette</u> v. <u>Shiva Corp.</u>, 27 F. Supp. 2d 268
(D. Mass. 1998); <u>In re Indigo Sec. Litig.</u>, 995 F. Supp. 233 (D.
Mass. 1998); <u>In re Computervision Corp. Sec. Litig.</u>, 914 F. Supp.

717 (D. Mass. 1996); Abato v. Marcam Corp., 162 F.R.D. 8 (D.
Mass. 1995); In re Copley Pharm., Inc. Sec. Litig.; 1995 WL
169215 (D. Mass. Mar. 16, 1995) (unreported opinion); In re
Computervision Corp. Sec. Litig., 869 F. Supp. 56 (D. Mass.
1994); Capri Optics Profit Sharing v. Digital Equip. Corp., 760
F. Supp. 227 (D. Mass. 1991); Boyle v. Merrimack Bancorp, Inc.,
756 F. Supp. 55 (D. Mass. 1991); Capri Optics Profit Sharing v.
Digital Equip. Corp., 1989 WL 159602 (D. Mass. Apr 20, 1989)
(unreported opinion), prepared me to analyze this important
issue.  Professor Linda Mullenix is the leading commentator on
this issue today, see Linda Mullenix, Taking Adequacy Seriously:
The Inadequate Assessment of Adequacy in Litigation and
Settlement Classes, 57 Vand. L. Rev. 1687 (2004), and this case
brings home the force of her analysis.  After all, granting that
viable claimants will recover nothing absent class action
treatment, what percentage need be achieved for those deserving
recovery to make the enormous transaction costs of class action
litigation worthwhile?  The plaintiffs' attorneys, while here
assuming great risks, in the end achieved satisfactory
recompense, and the corporate interest has paid for and achieved
a nationwide litigation bar.

What of the consumers?  What percentage of them need recover
in order to warrant litigation? 10%? 25%? 50%? Or more?  Here,
32.5% percent of viable consumer claims have been (or will be)

paid[26] and 12,790 consumers in states where no recovery is
afforded due to the pro-business stance of their state
legislatures will get something to warrant SmithKline receiving
its nationwide litigation ban. Is this good enough? I think so,
after analyzing the settlement results in similar litigation
elsewhere, see supra pp. 73-74, but I'm not sure.  If ever the
question is again posed, I will be more assiduous pre-
certification in assuring that the intended beneficiaries of the
litigation actually exist, In re Silica Prods. Liab. Litig., No.
MDL 1553, slip op., 2005 WL 1593936 (S.D. Tex. June 30, 2005)
(Jack, J.) and that they will be the prime recipients of
settlement or a successful trial.

Second, consider the overeagerness to approve settlement.
There is nothing wrong with settlement, of course.  Most civil
cases should (and do) settle.  But see Owen Fiss, Against
Settlement, 93 Yale L.J. 1073 (1984) (arguing that settlement is
a "highly problematic technique" with a "questionable"
foundation, emphasizing that it is harbors the same problems as
does plea bargaining, and asserting that as it "is a capitulation
to the conditions of mass society . . . [it] should be neither
encouraged nor praised").  In the class action context, however,
the adversarial interests are skewed due to class counsel's

---

[26]272,229 consumers, out of an approximate 836,750 potential
class members, Glenn Decl. ¶¶ 9-10, will thus recover.

justifiable interest in getting paid.  So it is that the
controlling decisions have properly imposed on the district
courts the duty to act as a "fiduciary" for the class.  <u>Evans</u> v.
<u>Jeff D.</u>, 475 U.S. 717, 726 (1986); <u>Marek</u> v. <u>Chesney</u>, 473 U.S. 1,
33 n.49 (1985); <u>Reynolds</u>, 288 F.3d at 279-80; <u>In re Relafen</u>
<u>Antitrust Litig.</u>, 360 F. Supp. 2d at 193.  If there has been
failure, it is here for, as will be explained below, the federal
courts today generally place a far higher premium on settlement
than on proper adjudication.  <u>See</u> Fiss, 93 Yale L.J. at 1081-1082
("Other policing mechanisms, such as Rule 23, which governs class
actions, make no effort to articulate a substantive standard for
approving settlements, but instead entrust the whole matter to
the judge.  In such cases, the judge's approval theoretically
should turn on whether the group consents, but determining
whether such consent exists is often impossible . . . .  The
judge's approval <u>instead</u> turns on how close or far the proposed
settlement is from what he imagines would be the judgment
obtained after suit.  The basis for approving a settlement,
contrary to what the dispute-resolution story suggests, is
therefore not consent but rather the settlement's approximation
to judgment. . . . [T]he judgment being used as a measure of the
settlement is very odd indeed: [i]t has <u>never in fact been</u>
<u>entered</u>, but only <u>imagined</u>. It has been constructed <u>without</u>
<u>benefit of a full trial</u>, and at a time <u>when the judge can no</u>

<u>longer count on the thorough presentation promised by the</u>
<u>adversary system</u>. The contending parties have struck a bargain,
and have every interest in <u>defending the settlement</u> and in
<u>convincing the judge</u> that it is in accord with the law."
(emphasis added)).[27]

Here, the work-up for trial proceeded smoothly and well.  As
is its wont, the Court set an early, firm trial date and, as the
commentators agree, Richard L. Schwartz, <u>Pretrial Preparation in</u>
<u>Antitrust Cases: What Can One Learn From The Microsoft Case?</u>
1152 PLI/Corp. 17, 25 (1999) (noting that Judge Jackson, in
<u>United States</u> v. <u>Microsoft Corp.</u>, No. 98-1232, 1998 U.S. Dist.
LEXIS 14231 (D.D.C. 1998), properly "established what is arguably
the most effective discipline on the parties -- an early trial

---

[27]Fiss further asserts that:
[T]he purpose of adjudication should be understood in
broader terms. Adjudication uses public resources, and
employs not strangers chosen by the parties but public
officials chosen by a process in which the public
participates. These officials, like members of the
legislative and executive branches, possess a power that has
been defined and conferred by public law, not by private
agreement. Their job is not to maximize the ends of private
parties, nor simply to secure the peace, but to explicate
and give force to the values embodied in authoritative texts
such as the Constitution and statutes: to interpret those
values and to bring reality into accord with them. This duty
is not discharged when the parties settle.
<u>Id.</u> at 1085.  <u>Cf.</u> Todd B. Hilsee, Shannon R. Wheatman, & Gina M.
Intrepido, <u>Do You Really Want Me to Know My Rights? The Ethics</u>
<u>Behind Due Process in Class Action Notice is More Than Just Plain</u>
<u>Language: A Desire to Actually Inform</u>, 18 Geo. J. Legal Ethics
1359 (2005) (positing, likewise, that the values embodied in
notice must be present in class action notice programs).

date"), this had the salutary effect of focusing the litigants'
attention and resources and minimizing the occurrence of
peripheral side issues - what my colleague Douglas Woodlock calls
"the instinct for the capillaries."  The case also benefitted
immeasurably from the brilliant voluntary mediation of the late
A. David Mazzone, who not only brought the litigants to the table
but ably framed the settlement agenda, all without slowing the
march to trial or relieving the pressure of the firm trial date.[28]
To its credit, SmithKline mounted a formidable summary judgment
motion, analyzing in detail every legal argument that might give
it complete victory.  The Court necessarily treated this motion
with care, allowing it in part and denying it in part after
extensive argument and the most careful reflection.  In due
course, the parties reported a settlement in principle.  As
originally sketched out, SmithKline would pay $75,000,000 in
return for a nationwide settlement class instead of the far more
limited exemplar class the Court had already certified.  In re
Relafen Antitrust Litig., 218 F.R.D. 337.

This development transformed the dynamics of the litigation
virtually overnight.  No longer was the trial date a credible

---

[28]It was at the mediation stage that Judge Mazzone
perceptively noticed what I had thus far missed altogether - that
a major issue in this massive consumer class action litigation
involved the difficulty of getting any appreciable amount of the
potential settlement funds into the hands of actual consumers.
This apparently concerned Judge Mazzone more than the litigants'
counsel.

benchmark.    After all, the parties wanted settlement, not trial,

and all attention turned to effectuating it.   Nor could the Court

any longer trust in the adversary system.   At once, "the law" -- so

carefully scrutinized in determining the summary judgment motion –

seemed to take a back seat to more practical needs in the minds of

everyone but the Court.   Indeed, SmithKline -- which had been so

forceful and articulate in arguing that no consumer in any state

ought recover -- now calmly swallowed a settlement (and consequent

litigation bar) with consumers in all fifty states.   Indeed, when

this Court eventually issued its memorandum of decision explaining

its ruling on the summary judgment motion, In re Relafen Antitrust

Litig., 346 F. Supp. 2d 349, SmithKline promptly sought a writ of

mandamus to expunge the offending analysis on the ground that the

case was already over.   Id., appeal docketed, No. 05-1078 (1st Cir.

Jan. 18, 2005).[29]   Only when this Court issued the same opinion a

second time in the context of explaining its approach to the

fairness hearing, In re Relafen Antitrust Litig., 360 F. Supp. 2d

166, did SmithKline realize the error of its ways and withdraw the

petition for mandamus.   In re Relafen Antitrust Litig., 346 F. Supp.

2d 349, appeal withdrawn, No. 05-1078 (1st Cir. Mar. 17, 2005).

---

[29]See Judith Resnik, Whose Judgment? Vacating Judgments,
Preferences for Settlement, and the Role of Adjudication at the
Close of the Twentieth Century, 41 UCLA L. Rev. 1471 (1994), for
a thoughtful analysis criticizing those circuit court decisions
that allow settlement somehow to remove offending district court
decisions already issued.

The point in all this is that once skilled counsel arrive at a settlement in principle, the pressure to approve it and get the case concluded can become well nigh irresistible.  It was while the Court held off approving the settlement originally proposed and advocated by all parties that the consolidated cases passed the three year benchmark and became reportable under my charge pursuant to the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471, 472-482 (1990), with the attendant inference that I had somehow mismanaged the litigation since it had not yet been terminated.  Moreover, once the trial date vanished, SmithKline lost any incentive it may have had to sweeten the deal, even though the Court was obviously balking at adding in thousands of consumers it had just ruled had no right to recover due to their residence in non-<u>Illinois Brick</u> repealer states.

This Court virtually entered the bargaining process to limn the kind of settlement it would approve, <u>see</u> Trs. of H'rgs of 6/1/04**,** 7/14/04, 9/14/04, such that counsel reached "the Great Compromise" discussed above.  <u>Cf.</u> Mullenix, 57 Vand. L. Rev. at 1720 (asserting that in <u>In re "Agent Orange" Prod. Liab. Litig.</u>, 597 F. Supp. 740 (E.D.N.Y. 1984), "Judge Weinstein of the Eastern District of New York had sought to salve the wounds of the Vietnam War with his approval and supervision of the Agent Orange class action litigation and the resulting settlement class").  Notwithstanding the Court's proactive fiduciary duty, this is an awkward role for a judicial

84

officer. See Judith Resnik, Mediating Preferences: Preferences for Process and Judicial Preferences for Settlement, 2002 J. Disp. Resol. 155, 164 (2002) (positing "that the judicial embrace of settlement is unwise – especially for judges. Through their practices, rules, teaching, and doctrine, judges have not only made plain the many facets of the role of judge (judge as settler, judge as negotiator, judge as dealmaker) but also have deconstructed the role of judging, rendering it more vulnerable politically and legally." (internal footnote omitted)). Compare Jean Wegman Burns, Decorative Figureheads: Eliminating Class Representatives in Class Actions, 42 Hastings L.J. 165, 184 (1990) ("[T]he role of the judge is significantly different in class litigation than in the traditional two-party lawsuit. While in the traditional lawsuit the judge plays only a passive, neutral role, the judge in the class action typically takes on a more activist role in supervising and guiding the litigation . . . . [T]he Supreme Court [has] . . . noted, once the class complaint is filed the district court has a 'managerial responsibility.' [A] district court has both the duty and broad authority to exercise control over a class action."); Deborah R. Hensler, Revisiting the Monster: New Myths and Realities of Class Action and Other Large Scale Litigation, 11 Duke J. Comp. & Int'l Law 179, 196 (2001) (stating that the social effect of class actions "depends substantially on how well judges control the litigation process"); Alexandra Lahav, Fundamental Principles for

Class Action Governance, 37 Ind. L. Rev. 65, 114 (2003) (indicating that some scholars "have advocated increased judicial oversight as the solution to . . . conflicts of interest and lack of fairness in class action lawsuits"), with Fiss, 93 Yale L.J. at 1085 (noting that a judge's "job is not to maximize the ends of private parties, nor simply to secure the peace"); William B. Rubenstein, A Transactional Model of Adjudication, 89 Geo. L.J. 371, 429 (2001) (noting that in Amchem, 521 U.S. 591, and Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999), the "lower court judges were active dealmakers in the bargains that culminated in the Amchem and Ortiz settlements. The transactional work they undertook stretched the limits of their judicial capacity.  Moreover, as noted above, the judges were beneficiaries of the deals that were cut in that their workload was thereby reduced significantly."). See also Charles Silver, "We're Scared to Death": Class Certification and Blackmail, N.Y.U. L. Rev. 1357, 1338 (2003) (citing Blair v. Equifax Check Servs., Inc., 181 F.3d 832 (7th Cir. 1999) where Judge Easterbrook wrote that trial judges, at times, "wring settlements from defendants whose legal positions are justified but unpopular," and In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995), where Judge Posner emphasized the "district judge's commendable desire to experiment with an innovative procedure for streamlining the adjudication of this mass tort" (internal quotation marks omitted)); Georgene Vairo, Why Me? The Role of Private Trustees in Complex Claims Resolution,

57 Stan. L. Rev. 1391, 1398 (2005) ("Indeed, over the last twenty years, judges aggressively have used numerous procedural devices to steer mass tort cases to resolution without trial.").

The settlement ultimately approved is discussed above.  Is it the result of judicial overeagerness to approve a settlement and move the case?  The objectors think so; I think not.  Is the institutional tendency present? Absolutely.

In a larger sense, the rise and fall of Rule 23 is a virtually perfect metaphor for the rise and decline of the federal district courts and America's jury trial system. <u>See</u> Appendix.


/s/ William G. Young
_____
WILLIAM G. YOUNG
CHIEF JUDGE

APPENDIX

In the wake of the cataclysm of World War II, Americans turned to law as never before to solve society's ills.  This faith in law drove the great expansion of constitutional criminal procedure, the courageous dismantling of our "separate but equal" doctrines, and our largely peaceful civil rights revolution.  To make "the equal justice under law" a reality for our citizens, there was a concomitant expansion in the number, jurisdiction, and role of our federal district judges, and Americans were invited into our courts in record numbers, directly to participate in government through service on the nation's juries.

In this new millennium, that impulse appears largely spent.

Today there is a general turning away from the law, Mark Galanter, The Hundred-Year Decline of Trial and the Thirty Years War, 57 Stan. L. Rev. 1255, 1272-1274 (2005) ("The recent accelerated decline in the number of trials is . . . part of a much broader turn from law, a turn away from the definitive establishment of public accountability in adjudication . . . ."), and the American jury, that most vital expression of American democracy, the New England town meeting writ large, "is dying out -- more rapidly on the civil than on the criminal side of the courts and more rapidly in the federal than in the state courts -- but dying nonetheless." United States v. Reid, 214 F. Supp. 2d 84, 98 n.11 (D. Mass. 2002).

Again, what has gone wrong?

Here too the reasons are complex and beyond the scope of these brief reflections.  Undoubtedly, among the chief reasons are the expense, delay, and wrongly perceived uncertainty of "the law," even though it is demonstrable and undisputed that every step away from our American system of justice by jury adjudication favors those persons and entities that have more at the expense of those of our people who have less.  Cf. Valerie Hans, Empirical Research and Civil Jury Reform, 78 Notre Dame L. Rev. 1497, 1498 (2003) (noting a commonly accepted criticism of today's juries, namely that they are "highly sympathetic to plaintiffs who bring lawsuits and tend to be hostile to corporate and insurance defendants"); id. at 1514 (citing Hans's mock study which demonstrated that "consistently higher awards" were granted in cases involving corporate defendants rather than individual defendants); Valerie P. Hans & Alayna Jehle, Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection, 78 Chi.-Kent L. Rev. 1179 (2003) ("The conclusion from the existing research is that jurors' experiences with and pre-existing attitudes toward . . . corporate defendants shape perceptions of evidence and may influence civil jury verdicts and awards.").  See generally Valerie P. Hans, Business on Trial: The Civil Jury and Corporate Responsibility (2000).

As a trial judge for nearly half the era since World War II,

it suffices here simply to point out our own complicity in two of the salient reasons for the decline in the federal district courts.

The first is the sanctioning of a six person jury.

> [O]n this issue the federal judiciary itself appears to have faded from dynamism into stasis in its willingness to accept a diminished, less representative, and thus sharply less effective civil jury, see Judith Resnik, Changing Practices, Changing Rules: Judicial and Congressional Rulemaking on Civil Juries, Civil Justice and Civil Judging, 49 Ala. L. Rev. 133, 137-52 (1997) (decrying the failure of the Judicial Conference to restore twelve-person juries in civil cases); Development in the Law-The Civil Jury, 110 Harv. L. Rev. 1408, 1466-89 (1997) (same); see also Michael J. Saks, Small-Group Decision Making and Complex Information Tasks, 26, 30 (Federal Judicial Center 1981) . . . .

Ciulla v. Rigny, 89 F. Supp. 2d 97, 102 n.6 (D. Mass. 2000) (citing Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 271-72 n.3 (D. Mass. 1998). See also ABA Principles for Juries and Jury Trials (Aug. 2005) at 16-17 ("In light of history and the empirical data these Principles seek to encourage a return to the twelve person jury in all non-petty criminal cases and in all civil cases wherever feasible. Studies have established that there are significant differences between the effectiveness of six and twelve member juries. Larger juries deliberate longer, and have better recall of trial testimony. Thus, they are more likely to produce accurate results. The smaller the size of the jury, the less representative it becomes. A jury of one's peers must be representative of the community lest it become a means of tyranny by the majority. Maintaining the representative nature of the jury is essential to preserving its fairness and legitimacy in the eyes of the public.

Twelve person juries are significantly more likely to facilitate representation of minority voices." (internal citations omitted)). See generally id. at 15-19.

Second, we have so "deconstructed the role of the trial judge" that far too many of our colleagues are today unclear on the concept. See Resnik, Mediating Preferences, 2002 J. Disp. Resol. at 164. "This is a trial court. Trial judges ought go on the bench every day and try cases." William G. Young, Speech to the American College of Trial Lawyers 54th Spring Meeting (Mar. 6, 2004), available at http://www.actl.com/PDFs/JudgeYoungSpeech.pdf (quoting the Hon. John Meagher, Senior Active Justice of the Massachusetts Superior Court (1978)). That simple precept applies with full force to all of us privileged to serve as judge on the federal district courts, yet average on-bench time among active district judges has declined from 790 hours in 1980 to 490 hours in 2002. Rep. of the Fed. Judicial Ctr., Average Trial and Nontrial Time Reported on the JS-10 by Judges Who Were Active District Judges All Year and Reported Time for at Least 11 Months.

Indeed, some knowledgeable commentators are pointing out that we "trial" judges appear no longer very interested in doing our job. See Patrick E. Higginbotham, So Why Do We Call Them Trial Courts? 55 SMU L. Rev. 1405 (2002) (expressing his "concern over trial numbers" and noting "the decline in trials" and "the attending decline in participation of lay citizens . . . in our justice

system"); Leonard Post, <u>Federal Tort Trials Continue a Downward Spiral; 79% Decline; Increased Used of ADR, Better Case Management Cited</u>, Nat'l. L.J., Aug. 22, 2005, at P7 (quoting Professor Stephen Burbank as saying "federal judges now give more attention to case management and non-trial adjudication than they give to trials," and that "it is quite clear that 'trial' judges ought to spend more time on that activity from which the[ir] name is taken."). <u>See also</u> <u>The "Vanishing Trial:" The College, The Profession, The Civil Justice System</u>, American Coll. of Trial Lawyers (2004) at 4-5 ("The number of civil trials in federal court over the 40 years from 1962-2002 has fallen, both as a percentage of filings and in absolute numbers. . . . These numbers are particularly startling in light of the enormous increase in litigation over the same 40 year period.").

The results of our own lack of interest in jury trials is already sadly apparent. <u>But see</u> Brief Amicus Curiae of Chief Judge William G. Young in Support of Judge Nancy Gertner, <u>In re: United States</u>, (1st Cir. 2005) (No. 05-2358). Since we no longer seem very interested in using courtrooms, we are losing them, United States Courts Design Guide (1997) at 4-41 (propounding the sharing of United States district courtrooms), and the institutional judiciary seems bent on dismantling the superb professional teams so essential to sustained trial operations.[30]

---

[30]Today, federal judges speak openly of this being "the last generation of court reporters." <u>See</u> <u>Miara</u> v. <u>First Allmerica Fin. Life Ins., Co.</u>, 379 F. Supp. 2d 20, 69 n.57 (expressing

Somehow, we seem to be forgetting that the very reason for our judicial existence is to afford jury trials to our people pursuant to the United States Constitution. U.S. Const. art. III, sec. 2. Ironically, our very ability to control our dockets to avoid the quotidian details of daily jury trials and save ourselves instead for "really big" constitutional adjudication insures instead that such cases will come our way less and less.   See Enwonwu v. Chertoff, 376 F. Supp. 2d 42 (D. Mass. 2005); John W. Keker, The Advent of the "Vanishing Trial": Why Trials Matter, The Champion (Sept./Oct. 2005) 32, 33 ("Judges led the charge to fewer trials and now they regret it.").

Imagine that we actually celebrated the essential function – the trial of a federal case – that sets a United States District Judge apart from any other judicial officer.   What would such a system look like?  Can we identify our "best" federal trial courts and learn from them?   In one sense, we can.   The Administrative Office keeps records of the number of trials completed (on average)

concern over the marginalization of our official court reporters).   See also Proceedings of the United States Judicial Conference, Sept. 20, 2005 (cutting, without discussion, court reporter transcript income by nearly one-third to establish, at public expense, a costly internal transcript payment mechanism duplicative of private systems already serving this need at no public cost).   In the same vein, see Hon. John Richardson, Remarks to the Annual Meeting of Chief United States District Judges, urging personnel reductions in docket clerks now that they have served to implement the federal courts' electronic docketing system – a system sometimes referred to as "pathetic Pacer."   Enwonwu v. Chertoff, 376 F. Supp. 2d 42, 82 n.34 (D. Mass. 2005).

in each district court and ranks them accordingly.  Using the most
recent available data (2003), here's the top ten (actually eleven
due to tie scores):

| Rank by Trials Completed | Court | Trials Completed in 2003 | Rank by Total Filings | Total Filings in 2003 |
|---|---|---|---|---|
| 1st | Montana | 42 | 66th | 387 |
| 2nd | Iowa Northern | 41 | 22nd | 534 |
| 3rd | Tennessee Middle | 39 | 40th | 482 |
| 4th | Pennsylvania Middle | 38 | 42nd | 480 |
| 5th | Florida Northern | 37 | 39th | 486 |
| 6th | Iowa Southern | 33 | 51st | 436 |
| 6th | Kansas | 33 | 57th | 421 |
| 8th | Louisiana Middle | 32 | 56th | 424 |
| 8th | Nebraska | 32 | 40th | 482 |
| 8th | Texas Southern | 32 | 5th | 709 |
| 8th | Virginia Eastern | 32 | 21st | 550 |

Are these courts really the finest of our federal district courts?
Certainly it must be clear that, within limits,[31] sustained trial
operations are a matter of culture, not caseload, and all of us can,

---

[31]It is no accident that, with one exception (Texas
Southern), the courts with the heaviest caseload are missing from
this list.  Those courts are simply swamped with cases and,
having served three such courts as a visiting judge, I don't see
how they can possibly mount sustained trial operations.
Obviously, the Southern District of Texas has much to teach us
all.

and should, learn from their success.

Unfortunately, the Administrative Office has substantially diluted the value of its statistical record since, for it, a "trial" is not a jury or jury-waived proceeding that leads to a verdict or final decision, but rather simply an evidentiary hearing. Monthly Report of Trials and Other Court Activity (Form JS-10) (explaining that "for the purposes of [reporting proceedings] . . . a <u>trial</u> is defined as a contested proceeding before a court or jury in which <u>evidence is introduced</u>" (emphasis added in part, original emphasis omitted in part)). Thus, any evidentiary fragment of a case, e.g. motions to suppress, <u>Daubert</u> hearings, <u>Markman</u> hearings,[32] counts as a separate "trial" for statistical purposes. This leads to a substantial overcount, an inflation of at least 33% if experience in Massachusetts is any guide. For example, a criminal case that involves motion to suppress, a genuine jury trial, and then an evidentiary sentencing hearing[33] counts as three "trials' although it may involve only one defendant. It is unclear who we're trying

---

[32]<u>But see</u> <u>Phillips</u> v. <u>AWH Corp.</u>, 363 F.3d 1207 (Fed. Cir. 2004), <u>reh'g en banc granted, j. vacated</u> 376 F.3d 1382 (Fed. Cir. 2004), <u>on reh'g en banc</u> 415 F.3d 1303 (Fed. Cir. 2005), suggesting, with its emphasis on the patent claims and specifications, that evidentiary <u>Markman</u> hearings may be on the wane.

[33]These are definitely on the rise in this post-<u>Booker</u> era where judges have more freedom to engage in genuine fact-finding in determining sentences. One such proceeding in this district lasted eleven trial days in order to determine drug quantity. <u>United States</u> v. <u>Osorio-Norena</u> (Crim. A. No. 00-10224-12) & <u>United States</u> v. <u>Arango</u> (Crim. A. No. 00-10224-13) (Lindsay, J.)

to fool with this inaccurate nomenclature - perhaps ourselves.

   Another method of determining our finest trial courts is to look at the hours actually spent in court on trial.  This would seem a pretty good measure of trial culture, professional expertise, and quality of justice.  Using this approach, Massachusetts appears to shine:



This chart, however, shows only that we beat the national average by a substantial margin.   Actually, the District of Massachusetts ranks 12th.   "The highest average number of trial hours for active judges in a district court is 448.0 and the tenth highest is 295.5." Email from Steven Schlesinger to William G. Young (Sept. 26, 2006)

(on file).[34]

Who's on top?  And why?  And how can we learn from their more efficient use of judicial time? These questions cannot presently be answered since the Committee on Judicial Resources has foreclosed the sharing of this data, even within the judiciary, on the ground it would be "misunderstood."  Say what? The very data we ought celebrate and emulate is thus beyond the reach of the courts who could most benefit from it.

A member of Congress, of course, could obtain this information in a heartbeat.  But none ask.  They recognize, if only viscerally, that as the jury trial function of America's great trial court slowly atrophies, so too does its independence and the moral authority to secure the genuine separation of powers envisioned by the Constitution.  See Enwonwu, 376 F. Supp. 2d at 43.

There are, however, hopeful signs.  A somewhat shifting majority of the Supreme Court is emphasizing the constitutional role of the American jury as a bulwark of the judicial role.  United States v. Booker, 125 S.Ct. 738, 746 (2005) (Stevens, J.); Blakely v. Washington, 542 U.S. 296 (2004); Ring v. Arizona, 536 U.S. 584 (2002); Apprendi v. New Jersey, 530 U.S. 466 (2000).  More and more judges, recognizing the inadequacies of the federal six

_____

[34]The District of Massachusetts "is 12th among the 94 district courts, with an average of 281.2 trial hours per active district judge.  These data are based on active judges who have served on the bench the full 2 months ending June 30, 2005." Schlesinger Email.

person civil jury, routinely empanel twelve persons in every civil case.   Prominent examples are Walter Smith, Chief Judge of the Western District of Texas, and my own colleague Douglas Woodlock in the District of Massachusetts.   Every federal judge can do likewise as no rule restricts it.   We all should.   Moreover, courts can celebrate a proper trial culture.   Clearly, the District of Southern Iowa does so.   Mark W. Bennett, et al., <u>Judges' Views on Vanishing Civil Trials</u>, Judicature, 306-309, 312 (May-Jun. 2005).   Likewise, Professor Marc Galanter has called the District of Massachusetts "an island of resistence" to the general turning away from the law. Surely, those courts that lead the way in trial times ought be heard from and supported.

This much I know is true.   Lincoln was right when he said, "We cannot escape history. [It] will light us down, in honor or dishonor, to the latest generation."   Abraham Lincoln, Annual Address to Congress (Dec. 1, 1862).   History will not look kindly on that generation of jurists who acquiesced in the eclipse of our greatest bulwark of personal liberty — the American jury.